No. 25-2382

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

CHRISTOPHER MANHART,
*individually and on behalf of all others similarly situated,*
Plaintiff-Appellant
v.
WESPAC FOUNDATION INC., *et al.,*
Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:24-cv-8209
Judge Mary M. Rowland

Opening Brief and Required Short Appendix
of Appellant Christopher Manhart

HAMILTON LINCOLN LAW INSTITUTE
Theodore H. Frank
1629 K St. NW, Suite 300
Washington, D.C. 20006
(703) 203-3848
ted.frank@hlli.org

*Attorneys for Plaintiff-Appellant Christopher Manhart*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2382

Short Caption: Manhart v. WESPAC Foundation Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Christopher Manhart

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Hamilton Lincoln Law Institute

(3)     If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

N/A

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Theodore H. Frank                Date: August 14, 2025

Attorney's Printed Name:  Theodore H. Frank

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☑  **No** ☐

Address:  1629 K St. NW, Suite 300

Washington, D.C. 20006

Phone Number: 703-203-3848                Fax Number:

E-Mail Address: ted.frank@hlli.org

# Table of Contents

Circuit Rule 26.1 Disclosure ........................................................................... i

Table of Contents ......................................................................................... ii

Table of Authorities .................................................................................... iv

Rules and Statutes and Restatement Sections ....................................... xv

Jurisdictional Statement ............................................................................. 1

Statement of the Issues ............................................................................... 2

Standard of Review ...................................................................................... 3

Statement of the Case .................................................................................. 3

    A.    The A15action campaign successfully conspires to blockade O'Hare
Airport, trapping Manhart and thousands of drivers on I-190. ......................3

    B.    Nonprofit WESPAC acts as the "direct fiscal sponsor" for NSJP ..................5

    C.    Manhart brings a federal class action against the Individual and
Organizational Defendants. ..................................................................6

    D.    The district court dismisses the complaint with prejudice for failure
to state a claim, and finds that Manhart's attorneys violated Rule 11............6

Summary of the Argument ........................................................................... 8

Argument ...................................................................................................... 11

I.    Manhart stated a claim under Illinois law for false imprisonment or, in the
alternative, unlawful restraint of freedom of locomotion. ....................... 11

    A.    Section 36(3) and comment *d* of the *Second Restatement* do not
preclude Manhart's claim ....................................................................14

    B.    The district court erred in finding a reasonable means of escape. ...............20

    C.    That Defendants committed a public nuisance does not preclude a
private claim for false imprisonment. .................................................23

II.    Manhart stated a claim for negligence under Illinois law. ..................... 24

    A.    Manhart may bring a common-law negligence claim based on
intentional acts. ................................................................................25

      B.     The district court erred because Manhart satisfies *prima facie* negligence standard under *Kalata*. ....................................................28

III.    Manhart's derivative in concert, aiding-and-abetting, and conspiracy claims are revived. ................................................................................ 30

IV.    Manhart stated a derivative claim against WESPAC for NSJP's torts. ................. 31

V.    Manhart requests reassignment under Circuit Rule 36............................................ 34

Conclusion ........................................................................................................................ 38

Statement Regarding Oral Argument ............................................................................ 39

Certificate of Compliance with Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 30(d)......... 40

Proof of Service................................................................................................................. 41

# Table of Authorities

<u>Cases</u>

*Adams v. Zayre Corp.,*
    499 N.E.2d 678 (Ill. App. 1986) ...............................................................11, 17

*Adcock v. Brakegate, Ltd.,*
    164 Ill. 2d 54 (Ill. 1994) ...............................................................................31

*AHP Subsidiary Holding Co. v. Stuart Hale Co.,*
    1 F.3d 611 (7th Cir. 1993) ............................................................................35

*Back Doctors Ltd. v. Metropolitan Prop. and Cas. Ins. Co.,*
    637 F.3d 827 (7th Cir. 2011) .........................................................................37

*Bew v. City of Chicago,*
    252 F.3d 891 (7th Cir. 2001) .........................................................................12

*Bier v. Leanna Lakeside Prop. Ass'n,*
    711 N.E.2d 773 (Ill. App. 1999) ....................................................................29

*Bird v. Jones,*
    7 Q.B. 742, 115 Eng. Rep. 668 (1845) ...........................................................15

*Block v. Lohan Assocs., Inc.,*
    645 N.E.2d 207 (Ill. App. 1993) ............................................................. 26-27

*Budinich v. Becton Dickinson & Co.,*
    486 U.S. 196 (1988)........................................................................................1

*Byrne v. Hayes Beer Distrib. Co.,*
    122 N.E.3d 753 (Ill. App. 2018) ....................................................................18

*Cange v. Stotler & Co.,*
    913 F.2d 1204 (7th Cir. 1990) .......................................................................35

*Dixon v. Wash. & Jane Smith Cmty.*,
    No. 17 C 8033, 2018 WL 2445292, 2018 U.S. Dist. LEXIS 90344
    (N.D. Ill. May 31, 2018) ........................................................................ 29-30

*Flores v. AON Corp.*,
    2023 IL App (1st) 230140 ...........................................................................30

*Hale v. Pace*,
    2011 U.S. Dist. LEXIS 35281, 2011 WL 1303369 (N.D. Ill. Mar. 31, 2011) ...............17

*Hartford Accident & Indem. Co. v. Lin*,
    97 F.4th 500 (7th Cir. 2024)........................................................................36

*Heitz v. Hogan*,
    480 N.E.2d 185 (Ill. App. 1985).....................................................................28

*Hess v. Garcia*,
    72 F.4th 753 (7th Cir. 2023) ..........................................................................3

*Iseberg v. Gross*,
    879 N.E.2d 278 (Ill. 2007) .........................................................................12

*Jacobson v. Gen. Fin. Corp.*,
    592 N.E.2d 1121 (Ill. App. 1992) ..................................................................18

*Kalata v. Anheuser-Busch Companies, Inc.*,
    581 N.E.2d 656 (Ill. 1991) ................................................................ 25, 28-29

*Karow v. Student Inns, Inc.*,
    357 N.E.2d 682 (Ill. App. 1976) ...............................................................11, 19

*King v. Mid-State Freight Lines*,
    126 N.E.2d 868 (Ill. App. 1955).....................................................................27

*Krywin v. Chicago Trans. Auth.*,
    938 N.E.2d 440 (Ill. 2010)..........................................................................26

*Kusay v. United States,*
 62 F.3d 192 (7th Cir. 1995) ..................................................................... 34-35

*Lee v. Six Flags Theme Parks, Inc.,*
 10 N.E.3d 444 (Ill. App. 2014) ..................................................................24

*Liljeberg v. Health Servs. Acquisition Corp.,*
 486 U.S. 847 (1988)....................................................................................35

*Lopez v. Winchell's Donut House,*
 466 N.E.2d 1309 (Ill. App. 1984) ..............................................................11

*Marcano v. Nw. Chrysler-Plymouth Sales, Inc.,*
 550 F. Supp. 595 (N.D. Ill. 1982) ......................................................7, 21-22

*Marshall v. Burger King Corp.,*
 856 N.E.2d 1048 (Ill. 2006) .......................................................................24

*Mathias v. Accor Econ. Lodging, Inc.,*
 347 F.3d 672 (7th Cir. 2003) ......................................................................37

*McCarter v. Ret. Plan for the Dist. Managers of the Am. Family Ins. Grp.,*
 540 F.3d 649 (7th Cir. 2008) ........................................................................1

*McCoy v. McCoy,*
 591 N.E.2d 124 (Ill. App. 1992) ....................................................25, 28, 29

*M.D. v. Abbott,*
 119 F.4th 373 (5th Cir. 2024).................................................................35-36

*Meerbrey v. Marshall Field & Co.,*
 564 N.E.2d 1222 (1990)..............................................................................11

*Midwest Sanitary Serv. v. Sandberg,*
 211 N.E.3d 448 (Ill. 2022).........................................................................20

*Morris v. Faulkner,*
    361 N.E.2d 112 (Ill. App. 1977) ...................................................................11-12, 17-19

*New York ex rel. TZAC, Inc. v. New Isr. Fund,*
    520 F. Supp. 3d 362 (S.D.N.Y. 2021)...........................................................................33

*Noyola v. Bd. of Educ.,*
    688 N.E.2d 81 (Ill. 1997)............................................................................................29

*Olson v. Ferrara Candy Co.,*
    2025 IL App (1st) 241126 ...........................................................................................30

*Osman v. Ford Motor Co.,*
    833 N.E.2d 1011 (Ill. App. 2005) ...............................................................................18

*Otis v. City of Chicago,*
    29 F.3d 1159 (7th Cir 1994) (en banc)...........................................................................1

*Palausky v. Landers,*
    385 N.E.2d 751 (Ill. App. 1978) ............................................................................25-26

*Perrin v. United States,*
    444 U.S. 37 (1979)......................................................................................................20

*Pilotto v. Urb. Outfitters W., L.L.C.,*
    72 N.E.3d 772 (Ill. App. 2017) ...................................................................................24

*Pratt Cent. Park Ltd. v. Dames & Moore,*
    60 F.3d 350 (7th Cir. 2001) ........................................................................................37

*Prop. Unlimited, Inc. Realtors v. Cendant Mobility Servs.,*
    384 F.3d 917 (7th Cir. 2004) ........................................................................................1

*Randall v. Lemke,*
    726 N.E.2d 183 (Ill. App. 2000) ...............................................................................11,

*Robinson v. Miller*,
    1985 Ill. App. LEXIS 2179 (Ill. App. 1985) ................................................... 11, 17-19, 36

*Rodgers v. St. Mary's Hosp. of Decatur*,
    556 N.E.2d 913 (Ill. App. 1990),
    *aff'd*, 597 N.E.2d 616 (Ill. 1992) ................................................................................. 29

*Schultz v. Siddens*,
    548 N.E.2d 87 (Ill. App. 1989) ........................................................................... 25, 28

*Scott v. Aldi, Inc.*,
    703 N.E.2d 526 (Ill. App. 1998) .............................................................................. 27

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ................................................................................................. 18

*Simpkins v. CSX Transp., Inc.*,
    965 N.E.2d 1092 (Ill. 2012) ......................................................................... 26, 32-34

*Smith v. First Hosp. Labs., Inc.*,
    77 F.4th 603 (7th Cir. 2023) ...................................................................................... 3

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ................................................................................................. 24

*In re Stericycle Sec. Litig.*,
    35 F.4th 555 (7th Cir. 2022) .................................................................................... 40

*Tinder v. Ill. Power Co.*,
    758 N.E.2d 483 (Ill. App. 2001) .............................................................................. 28

*Topps v. Ferraro*,
    601 N.E.2d 292 (Ill. App. 1992) ......................................................................... 26-27

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471, 495 (2023) ......................................................................................... 12

*United States v. Billups,*
    536 F.3d 574 (7th Cir. 2008) ...........................................................12

*United States v. Microsoft Corp.,*
    56 F.3d 1448 (D.C. Cir. 1995).................................................... 35-36

*Watkins v. Schmitt,*
    665 N.E.2d 1379 (Ill. 1996) ...........................................................28

*Whittaker v. Honegger,*
    674 N.E.2d 1274 (Ill. App. 1996) ...................................................27

*Widlowski v. Durkee Foods,*
    562 N.E.2d 967 (Ill. 1990) .............................................................26

*Yee v. City of Escondido,*
    503 U.S. 519 (1992).......................................................................12

*Ziarko v. Soo Line R.R. Co.,*
    641 N.E.2d 402 (Ill. 1994) ........................................................ 25-27

<u>Rules and Statutes and Constitutional Provisions</u>

26 U.S.C. § 501(c)(3) ................................................. 2, 5, 31, 33-34

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 1332(d)(2)................................................................1, 37

28 U.S.C. § 1332(d)(4)....................................................................1

625 ILCS 5/1-101.05 ...................................................................19, 37

625 ILCS 5/1-217 ...........................................................................20

625 ILCS 5/4-201 ............................................................................................ 19-20

625 ILCS 5/4-201(a) ...........................................................................................21, 36

625 ILCS 5/4-201(b) .............................................................................................20

625 ILCS 5/4-203 .................................................................................................37

625 ILCS 5/4-203(a) .............................................................................................21

625 ILCS 5/4-203(b) .............................................................................................20

625 ILCS 5/4-203(d) .............................................................................................21

625 ILCS 5/4-203(g)(2) .........................................................................................21

625 ILCS 5/4-209 .................................................................................................20

625 ILCS 5/11-1303(a)(1)(j) ...............................................................................21, 37

625 ILCS 5/11-1416 ........................................................................................ 25, 27-29

625 ILCS 5/11-1418 .............................................................................................25

740 ILCS 14/20 ...............................................................................................29-30

Cir. R. 36 ...............................................................................................2, 11, 35, 38

Fed. R. App. Proc. 4(a)(1)(A) ...................................................................................1

Fed. R. Civ. Proc. 8(d)(3) .......................................................................................27

Fed. R. Civ. Proc. 11 ...................................................................................... 6, 8, 35-36

Fed. R. Civ. Proc. 12(b)(1) .......................................................................................37

Fed. R. Civ. Proc. 12(b)(6) .......................................................................................6

Fed. R. Civ. Proc. 23(a)(4)..............................................................................37

Fed. R. Civ. Proc. 58 ......................................................................................1

Ill. Sup. Ct. R. 23,
    494 N.E.2d 957 (1982)........................................................................18, 36

Ill. Sup. Ct. R. 23(e) (1994) ...............................................................17-18, 36

U.S. Const., Art. III........................................................................................1

Other Authorities

A15action website (Mar. 27, 2024 archive by archive.org),
    archived Mar. 27, 2025, at https://archive.ph/uZWfO ................................3

A15EconomicBlockade X account, Mar. 25, 2024 post,
    archived Jan. 27, 2025, at https://archive.ph/OafaK ..................................3

57A Am. Jur. 2d Negligence § 29 .................................................................25

American Law Institute webpage,
    https://www.ali.org/project/torts-intentional-torts-persons....................12

Colvin, Gregory T., and Stephanie L. Petit,
    Fiscal Sponsorship: 6 Ways to Do It Right (3d ed. 2019)......................5, 31-32, 34

Editorial Board,
    The Anthem Class-Action Con,
    Wall St. J. (Feb. 11, 2018) .........................................................................40

First Amended Master Consol. Class Action Compl., In re East Palestine Train
    Derailment, Dkt. 138, No. 4:23-cv-00242 (N.D. Ohio Aug. 14, 2023)........................23

Fortgang, Tal,
    *The Rise of Civil Terrorism*,
    CITY J. (Winter 2025) ............................................................... 37-39

Heytens, Toby J.,
    *Reassignment*,
    66 STAN. L. REV. 1 (2014) ............................................................34

IRS PLR 201712014 (Mar. 24, 2017) .............................................33

IRS PLR 201740022 (Oct. 6, 2017) ............................................5, 33

IRS Pub. 5781 (Rev. 2-2024) ..........................................................33

Landes, William M., and Richard A. Posner,
    *An Economic Theory of Intentional Torts*,
    1 INT'L REV. L. & ECON. 127 (1981) ..............................................24

OTTLEY, BRUCE L., *et al.*,
    ILLINOIS TORT LAW § 2.03 (4th ed. 2024) ...............................11, 18

OTTLEY, BRUCE L., *et al.*,
    ILLINOIS TORT LAW § 2.05 (4th ed. 2024) .........................12, 17, 18

OTTLEY, BRUCE L., *et al.*,
    ILLINOIS TORT LAW § 14.04 (4th ed. 2024) ...............................26-27

PROSSER, WILLIAM L.,
    HANDBOOK OF THE LAW OF TORTS (4th ed. 1971) ........................12

RESTATEMENT (SECOND) TORTS § 36 ..................................16-17, 22

RESTATEMENT (SECOND) TORTS § 36, comment *a* ........7, 8-9, 12-13, 15, 21

RESTATEMENT (SECOND) TORTS § 36, comment *c* .................................15

RESTATEMENT (SECOND) TORTS § 36, comment *d* .................6-7, 14-15, 18-19

RESTATEMENT (SECOND) TORTS § 36, Illustration 2 ........................................................9, 13, 17

RESTATEMENT (SECOND) TORTS § 36, Illustration 3 .......................................9-10, 13-14, 16-17

RESTATEMENT (SECOND) TORTS § 36, Illustration 4 ............................................. 9, 12-14, 17, 21

RESTATEMENT (SECOND) TORTS § 36, Illustration 5 .......................................9-10, 13-14, 16-17

RESTATEMENT (SECOND) TORTS § 36, Illustration 9 ..................................................9, 13, 15, 17

RESTATEMENT (SECOND) TORTS § 36, Illustration 10 ...................................................................15

RESTATEMENT (SECOND) TORTS § 36, Illustration 11 ...................................................................15

RESTATEMENT (SECOND) TORTS § 36(1) ......................................................................................15

RESTATEMENT (SECOND) TORTS § 36(3) ..........................................................6, 12, 14-15, 17-19

RESTATEMENT (SECOND) TORTS § 37 ......................................................................................8, 16

RESTATEMENT (SECOND) TORTS § 43 ...........................................................................................16

RESTATEMENT (SECOND) TORTS § 43, comment *a*...................................................................16

RESTATEMENT (SECOND) TORTS § 500 ..........................................................................................26

RESTATEMENT (SECOND) TORTS § 931 ..........................................................................................30

RESTATEMENT (SECOND) TORTS § 931(a) ......................................................................................30

RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 7,
    comment *a* (Tentative Draft No. 3) ...................................................................................12

RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 8
    (Tentative Draft No. 3) ...............................................................................................12, 14

RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 8,
    comment *b* (Tentative Draft No. 3) ...............................................................................12, 17

RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 8,
   comment *e* (Tentative Draft No. 3) .............................................................................22

RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 8,
   comment *h* (Tentative Draft No. 3) ................................................................. 12-13, 22

RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 8(c)
   (Tentative Draft No. 3) ...........................................................................................12, 22

RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 10
   (Tentative Draft No. 1) (formerly § 110) ....................................................................16

Rev. Rul. 68-489,
   1968-2 C.B. 210 ...........................................................................................................33

Riley, Jason L.,
   *If Police Won't Back Up 'Mr. Brooklyn,' Maybe a Lawyer Will,*
   WALL ST. J. (Jan. 24, 2024)...........................................................................................40

# Rules and Statutes and Restatement Sections

## Federal Rule of Civil Procedure 8. General Rules of Pleading.

(a) CLAIM FOR RELIEF. A pleading that states a claim for relief must contain:

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

…

(d) PLEADING TO BE CONCISE AND DIRECT; ALTERNATIVE STATEMENTS; INCONSISTENCY.

…

(2) *Alternative Statements of a Claim or Defense*. A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.

(3) *Inconsistent Claims or Defenses*. A party may state as many separate claims or defenses as it has, regardless of consistency.

(e) CONSTRUING PLEADINGS. Pleadings must be construed so as to do justice.

## Illinois Supreme Court Rule 23

### Effective April 1, 1982

(494 N.E.2d 957)

A case shall be disposed of by opinion when a majority of the panel deciding the case determines that (1) the case involves an important new legal issue or modifies or

questions an existing rule of law; or (2) the decision considers a conflict or apparent conflict of authority within the appellate court; or (3) the decision is of substantial public interest; or (4) the opinion constitutes a significant contribution to legal literature by either an historical review of law or by describing legislative history. Regardless of whether any one of the above criteria has been met, whenever a concurring or dissenting opinion is proposed to filed, the case shall be disposed of by opinion unless the panel unanimously decides otherwise. In that event, the case shall be disposed of by order and the fact of concurrence or dissent may be noted. In all cases disposed of by opinion, the opinion or opinions shall be published.

All cases not required by the foregoing paragraph to be disposed of by opinion shall be disposed of by a written order which shall succinctly state the facts, the contentions of the parties, the reasons for the decision, the disposition, and the names of the participating judges. Orders are not precedential and will not be published. They may be involved, however, to support contentions such as double jeopardy, res judicata, collateral estoppel, or the law of the case. When so invoked, a copy of the order shall be furnished to other counsel and the court.

## Illinois Supreme Court Rule 23

### Effective June 27, 1994

The decision of the Appellate Court may be expressed in one of the following forms: a full opinion, a concise written order, or a summary order conforming to the provisions of this rule. All dispositive opinions and orders shall contain the names of the judges who rendered the opinion or order. Only opinions of the court will be published.

**(a) Opinions.** A case may be disposed of by an opinion only when a majority of the panel deciding the case determines that at least one of the following criteria is

satisfied, subject to the limitations contained in the accompanying administrative order: (1) the decision establishes a new rule of law or modifies, explains or criticizes an existing rule of law; or (2) the decision resolves, creates, or avoids an apparent conflict of authority within the Appellate Court.

**(b) Written Order.** Cases which do not qualify for disposition by opinion may be disposed of by a concise written order which shall succinctly state: (1) the germane facts; (2) the issues and contentions of the parties when appropriate; (3) the reasons for the decision; and (4) the judgment of the court.

**(c) Summary Order.** In any case in which the panel unanimously determines that any one or more of the following dispositive circumstances exist, the decision of the court may be made by summary order. …

…

**(e) Effect of Orders.** An unpublished order of the court is not precedential and may not be cited by any party except to support contentions of double jeopardy, res judicata, collateral estoppel or law of the case. When cited for these purposes, a copy of the order shall be furnished to all other counsel and the court.

## 625 ILCS 5/ - Illinois Vehicle Code.

## Chapter 1 - Title And Definitions

(625 ILCS 5/1-101) (from Ch. 95 1/2, par. 1-101)

Sec. 1-101. Definition of words and phrases. The following words and phrases when used in this Code shall, for the purpose of this Code, have the meanings respectively ascribed to them in this Chapter, except when the context otherwise requires and except where another definition set forth in another Chapter of this Code and applicable to that Chapter or a designated part thereof is applicable.

…

(625 ILCS 5/1-101.05)

Sec. 1-101.05. Abandoned vehicle. For the purposes of Chapter 4, "abandoned vehicle" means any vehicle in a state of disrepair rendering the vehicle incapable of being driven in its condition or any vehicle that has not been moved or used for 7 consecutive days or more and is apparently deserted.

(Source: P.A. 90-89, eff. 1-1-98.)

…

(625 ILCS 5/1-111.1) (from Ch. 95 1/2, par. 1-111.1)

Sec. 1-111.1. Chapter. The word "Chapter" as used in this Code shall, unless the context otherwise clearly indicates, mean a Chapter of "The Illinois Vehicle Code".

(Source: P.A. 82-123.)

…

(625 ILCS 5/1-217) (from Ch. 95 1/2, par. 1-217)

Sec. 1-217. Vehicle. Every device, in, upon or by which any person or property is or may be transported or drawn upon a highway or requiring a certificate of title under Section 3-101(d) of this Code, except devices moved by human power, devices used exclusively upon stationary rails or tracks, and snowmobiles as defined in the Snowmobile Registration and Safety Act.

For the purposes of this Code, unless otherwise prescribed, a device shall be considered to be a vehicle until such time it either comes within the definition of a junk vehicle, as defined under this Code, or a junking certificate is issued for it.

…

(Source: P.A. 102-1130, eff. 7-1-23.)

…

## Chapter 4 - Anti-Theft Laws and Abandoned Vehicles

…

(625 ILCS 5/4-101) (from Ch. 95 1/2, par. 4-101)

Sec. 4-101. Applicability of this Chapter.

The provisions of this Chapter apply to all vehicles.

…

(625 ILCS 5/4-201) (from Ch. 95 1/2, par. 4-201)

Sec. 4-201. Abandonment of vehicles prohibited.

(a) The abandonment of a vehicle or any part thereof on any highway in this State is unlawful and subject to penalties as set forth under Penalty Section 4-214 of this Chapter.

…

(Source: P.A. 90-330, eff. 8-8-97.)

…

(625 ILCS 5/4-203) (from Ch. 95 1/2, par. 4-203)

(Text of Section from P.A. 103-154)

Sec. 4-203. Removal of motor vehicles or other vehicles; towing or hauling away.

(a) When a vehicle is abandoned, or left unattended, on a toll highway, interstate highway, or expressway for 2 hours or more, its removal by a towing service may be authorized by a law enforcement agency having jurisdiction.

…

(d) When an abandoned, unattended, wrecked, burned, or partially dismantled vehicle is creating a traffic hazard because of its position in relation to the highway or its physical appearance is causing the impeding of traffic, its immediate removal from the highway or private property adjacent to the highway by a towing service may be authorized by a law enforcement agency having jurisdiction.

…

(g)     (1) …

(2) When a vehicle removal from either public or private property is authorized by a law enforcement agency, the owner of the vehicle shall be responsible for all towing and storage charges.

(3) Vehicles removed from public or private property and stored by a commercial vehicle relocator or any other towing service authorized by a law enforcement agency in compliance with this Section and Sections 4-201 and 4-202 of this Code … shall be subject to a possessor lien for services …

…

…

(Source: P.A. 102-982, eff. 7-1-23; 103-154, eff. 6-30-23.)

…

(625 ILCS 5/4-214) (from Ch. 95 1/2, par. 4-214)

Sec. 4-214. Violations of Section 4-201.

(a) Any person who violates Section 4-201 of this Code or who aids and abets in that violation:

(1) shall be subject to a mandatory fine of $200; and

(2) shall be required by the court to make a disposition on the abandoned or unclaimed vehicle and pay all towing, storage, and processing charges and collection costs pursuant to Section 4-203, subsections (a) and (e).

…

## Chapter 11 – Rules Of The Road

…

(625 ILCS 5/11-1416) (from Ch. 95 1/2, par. 11-1416)

Sec. 11-1416. Obstructing person in highways. No person shall wilfully and unnecessarily hinder, obstruct or delay, or wilfully and unnecessarily attempt to delay, hinder or obstruct any other person in lawfully driving or traveling along or upon any highway within this State or offer for barter or sale merchandise on said highway so as to interfere with the effective movement of traffic.

(Source: P.A. 80-911.)

…

RESTATEMENT OF THE LAW

(Second)

Torts 2d

VOLUME 1

DIVISION ONE

INTENTIONAL HARMS TO PERSONS, LAND, AND CHATTELS

…

Chapter 2

INTENTIONAL INVASIONS OF INTERESTS IN PERSONALITY

…

TOPIC 4. THE INTEREST IN FREEDOM FROM CONFINEMENT

…

## § 36. What Constitutes Confinement

**(1)     To make the actor liable for false imprisonment, the other's confinement within the boundaries fixed by the actor must be complete.**

**(2)      The confinement is complete although there is a reasonable means of escape, unless the other knows of it.**

**(3)      The actor does not become liable for false imprisonment by intentionally preventing another from going in a particular direction in which he has a right or privilege to go.**

See Reporter's Notes

**Comment:**

*a. Means of escape.* If the actor knows of an avenue of escape, he cannot intend to imprison the other by closing all the other exits unless he believes that the other is unaware of the available avenue of escape.  Since the actor has intended to imprison the other, the other is not required to run any risk of harm to his person or to his chattels or of subjecting himself to any substantial liability to a third person in order to relieve the actor from a liability to which his intentional misconduct has subjected him.  So too, even though there may be a perfectly safe avenue of escape, the other is not required to take it if the circumstances are such as to make it offensive to a reasonable sense of decency or personal dignity.

On the other hand, it is unreasonable for one whom the actor intends to imprison to refuse to utilize a means of escape of which he is himself aware merely because it entails a slight inconvenience or requires him to commit a technical invasion of another's possessory interest in land or chattels which subjects him at most to the risk of an action for nominal damages which in practice is seldom if ever brought.

**Illustrations:**

1.      A locks B, an athletic young man, in a room with an open window at a height of four feet from the floor and from the ground outside. A has not confined B.

2.      A locks B, who is suffering from a disease which makes any considerable exertion dangerous to him, in such a room as supposed in Illustration 1. A has confined B.

3.      A closes every exit from a place where B is except one, which B can use only by doing some act which would threaten C with substantial bodily harm. A has confined B.

4.      A closes every exit except one, the use of which would involve material harm to B's clothing.  A has confined B.

5.      A is naked in a Turkish bath. B locks the door into the dressing room but leaves open the door to the general waiting room where persons of both sexes are congregated. B has confined A.

...

*c.* If the actor by force or threats of force, or by exerting legal authority, compels another to accompany him from place to place, he has as effectively confined the other as though he had locked him in a room.  So too, the fact that the place of confinement is itself in constant motion, as where the other against his will is forcibly made to go on a sea voyage, does not prevent his confinement from being actionable under the rule stated in § 35.

**Illustration:**

9.      A, a young man, takes B, a girl, for a ride in his car, and offers indecent liberties.  A refuses to allow B to leave the car unless she consents, and drives her several miles.  A has confined B.

*d. Blocking highway.*  In order to make the actor liable for false imprisonment under the rule stated in § 35, it is necessary that he shall have confined another in a particular area, the boundaries of which are fixed by the will of the actor.  It is not enough that the other's freedom of movement has been improperly restricted.  Thus, one who blocks off

a highway, intending to prevent the public from passing along it, is not liable for false imprisonment to one whose privilege to use the highway has been thus denied. Indeed, the actor does not incur any liability by so doing, since the public is merely privileged to travel the public highways and has not a right to do so; that is, the interest of the members of the public in such travel is not protected by a right of action in them. The actor, in such a case, incurs liability only to the municipality whose highways are thus impeded, unless by blocking the highway he deprives an abutting owner of access for himself and others to his premises. In the latter case the other has a right of access to his house for himself and those whom he chooses for business or social purposes to admit thereto, and therefore the obstruction of a highway is an actionable wrong to him. See, as to private action for public nuisance, §§ 821 B and 821 C.

**Illustrations:**

10. A piles building materials on a public highway in front of the driveway into B's factory. There are exits from the factory by which B and his workmen can leave, but the driveway is the only way in which his raw material can be brought into the factory and the finished product taken out. The building materials are allowed to remain on the highway for three days, during which the traveling public are forced to make a detour around them. B may recover for the deprivation of the access and egress to his factory and the injury to his business so occasioned. C, a member of the traveling public, who is merely forced to make a detour, cannot recover against A.

11. A unlawfully encloses a part of the highway. B enters the enclosure, and A prevents him from passing out of it on the other side, but puts no obstacle in the way of his leaving by the way in which he entered. This is

not an actionable confinement of B, though B has the right or privilege of an unobstructed passage along the highway.

**REPORTER'S NOTES**

…

Illustration 11 is taken from *Bird v. Jones*, 7 Q.B. 742, 115 Eng. Rep. 668 (1845). *Cf. Crossett v. Campbell*, 122 La. 659, 48 So. 141, 20 L.R.A. N.S. 967, 129 Am. St. Rep. 362 (1909), expulsion from premises; *Marrone v. Washington Jockey Club*, 35 App. D.C. 82 (1910), *affirmed*, 227 U.S. 633, 57 L. Ed. 679, 33 S. Ct. 401, 43 L.R.A. N.S. 961, refusal of admission to race track; *Martin v. Lincoln Park West Corporation*, 219 F.2d 622 (7 Cir. 1955), locking plaintiff out of room; *Great Atlantic & Pacific Tea Co. v. Billups*, 253 Ky. 126, 69 S.W.2d 5 (1934), stopping plaintiff.

…

**§ 37. Confinement: How Caused**

**If an act is done with the intent to confine another, and such act is the legal cause of confinement to another, it is immaterial whether the act directly or indirectly causes the confinement.**

**Comment:**

*a.*  If the actor's intention is to confine another, it is immaterial that the manner in which his intention is carried out is indirect rather than direct. Thus, one who digs a pitfall in another's path is as fully liable if the other falls into it and is unable to get out, as if he had thrown the other into the pit. …

…

**§ 43. Act Intended to Affect Third Parties**

**If an act done with the intention of affecting a third person imposes a confinement upon another, the actor is subject to liability to such other as fully as though it were intended so to affect him.**

**Comment:**

*a.* To make the actor liable for false imprisonment under the rule stated in § 35, it is not necessary that his act be done with the intention of imposing a confinement upon the other. It is enough if he intends to confine a third person and the other is in fact confined.

**Illustration:**

1. A and B are in a room. C has no reason to know and does not know of B's presence in the room. C locks the door for the purpose of confining A. C is subject to liability to B.

RESTATEMENT OF THE LAW THIRD

TORTS: INTENTIONAL TORTS TO PERSONS

Draft

Chapter 1

Definitions of Intentional Torts to Persons; Transferred Intent

§ 7 False Imprisonment: General Definition (T.D. No. 4) (approved 2019)

An actor is subject to liability to another for false imprisonment if:

(a) the actor intends to confine the other within a limited area, or the actor's intent is sufficient under § 11 (transferred intent);

(b) the actor's affirmative conduct causes a confinement of the other, as provided in §§ 8 and 9, or the actor fails to release the other from a confinement despite owing a duty to do so; and

(c) the other is aware that he or she is confined or the other suffers bodily harm as a result of the confinement.

**Comment:**

…

*c. Intent to confine.* … Many jurisdictions follow Restatement Second, Torts §§ 35(1)(a) and 36 in employing the language "boundaries fixed by the actor," to describe the necessary confinement and the necessary intent to confine. This Restatement uses the language "limited area" instead. It is not quite accurate to say that the actor must "fix" the boundaries within which the plaintiff is confined (or that the actor must intend a confinement of that nature). Rather, it is sufficient that the actor precludes the plaintiff's exit from a limited or circumscribed area, even if nature or another person created those limits. …

*d. Transferred intent.* … Transferred-intent doctrines extend an actor's liability beyond that specified in this Section. First, the actor's intent to confine a third party may be sufficient for false-imprisonment liability, even if the actor did not have the intent to confine the plaintiff. …

…

## § 8. False Imprisonment: What Constitutes a Confinement (T.D. No. 3) (approved 2018) (formerly § 108)

An actor confines another within the meaning of § 7(b) if:

(a) the actor employs physical barriers that preclude, or appear to preclude, the other from exiting the area of confinement, and the other is unaware of a readily available and safe means of exit;

(b) the actor employs physical force or restraint, or the actor makes an express or implied threat of immediate physical force or restraint, and the other submits to the force, restraint, or threat rather than exiting the area of confinement;

**(c) the actor causes duress, other than by a threat of force or of restraint, and the other submits to the duress rather than exiting the area of confinement; or**

**(d) the other submits to the actor's assertion of legal authority … .**

**Comment:**

…

*b. Confinement general considerations.* … In most false-imprisonment cases, the confinement consists of preventing the plaintiff from exiting a limited area that he or she already occupies. Accordingly, this Section refers to whether the plaintiff's freedom to "exit" an area has been improperly restricted. However, false imprisonment also occurs if the actor compels the person to move or travel in a highly restricted way … In such cases, too, the restriction of the person's freedom to leave the company of the actor or to exit the vehicle is embraced within this Section.

A number of cases approvingly cite the statement, from Restatement Second, Torts § 36(3), that "the actor does not become liable for false imprisonment by intentionally preventing another from going in a particular direction in which he has a right or privilege to go." This statement is accurate in most circumstances, but not all. Unlawfully preventing a person from entering a store or even his own house is not false imprisonment, because the person retains substantial freedom of movement. … However, if a person desires to go in a particular direction that is the *only* means of exit then available, an actor who prevents the person from proceeding in that direction is subject to liability for false imprisonment.

**Illustration:**

1. Y can exit from a deep well only by climbing a ladder. X removes the ladder, knowing that this is Y's only means of exit. X has confined Y.

…

*c. Physical and temporal scope of confinement.* The physical scope of confinement in most cases is relatively small—a room, a house, a prison cell, a moving automobile, a mental institution. But confinement even within a substantial area, such as a city, sufficiently interferes with the other's freedom of movement to warrant liability. Liability should be denied only when the area of confinement is so large that the interference with the other's freedom is de minimis. …

The temporal scope of confinement can be very brief. If D grabs P by the arm against P's will, refusing to let P go, that is sufficient for false imprisonment, even if P breaks free in less than a minute. …

*e. Confinement by actual or apparent physical barriers.* Without making a threat or demanding submission to a claim of legal authority, an actor can, as stated in Subsection (a), effectively confine a person by establishing a physical barrier that precludes the person's exit. …

Whether a physical barrier amounts to a confinement depends not only on whether an alternative means of exit exists, but also on whether it would be safe to take that exit. If the use of an alternative exit would expose the plaintiff to any risk of physical harm, the plaintiff need not take such a risk. In these circumstances, if the plaintiff declines to use that avenue of escape, the actor remains subject to liability for false imprisonment.

**Illustrations:**

7. D intentionally locks P in a ground-floor room with an open window at a height of two feet from the floor that P can easily climb through. P knows that if he were to exit through the window, he could easily let himself down safely to the ground outside. D has not confined P.

8. Same facts as Illustration 7, except P knows that if he were to exit through the window, he would be required to jump or drop eight feet to the ground outside. D has confined P.

…

*h. Confinement by causing duress.* Under Subsection (c), if the actor causes duress to the other that induces the other to remain in a confined area, and the duress is sufficiently coercive that the other's submission to it does not amount to legally effective consent, then the other has been confined. The general criterion for when such duress is sufficient to invalidate the consent is set forth in § 15(c) and Comment *d*.

… Confinement is also established if the actor places the plaintiff in a situation in which the plaintiff would face any other significant burden or detriment if the plaintiff were to leave the area. …

The Restatement Second, Torts § 36 addresses within a different category some cases that this Restatement characterizes as duress. Under § 36, a confinement must be "complete" and does not qualify as complete if the plaintiff knows that he has a "reasonable means of escape." Comment *a* to that Section states that a known means of exit is not "reasonable" if it would require the plaintiff to "run any risk of harm to . . . his chattels" or if, under the circumstances, taking the avenue of escape would be "offensive to a reasonable sense of decency or personal dignity." This Restatement instead treats such cases as instances of duress, because they involve the actor wrongfully putting the plaintiff to an unpalatable choice.

…

…

## § 11. Transferred Intent  (T.D. No. 1) (approved 2015) (formerly § 110)

**(a) For purposes of liability for battery, purposeful infliction of bodily harm, assault, or false imprisonment, the intent requirement for the tort is satisfied if the**

actor intends to cause the relevant tortious consequence to a third party, rather than to the plaintiff, but the actor's conduct causes that consequence to the plaintiff.

…

## Chapter 2
## Consent

…

### § 15. Actual Consent: Requirements of Capacity, Absence of Duress, and Absence of Substantial Mistake  (T.D. No. 4) (approved 2019)

**A person does not actually consent to the actor's conduct if any of the following circumstances exists:**

**…**

> **(b) The person gives consent because of duress caused by the actor; …**
>
> **…**

**Comment:**

…

> *d. Duress caused by the actor. …*

… If a person submits to confinement in order to avoid a threat that is serious enough to count as duress, then two legal consequences follow: the person does not actually consent to the confinement, and the submission constitutes a confinement for which the actor is subject to liability. …

…

## Jurisdictional Statement

The district court had jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class-action controversy exceeding the value of $5,000,000, exclusive of interest and costs, and members of the class are citizens of a State different than at least one of the Defendants. Manhart is a citizen of Indiana, and Defendant Rifqa Falaneh, for example, is a citizen of Illinois. Manhart's proposed class action on behalf of a class of thousands of non-Illinois drivers sought over $5 million in damages. A48 ¶ 10; A66.[1] Because the proposed class excludes Illinois citizens, 28 U.S.C. § 1332(d)(4) does not apply. Manhart has Article III standing. A29.

This Court has jurisdiction under 28 U.S.C. § 1291, which provides jurisdiction over appeals from all final decisions of district courts. The district court issued an opinion and order dismissing Manhart's Second Amended Complaint with prejudice and an order terminating the case on August 7, 2025. A1, A41. This is a final decision despite the lack of formal compliance with Rule 58. *Otis v. City of Chicago*, 29 F.3d 1159, 1166 (7th Cir. 1994) (en banc); *Props. Unlimited, Inc. v. Cendant Mobility Servs.*, 384 F.3d 917, 919 (7th Cir. 2004). Manhart filed a timely notice of appeal on August 8, 2025. A42; *see* Fed. R. App. Proc. 4(a)(1)(A).

The district court also issued a non-final decision on sanctions against Manhart's attorneys in the same August 7 orders and opinion. The sanctioned attorneys plan to appeal if and when that decision becomes final. *See generally McCarter v. Ret. Plan for the Dist. Managers of the Am. Family Ins. Grp.*, 540 F.3d 649, 653-54 (7th Cir. 2008). The existence of the non-final sanctions decision does not affect the finality of the dismissal. *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196 (1988).

---

[1] "Axyz" refers to page xyz of Manhart's Appendix in this appeal. "Dkt." refers to docket entries in the district court below.

**Statement of the Issues**

The "A15action" campaign, according to its own public statements, conspired "to coordinate a multi-city economic blockade" on April 15, 2024, to "cause pain to the economy" and "to disrupt and blockade economic logistical hubs and the flow of capital." In Chicago, that consisted of a coordinated effort by dozens of individuals, supported by a number of NGOs, to descend upon Interstate 190 during rush hour at the approach to O'Hare International Airport, chaining themselves together in a PVC-tubed "sleeping dragon," and, in violation of Illinois law against "interfer[ing] with the effective movement of traffic," causing a massive traffic jam for hours that trapped thousands of commuters on the roads against their will. Christopher Manhart, a driver trapped in his car by the blockade, missed a flight and a business meeting as a result, and sued.

1.      Did the district court err in dismissing Manhart's complaint for failure to state a claim under Illinois law?

2.      Federal tax law permits a 501(c)(3) nonprofit to act as a fiscal sponsor of a project or organization that does not have 501(c)(3) status, thus permitting the latter to receive tax-deductible contributions from third parties, so long as the sponsor retains control and discretion of the funding to ensure its charitable use. Is a direct fiscal sponsor liable as a matter of law for the torts of a beneficiary that does not have its own independent corporate structure?

In the alternative, did the district court err in holding that there is no duty under Illinois law for a direct fiscal sponsor to supervise a beneficiary that does not have its own independent corporate structure when the district court failed to apply the Illinois test for whether duty exists?

3.      Do the district court's errors justify reassignment on remand under Circuit Rule 36?

**Standard of Review**

A dismissal on the pleadings for failure to state a claim is reviewed *de novo*, accepting the factual allegations in the complaint as true and drawing reasonable inferences in plaintiff's favor. *E.g.*, *Smith v. First Hosp. Labs., Inc.*, 77 F.4th 603, 607 (7th Cir. 2023); *Hess v. Garcia*, 72 F.4th 753, 756-57 (7th Cir. 2023).

**Statement of the Case**

**A.     The A15action campaign successfully conspires to blockade O'Hare Airport, trapping Manhart and thousands of drivers on I-190.**

The "A15action" campaign, according to its own website, conspired "to coordinate a multi-city economic blockade" in dozens of cities on April 15, 2024, to "cause pain to the economy" and "to disrupt and blockade economic logistical hubs and the flow of capital." A61 ¶ 57. As early as March 25, A15action identified Chicago as a target in the "multi-city economic blockade to block the arteries of capitalism and jam the wheels of production." Dkt.91 at 4 (citing https://archive.ph/OafaK (last accessed Oct. 3, 2025) (noting blockade would be "coordinated")). On March 27, the conspiracy stated that the "aim" of a "blockade [of] major choke points" was "causing the most economic impact." *Id.* (citing https://archive.ph/uZWfO (last accessed Oct. 3, 2025)). Participants in the conspiracy agreed not to talk to the police "about our actions or our fellow organizers." *Id.*

In Chicago, the conspiracy manifested as a rush-hour blockade of the interstate highway into O'Hare International Airport. The four Individual Defendants (Jinan Chehade, Rifqa Falaneh, Superior Murphy, and Simone Tucker), along with three dozen compatriots, descended upon I-190 as it approaches the terminals at O'Hare. Twenty or so chained themselves together to form a wall blocking the road, covering the connecting chains with PVC tubing. This contraption, called a "sleeping dragon," has

the intended effect of making it difficult and time-consuming for law enforcement to remove activists from blocking a road without physically injuring participants. A47 ¶ 3. The result was a massive traffic jam that lasted over two hours, trapping thousands of commuters in their vehicles against their will and depriving them of their liberty and freedom of movement. A47-A48 ¶¶ 6-7. Gridlocked drivers could not exit the freeway forwards, backwards, or sideways, and could not legally leave their cars on the freeway and walk away. A65 ¶ 75.

The action required money and weeks of planning; the Organizational Defendants (National Students for Justice in Palestine (NSJP), Jewish Voice for Peace (JVP), Dissenters, and Tides, through the latter's Community Justice Exchange (CJE)) helped plan, promote, and execute the O'Hare blockade as part of the A15action conspiracy. A61-A63 ¶¶ 60-64.

As Dissenters and NSJP contemporaneously described it in posts made at the scene of the blockade, "drivers are prevented from entering the drop-off site for all domestic terminals 1-3 at O'Hare" and they "stopp[ed] travelers from reaching their flights." A91, A95. A15action "shut down traffic into three O'Hare international terminals for two hours this morning!" A93 (quoting JVP). Tucker, an organizer for JVP, was at the blockade and bragged to the media that the blockade "disrupted business as usual." A52.



Three of the Organizational Defendants and at least two of the Individual Defendants had engaged in similar illegal road blockades before the April 15 action. A58-A59 ¶¶ 43-48.

Plaintiff Christopher Manhart was one of the victims. On April 15, he drove from his home in Valparaiso, Indiana, to O'Hare to catch a flight to Norfolk, Virginia for business. The Defendants' actions caused him to be trapped in his car for over an hour with no way to maneuver out of the standstill traffic. Manhart missed his flight that morning, wasted several hours at the airport adjusting his travel plans, and arrived in Virginia hours late, causing him to miss an important work dinner and networking function. A47-A48 ¶ 6.

**B.    Nonprofit WESPAC acts as the "direct fiscal sponsor" for NSJP.**

Federal tax law permits a tax-exempt 501(c)(3) non-profit organization act as a "fiscal sponsor" for a non-exempt organization without 501(c)(3) status (thus permitting third parties to make tax-deductible donations to the sponsored organization), so long as it maintains control and discretion over the funds to ensure their use for a charitable purpose. *See generally* GREGORY T. COLVIN AND STEPHANIE L. PETIT, FISCAL SPONSORSHIP: 6 WAYS TO DO IT RIGHT (3d ed. 2019) ("COLVIN"). Acting as a conduit without that control is illegal, and can cost a non-profit its tax-exempt status. *E.g.*, IRS PLR 201740022 (Oct. 6, 2017). If the sponsored entity has no independent corporate structure, it is known as a "direct fiscal sponsorship," and is effectively an in-house program of the sponsor rather than a separate legal entity. COLVIN at 14-19.

Defendant WESPAC, during the relevant time, acted as the direct fiscal sponsor for NSJP, which never had a corporate structure independent of WESPAC. A50 ¶ 14. This permitted NSJP to solicit tax-deductible contributions from third parties funneled through WESPAC. A57 ¶ 42. Later in 2024, WESPAC disassociated itself from NSJP, who found a different direct fiscal sponsor. A50 ¶ 14.

**C.** **Manhart brings a federal class action against the Individual and Organizational Defendants.**

Manhart brought a federal class action on behalf of a putative class of non-Illinois citizens trapped in the blockade. The operative complaint (A45-A81) raised claims of false imprisonment (Count I) and in tort for the intentional breach of duty of complying with the portion of the Illinois Vehicle Code barring persons from "willfully and unnecessarily hinder[ing], obstruct[ing] or delay[ing], or willfully and unnecessarily attempt[ing] to delay, hinder or obstruct any other person in lawfully driving or traveling along or upon any highway within" the state of Illinois (Count II) against the Individual Defendants. Counts III through VIII sought liability against the Organizational Defendants for in-concert, conspiracy, and aiding and abetting the torts; it named WESPAC as responsible for NSJP's liabilities.

Because WESPAC took the unprecedented position that it had no liability because, contrary to tax law, it had no control over NSJP's actions, Manhart pled a Count IX in the alternative, for breach of WESPAC's duty to control and supervise NSJP's activities. A78.

Defendants collectively filed five motions to dismiss; two sets of defendants also filed Rule 11 motions that the operative complaint was frivolous.

**D.** **The district court dismisses the complaint with prejudice for failure to state a claim, and finds that Manhart's attorneys violated Rule 11.**

The district court granted the motions on August 7, 2025, dismissing the case with prejudice under Rule 12(b)(6). A1.

There was no false imprisonment, the court said, because "one is not liable for false imprisonment even if they 'intentionally prevent[] another from going in a particular direction in which he has a right or privilege to go.'" A10-A11 (citing RESTATEMENT (SECOND) OF TORTS § 36(3) & cmt. *d* ("*Second Restatement*"). It rejected a 1985 Illinois appellate opinion as unpublished, and therefore, it said, uncitable, as well

as "too dissimilar." A11-A12. It held that comment *d* applied to any blockade of a road, not just one that permitted escape. A13. "In a claim for false imprisonment, whether a plaintiff had reasonable means of escape is a separate inquiry from whether the defendant confined the plaintiff" and "[w]hatever conditions prevented Plaintiff from exiting his car on the highway are present every time Plaintiff is in his car on the highway; Defendants did not impose them on Plaintiff." A14. "[I]t is not enough for a plaintiff to voluntarily remain in a place even if they believe they are justified in doing so." A15 (citing *Marcano v. Nw. Chrysler-Plymouth Sales, Inc.*, 550 F. Supp. 595, 603 (N.D. Ill. 1982)). Though the district court cited § 36 comment *a*, it did not reconcile these holdings with Illustrations in that comment contradicting its holdings. In any event, the district court continued, "Plaintiff could have left his car" on the highway "for at least a week," and could thus escape by walking away. A14.

The district court went on to hold that, because a road blockade is a public nuisance, Manhart used the "wrong tort": the doctrines precluding public nuisance suits by private parties should apply to false imprisonment suits as well, and thus no victim of a road blockade could have a claim for false imprisonment. A15-A18.

The district court rejected Count II because, it held, the Defendants' arguable violation of the Illinois Vehicle Code did not cause injuries "of the kind intended to be protected by the relevant statute." A18-A21. Moreover, no claim of negligence could flow from intentional conduct. A23-A25.

Counts III through IX thus failed because there was no underlying tortious conduct. A25-A26. Count IX also failed because "Plaintiff has not pled facts sufficient to show that WESPAC owed Plaintiff any duty." A26.

Sanctions were granted (A33-A39) because the complaint, an article cited by Manhart, and Manhart's damages request for the class allegedly demonstrated an improper purpose. A34-A35. While "there is nothing *per se* frivolous about the legal

theories" in the complaint, A35, the court thought several of the arguments made in defense of the complaint rose to the level of frivolousness. A35-A39. For example, it was frivolous to cite an unpublished case, and it was frivolous to argue that the Illinois Vehicle Code prevented Manhart from leaving his vehicle on the highway. A36. It was frivolous to suggest negligence could support a conspiracy claim. A37 n.11. Defendants had not claimed that Manhart's opposition brief had violated Rule 11.

A separate August 7 order terminated the case and asked the parties to set a schedule for the determination of attorneys' fees for the Rule 11 sanctions. A41. Manhart appealed the dismissal August 8. A42. (The sanctions order is still non-final.)

Post-judgment, two more Defendants filed Rule 11 motions. Proceedings on all four pending Rule 11 motions are stayed while this appeal is pending. Dkt.125.

## Summary of the Argument

On April 15, 2024, Defendants intended to trap thousands of drivers in gridlock, as they had done in the past, and celebrated when they did. Manhart presents a novel claim, but one that is a straightforward application of false-imprisonment doctrine. *See* Section I below. Because of Defendants' intentional actions aimed at trapping drivers to "cause pain," the gridlock Defendants caused confined Manhart in his vehicle for a great deal of time before he could reasonably escape off the highway. "If an act is done with the intent to confine another, and such act is the legal cause of confinement to another, it is immaterial whether the act directly or indirectly causes the confinement." *Second Restatement* § 37. Manhart's only means of "escape" would have been to illegally leave his car on an interstate highway (or interstate highway exit ramp), and walk, and the law simply does not require that of him.

Black letter law recognizes false-imprisonment claims for scenario after scenario where escape is hypothetically possible, but it is reasonable for the victim to stay put.

"Since the actor has intended to imprison the other, the other is not required to run any risk of harm to his person or to his chattels or of subjecting himself to any substantial liability to a third person in order to relieve the actor from a liability to which his intentional misconduct has subjected him." *Second Restatement* § 36, cmt. *a*.

For example,

> 2.      A locks B, who is suffering from a disease which makes any considerable exertion dangerous to him, in [a room with a window four feet off the ground]. A has confined B.

> 3.      A closes every exit from a place where B is except one, which B can use only by doing some act which would threaten C with substantial bodily harm. A has confined B.

> 4.      A closes every exit except one, the use of which would involve material harm to B's clothing. A has confined B.

> 5.      A is naked in a Turkish bath. B locks the door into the dressing room but leaves open the door to the general waiting room where persons of both sexes are congregated. B has confined A.

*Second Restatement* § 36, Illustrations 2-5.

Instead, to dismiss Manhart's claim, the district court adopted its own novel, but erroneous, doctrines of false imprisonment law that contradicted Illinois law, the Restatements, or both. The district court held, citing only an inapposite federal district-court decision, that "it is not enough for a plaintiff to voluntarily remain in a place even if they believe they are justified in doing so." A15. *Contra Second Restatement* § 36, Illustrations 2-5, 9. That any limitation on escape caused by "other individuals who the defendant does not control" precludes liability. A13. *Contra Second Restatement* § 36 Illustrations 3 & 5. The district court's erroneous premises of law, which it did not try to reconcile with the Restatement, led to erroneous conclusions. *See* Section I.A below.

The district court also held that Manhart did have a reasonable means of escape because he "could have left his car" on the highway for "at least a week" and simply walked to the airport—and then proceeded to sanction Manhart for arguing otherwise. A14, A36. This is an erroneous reading of the Illinois Vehicle Code. *See* Section I.B below.

Finally, the district court held that Manhart could not bring a false imprisonment claim because it was the "wrong tort"; after all, public-nuisance claims exist for blockaded roads. A15-A18. This is a non sequitur, and the district court's public-policy analysis is also incorrect and no grounds to block Manhart's claim. *See* Section I.C below.

With respect to Manhart's negligence claim, the district court failed to apply Illinois law. Contrary to the district court's holding (A15), intentional acts may form the basis of a "negligence" claim under Illinois's idiosyncratic doctrine. The district court erred in failing to find a common-law and a *prima facie* statutory claim for negligence. *See* Section II below.

The district court dismissed derivative claims for the lack of any underlying torts, but reviving those tort claims should revive the derivative claims. *See* Section III below.

Another derivative claim, Count IX, sought liability on WESPAC for negligent failure to supervise a beneficiary for which it was collecting tax-deductible donations as a direct fiscal sponsor. Without applying the test required by Illinois Supreme Court precedent, the district court simply held there was no duty. A26. This is wrong. As a matter of corporate law, WESPAC is liable for NSJP's acts during the relevant time frame because NSJP had no separate corporate existence; there is no veil to pierce. And Illinois law would impose on a fiscal sponsor a duty to control and supervise the

beneficiary when, as alleged, the fiscal sponsor is on notice of the beneficiary's wrongdoing. *See* Section IV below.

Because of these errors, as well as others relating to the sanctions not yet before this court, reassignment under Circuit Rule 36 is appropriate. *See* Section V below.

The district court's decision should be vacated, and Manhart's complaint should go forward in full.

## Argument

### I.   Manhart stated a claim under Illinois law for false imprisonment or, in the alternative, unlawful restraint of freedom of locomotion.

"False imprisonment is the unreasonable restraint of an individual's liberty, against his will, caused or procured by the defendant." *Meerbrey v. Marshall Field & Co.*, 564 N.E.2d 1222, 1231 (1990) (alleged false arrest). False imprisonment occurs when a person is intentionally restrained, regardless of motive. *E.g., Lopez v. Winchell's Donut House*, 466 N.E.2d 1309, 1311-12 (Ill. App. 1984). "If an act is done with the intent to confine another, and such act is the legal cause of confinement to another, it is immaterial whether the act directly or indirectly causes the confinement." *Second Restatement* § 37. (Illinois courts "deem persuasive the Restatement" in the "absence of Illinois authority." *Randall v. Lemke*, 726 N.E.2d 183, 185 (Ill. App. 2000) (*Second Restatement*).) It does not require that the defendant use physical violence or lay hands on the plaintiff. *Lopez*, 466 N.E.2d at 1311; BRUCE L. OTTLEY *et al.*, ILLINOIS TORT LAW § 2.03 (4th ed. 2024) ("OTTLEY") (citing, for example, *Robinson v. Miller*, 1985 Ill. App. LEXIS 2179 (4th Dist. 1985)).

Though it exceeds what the *Second Restatement* considers actionable, most Illinois state courts agree that false imprisonment includes the "unlawful restraint… of freedom of locomotion." *E.g., Adams v. Zayre Corp.*, 499 N.E.2d 678, 684 (Ill. App. 1986); *Lopez*, 466

N.E.2d 1309; *Karow v. Student Inns, Inc.*, 357 N.E.2d 682 (Ill. App. 1976); *Robinson*, 1985 Ill. App. LEXIS 2179; *but compare Morris v. Faulkner*, 361 N.E.2d 112, 114-15 (Ill. App. 1977) (finding unlawful loss of freedom of locomotion actionable, but declining to call it "false imprisonment" because of *Second Restatement*); *see generally* OTTLEY § 2.05; RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 8 & cmt. *b*, Tentative Draft No. 3 at 44-45, 57-58 (ALI 2018) ("*Third Restatement*")[2] (citing Illinois law in noting imprecision of *Second Restatement* § 36(3)).

Liability for false imprisonment "does not require that the plaintiff be literally 'imprisoned' within a penal or correctional institution; many other modes of confinement suffice." *Third Restatement* § 7 cmt. *a*, Tentative Draft No. 3 at 1. "'Imprisonment,' while it seems originally to have meant stone walls and iron bars, no longer signifies incarceration; the plaintiff may be imprisoned when his movements are restrained in the open street, or in a travelling automobile…" WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS 42 (4th ed. 1971) (footnotes omitted).

---

[2] While the Third Restatement citation is labeled as a draft, the ALI has approved the intentional torts project. "Drafting of this project is completed; preparation of the official text is in progress." American Law Institute webpage, https://www.ali.org/project/torts-intentional-torts-persons (last accessed Sept. 9, 2025). *Cf. Twitter, Inc. v. Taamneh,* 598 U.S. 471, 495 (2023) (citing Tentative Draft No. 3); *Iseberg v. Gross*, 879 N.E.2d 278, 290-91 (Ill. 2007) (citing draft of another Third Restatement Torts project).

While Manhart did not mention the Third Restatement below, he raised the correct issue that he had a viable false imprisonment claim. "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee v. City of Escondido*, 503 U.S. 519, 534-35 (1992); *United States v. Billups*, 536 F.3d 574, 578 (7th Cir. 2008); *Bew v. City of Chicago*, 252 F.3d 891, 895-96 (7th Cir. 2001).

A plaintiff who attempts to escape, but fails to "immediately escape the confinement" still has a wrongful confinement claim. *Third Restatement* § 8 cmt. b, Tentative Draft No. 3 at 55. Duress precluding escape, such as reasonable fear of injury to person or property, is sufficient to constitute false imprisonment. *Id.* § 8(c) at 44; *id.* § 8 cmt. *h* at 52; *accord Second Restatement* § 36 cmt. *a* & Illus. 4 (if escape impossible without tearing clothes, there is false imprisonment). An "actor wrongfully putting the plaintiff to an unpalatable choice" is an example of duress. *Third Restatement* § 8 cmt. *h*, Tentative Draft No. 3 at 53.

Here, Defendants intentionally and wrongfully blockaded the road to cause a traffic standstill, trapping or restraining thousands of people, including Manhart, in their gridlocked cars, depriving them of liberty and freedom of locomotion against their will unless they exercised the unpalatable choice of illegally leaving their vehicles unattended parked *on* a highway, subject to an expensive tow.

This is a straightforward description of a claim for false imprisonment—or at least an intentional tort—under Illinois law. The district court disagreed. It is wrong.

*First*, the district court erroneously held (A10-A14) that false imprisonment does not include *any* road blockade, relying on an inapposite Second Restatement comment and, in the process, contradicting Illinois precedent and the Third Restatement. Black-letter false-imprisonment law recognizes that an actor is liable for confinement even in scenarios where the actor did not create all of the conditions that preclude escape. For example, it is false imprisonment when the victim is too sick to escape through a difficult exit or force a victim to jump out of a moving vehicle (*Second Restatement* § 36 Illus. 2 & 9); or when escape would cause harm to a third party (*id.* Illus. 3); or when escape would damage the victim's chattels (*id.* Illus. 4); or when escape would cause unreasonable embarrassment to the victim (*id.* Illus. 5). Yet the district court held that any limitation on escape caused by "other individuals who the defendant does not

control"—or caused by a plaintiff's reasonable fear of incurring damage—relieves the defendant of liability. A13-A14. This is wrong. *See* Section I.A below.

    *Second*, the district court erroneously held (A14) that it is permissible to park a vehicle on an Illinois highway for "at least a week" without penalty, and thus Manhart was not restrained because that was a reasonable means of escape. This reading of Illinois law defies common sense and the Vehicle Code's text. The district court also erred to the extent it held that any means of escape, even if unreasonable, precludes a claim. *Compare* A15 ("it is not enough for a plaintiff to voluntarily remain in a place even if they believe they are justified in doing so") *with Second Restatement* § 36 Illus. 3-5; *Third Restatement* § 8. *See* Section I.B below.

    *Third*, the district court erroneously held that because Manhart did not have a public nuisance claim (which he did not plead in the operative complaint), Manhart must not have *any* common-law cause of action. A15-A18. This is a *non sequitur*. And the public policy precluding a private public-nuisance claim here does not preclude the intentional tort Manhart pleads. *See* Section I.C below.

## A.    Section 36(3) and comment *d* of the *Second Restatement* do not preclude Manhart's claim.

    If a pedestrian walking on the road comes to a roadblock or picket line, and is forced to turn around or detour, is he falsely imprisoned for being partially obstructed and unable to go in one particular direction? In most jurisdictions, the answer is no. *Second Restatement* § 36(3) & cmt. *d*. A forced detour is not black-letter false imprisonment. But Manhart's complaint is not about a forced detour, but about being trapped in gridlock. The district court nevertheless extended this narrow principle to hold that comment *d* "squarely" precluded Manhart's claim. A10-A14. This is wrong. Comment *d*, by its own terms and its illustrations, does not apply to Manhart's case, and the *Third Restatement*'s discussion of the *Second Restatement* agrees. Moreover, dicta

in Illinois law arguably permits claims for forced detours that wouldn't be black-letter false imprisonment.

Comment *d* refers to the denial of the privilege to enter the highway, rather than a scenario where a driver is surrounded and cannot move; it doesn't suggest that there is never false imprisonment upon the roads, and comment *c* and Illustration 9 each contemplate false imprisonment within a vehicle (if as a passenger). Illustration 10 of comment *d* presents the scenario where the road blockage causes a detour, rather than trapping the driver. Illustration 11 similarly anticipates a scenario like a union picket line of a factory entrance, where a driver can simply go back the way he came or turn down a different road. The Reporters' Notes to § 36(3) and Illustration 11 cite only cases of *partial* obstruction: *Bird v. Jones* is the classic case of a plaintiff being able to move in any direction except one where the defendant blocked a road to sell tickets to view a boat race. 7 Q.B. 742, 115 Eng. Rep. 668 (1845). While § 36(3) holds there is no liability for precluding movement in a particular direction, the unspoken implication is that the plaintiff can go somewhere else. Any other interpretation contradicts § 36(1), which holds complete confinement without reasonable means of escape to be false imprisonment.

Manhart maintained that Illustration 11 contemplated a plaintiff with "no obstacle in the way of his leaving by the way in which he entered," and thus comment *d* could not be addressing a scenario of a road blockade with no exit. The district court responded "Defendants *did not place any obstacles* [in] Plaintiff's way of leaving." A13 (emphasis in original). But, aside from the fact that that misses Manhart's point that Illustration 11 is meant to demonstrate the limited scope of comment *d*, the district court is wrong for two reasons.

*First*, the obstacle to turning around and driving the opposite way on a highway is the law against doing so, and therefore is not a "reasonable means of escape"; a

defendant cannot block the only safe avenue of escape. *Second Restatement* § 36 cmt. *a*; *see generally* Section I.B below.

*Second*, even if it were somehow legal for Manhart to turn his car around and go the wrong way on an interstate highway, the cars behind Manhart were trapped in gridlock for the same reason Manhart was: because of Defendants' intentional actions. "If an act is done with the intent to confine another, and such act is the legal cause of confinement to another, it is immaterial whether the act directly or indirectly causes the confinement." *Second Restatement* § 37; *see also id.* § 43 & cmt. *a* (transferred intent); *Third Restatement* § 10 (Tentative Draft No. 1, former § 110) (same). So, as a matter of common sense, Defendants *did* cause the confinement, and it would be clearly erroneous to make a factual finding otherwise. But at the barest minimum, at this early procedural stage, Manhart is entitled to the "reasonable inference" that the Defendants caused the gridlock trapping him.

The district court instead put the blame on other drivers "subsequently prevent[ing] the plaintiff from exiting in another direction." A13. But this is also wrong for at least two reasons. *First*, the vehicles behind Manhart blocking his U-turn were as much involuntary victims of Defendants as he was. It would be unreasonable to find otherwise, and certainly an error of law not to draw that "reasonable inference" at this stage of the case. *Second*, § 36 has Illustrations involving "other individuals who[m] the defendant does not control" that reach conclusions contradicting the district court's reasoning. In Illustration 3, the risk to person C, whom A does not control, creates liability to B. In Illustration 5, the presence in the waiting room of members of the opposite sex, whom A does not control, precludes the naked B from a reasonable means of escape, creating liability for A. The district court's argument contradicts the facts and the Restatement.

The district court continues, "Assuming Plaintiff was unable to reasonably escape his car, that does not mean that Defendants confined him there. Whatever conditions prevented Plaintiff from exiting his car on the highway are present every time Plaintiff is in his car on the highway; Defendants did not impose them on Plaintiff." A14. This, too, is wrong. As a thought exercise, if a room that Briseis is in has two exit doors, and Calchas independently locks one door, Achilles cannot lock the last exit and escape liability by blaming Calchas. (And Defendants are more culpable than Achilles in that example, engaging in the equivalent of handcuffing Calchas as a doorstop to block the first door.) And, again, § 36 is replete with examples imposing liability on a defendant in scenarios that track precisely the district court's rule. In Illustration 2, a variation of the eggshell-skull rule, the medical "conditions" that prevent B from leaving by an open window were not imposed by A, but A has liability. So too with the unreasonable exits in Illustrations 3, 4, and 5. So too in *Hale v. Pace*, which denied a motion to dismiss for a plaintiff who chose not to jump out of a moving vehicle. 2011 U.S. Dist. LEXIS 35281, 2011 WL 1303369, at *11 (N.D. Ill. Mar. 31, 2011); *accord Second Restatement* § 36 Illustration 9.

The Third Restatement agrees with Manhart's reading of *Second Restatement* § 36(3) as limited. *Third Restatement* § 8 cmt. *b*, Tentative Draft No. 3 at 44-45. "[I]f a person desires to go in a particular direction that is *the only means of exit then available*, an actor who prevents the person from proceeding in that direction is subject to liability for false imprisonment." *Id.* at 45 (emphasis added). That is the scenario of drivers trapped in gridlock, unable to go forward or turn around. The Third Restatement anticipates Manhart's claim and permits it.

*Second*, as noted above, Illinois recognizes a claim for "unlawful restraint… of freedom of locomotion," differing only on whether to call it false imprisonment or something else. *Compare Adams*, 499 N.E.2d 678; *and Robinson*, 1985 Ill. App. LEXIS 2179

(unreported)[3] *with Morris*, 361 N.E.2d at 114-15; *see generally* OTTLEY § 2.05. In *Morris*, a barmaid called the defendant sheriff to force the plaintiff to leave a tavern. While

---

[3] The district court held *Robinson* "has no precedential or persuasive value" because of Ill. Sup. Ct. R. 23(e), A11, and then sanctioned Manhart for citing it. A36. That overreaches: the "fact [that] one court has used certain reasoning in an unpublished opinion [under Rule 23(e)] does not bar courts [] from using the same reasoning"; that decision just cannot be used "as authority." *Osman v. Ford Motor Co.*, 833 N.E.2d 1011, 1016-17 (Ill. App. 2005) (citing Rule 23(e)). And Illinois courts *do* read unpublished orders like *Robinson* persuasively. *E.g.*, *Byrne v. Hayes Beer Distrib. Co.*, 122 N.E.3d 753, 759 (Ill. App. 2018) (discussing trial court's reliance on 2006 unpublished order and affirming); *cf. Jacobson v. Gen. Fin. Corp.*, 592 N.E.2d 1121, 1130 (Ill. App. 1992) (allowing citation of 1991 unpublished order). Indeed, the leading Illinois tort law hornbook cites *Robinson*. OTTLEY §§ 2.03, 2.05.

Moreover, Rule 23(e)'s 1994 created restrictions that its predecessor did not have, with its rule that an "unpublished order … *may not be cited* by any party" (emphasis added). In contrast, the 1980s-era Rule 23 governing *Robinson* stated only that appellate "orders are not precedential and will not be published." 494 N.E.2d 957. The express citation restriction from the 1994 Rule 23(e) is absent. (The Westlaw database incorrectly includes the anachronous restriction at the top of *Robinson*; it is not in the West printed edition or in the LEXIS version.) And to the best of our knowledge, Illinois has never applied the more stringent Rule 23(e) retroactively.

Finally, as the district court itself recognized elsewhere, Illinois procedural law does not control procedure in federal court. A30-A31 (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 397 (2010)).

The district court claimed *Robinson* was consistent with comment *d* because it was a blockade of plaintiffs' property. A11-A12. But this misstates the facts, because the *Robinson* plaintiffs could (and did) escape the blockade by foot. And it misstates comment *d*'s analysis, because a blockade of the entrance to private property is considered by comment *d* to be a public nuisance, rather than a false imprisonment as *Robinson* held.

ultimately deciding this did not constitute "false imprisonment" under § 36(3), *Morris* held that "the right of liberty, the freedom of locomotion, the right to come and go or stay, when or where one may choose" was "fundamental and is entitled to the protection of the law so that an action will lie for an unlawful restraint thereof." *Id.* at 115 (ultimately finding for defendant because restraint was not unlawful). In other words, that a cause of action would not lie under § 36(3) did not preclude a plaintiff's claim. Though comment *d* says "It is not enough that the other's freedom of movement has been improperly restricted," and § 36(3) disclaims a cause of action for "intentionally preventing another from going in a particular direction," each of those *is* enough to constitute actionable restraint in Illinois. *Accord Karow v. Student Inns Inc.*, 357 N.E.2d 682, 686 (Ill. App. 1976) ("When a person is impelled to go where he does not wish to go, the imprisonment or restraint element has been established.") (ultimately finding for defendant because restraint was not unlawful). *Karow* did not wish to leave a store; that he was required to go in a different direction was not what precluded relief, despite § 36(3). The restraints on Morris and Karow were considerably less binding than those of a driver trapped in gridlock; those plaintiffs were "confined" to the entire planet except a particular building. These decisions admittedly seem unsound expansions of false-imprisonment law; a *Robinson* plaintiff walked around the road blockade to attend a town meeting! But Illinois courts have not disclaimed them, and they contradict the district court's holding.

The district court's reading of § 36 to preclude Manhart's claim was legal error because it contradicts § 36's illustrations. And even if the district court's reading of the Second Restatement were correct, it is inconsistent with both Illinois law and the Third Restatement. Section 36(3) and comment *d* do not preclude Manhart's claim.

**B.      The district court erred in finding a reasonable means of escape.**

The district court separately incorrectly held there was a reasonable means of escape because "Plaintiff could have abandoned his car on the side of the [highway] without facing legal penalties." A14. Manhart noted that 625 ILCS 5/4-201 imposes penalties for abandoning a "vehicle" on a public highway. "But the Code defines an 'abandoned vehicle' narrowly," the district court responded. A14 (citing 625 ILCS 5/1-101.05). It concluded from that definition that Manhart had a reasonable means of escape because he could park his car on an interstate highway for "at least a week" without penalty. *Id.* As common sense would suggest, this is wrong.

Section 4-201(a) refers to "the abandonment" of a "vehicle," not the defined term "abandoned vehicle." Something qualifying as an "abandoned vehicle" has legal consequences described in the different subsections of § 4-201(b) and § 4-209, not relevant here. "Vehicle" has the broad meaning in 625 ILCS 5/1-217, and no one except the district court disputes that it applies to Manhart parking his car on the highway.

There's no statutory definition of "abandonment" given, and normally undefined statutory terms have their "ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979); *Midwest Sanitary Serv. v. Sandberg*, 211 N.E.3d 448, 453 (Ill. 2022). Giving the district court's argument the most charitable reading possible, one can construct a colorable argument that the statute was poorly drafted, and there is therefore an implicit unwritten definition of "abandonment of a vehicle" to mean "the creation of an abandoned vehicle" that courts should use notwithstanding the ordinary meaning. If so, § 4-201(a) would not take effect until the "vehicle" on the side of the road becomes an "abandoned vehicle." This novel interpretation seems tenuous, at best: for example, 625 ILCS 5/4-203(b) describes what can happen when "a vehicle is abandoned on a highway in an urban district for 10

hours or more," which would be impossible under this implied reading of "abandoned" and "abandonment" as only happening after a week.

Manhart's interpretation of § 5/4-201(a) is correct. Yet the district court not only disagreed (without giving Manhart a chance to respond to an argument Defendants never raised), it found Manhart's argument frivolous enough to impose sanctions. A36.

This Court can sidestep this interpretative question. Regardless of whether Section 4-201 prevented Manhart from engaging in the extraordinarily antisocial act of parking his vehicle on the side of an interstate highway for "at least a week" to escape gridlock (assuming he could even navigate his vehicle to the side of the highway), there is no question that 625 ILCS 5/4-203(a) or (d) permits Illinois to tow Manhart's car as "unattended" in two hours or less. This would make Manhart responsible for all towing and storage charges. 625 ILCS 5/4-203(g)(2). *See also* 625 ILCS 5/11-1303(a)(1)(j) (prohibiting parking or stopping on a controlled-access highway). Manhart would also have to waste time tracking down the tow company, and storage there would expose his car to collision risk. In *Second Restatement* § 36 Illustration 4, material harm to clothing is enough to make a means of escape unreasonable. If material harm to a piece of clothing precludes an exit from being a "reasonable means of escape," then it is the case as a matter of law that it is not "a reasonable means of escape" to break the law and park a car on the highway, subject to a quick and expensive tow. That should be true as a matter of law, but, at a minimum, Manhart is entitled at this stage to the reasonable inference that escape is not reasonable and that he was confined.

The district court suggested that the reasonableness of escape was irrelevant, relying heavily on an inapposite 1982 federal case. A15 (citing *Marcano v. Nw. Chrysler-Plymouth Sales, Inc.*, 550 F. Supp. 595, 603 (N.D. Ill. 1982)). Marcano brought her car to the dealership, which tricked her out of the keys and then repossessed her car with her purse and house keys in it; plaintiffs waited five hours at the dealership before getting a

ride home, and sued for, among a litany of torts, false imprisonment. *Marcano* held that this wasn't confinement (after all, plaintiffs could leave at any time and eventually chose to do so), but permitted claims for conversion and fraud to go forward. This is not Manhart's case, where he was *not* reasonably free to leave his car and did not do so; *Marcano* never addresses the scope of *Second Restatement* § 36 comment *a*, and neither does the district court. Marcano would be leaving her car behind, not imposing extra towing expenses on herself. *Marcano* held there was no intent to restrain the plaintiff, just the chattels. Not so here, where confinement was not just plausibly alleged, but where it's hard to imagine any other intent when Defendants are gleefully celebrating the gridlock they caused.

If the district court believes that *Marcano* creates a binding blanket rule for *all* scenarios that "it is not enough for a plaintiff to voluntarily remain in a place even if they believe they are justified in doing so," A15, this is an error of law that contradicts the Second and Third Restatements. Duress precluding escape, such as reasonable fear of injury to person or property, is sufficient to constitute false imprisonment. *Third Restatement* § 8(c) at 44; *id*. § 8 cmt. *h* at 52. An "actor wrongfully putting the plaintiff to an unpalatable choice" is an example of duress. *Id.* § 8 cmt. *h* at 53. Another example:

> Whether a physical barrier amounts to a confinement depends not only on whether an alternative means of exit exists, but also on whether it would be safe to take that exit. If the use of an alternative exit would expose the plaintiff to any risk of physical harm, the plaintiff need not take such a risk. In these circumstances, if the plaintiff declines to use that avenue of escape, the actor remains subject to liability for false imprisonment.

*Third Restatement* § 8 cmt. *e* at 48.

The district court erred in holding *Marcano* precluded Manhart's claim. Its decision gives no basis to pick and choose from the different parts of *Second*

*Restatement* § 36, and erred in failing to reconcile its interpretation of *Marcano* with the Restatements.

## C.  That Defendants committed a public nuisance does not preclude a private claim for false imprisonment.

The operative complaint did not plead a private claim for public nuisance. The district court held that because a road blockade *is* a public nuisance, Manhart must have pleaded the "wrong tort" to evade the requirements of a public-nuisance action. A15-A18. This reasoning is a *non sequitur*. For example, if a train derails and spills chemicals, this would create a public nuisance claim meriting remediation. But plaintiffs adversely affected would conceivably also state claims for common-law trespass and trespass-to-chattels and personal-injury negligence claims. *E.g.*, First Amended Master Consol. Class Action Compl., *In re East Palestine Train Derailment*, Dkt. 138, No. 4:23-cv-00242 (N.D. Ohio Aug. 14, 2023) (pleading all of the above).

Whether there is a private claim for public nuisance for a chemical spill is irrelevant to the viability of the trespass-to-chattels claim. The concern about opening a public-nuisance claim to "every subject in the kingdom" (A17) would not apply because only the people with damage to or loss of chattels would have the latter cause of action. So, too, here: only those who suffered confinement have a false-imprisonment claim, not "every subject in the kingdom." Not the people inconvenienced by taking a crowded Blue Line train instead of their preferred taxi; not the people who avoided O'Hare that day because of the gridlock; not the people landing at O'Hare who were delayed leaving because taxis couldn't get to the airport; not the people who might want to travel on the highway at some future time.

Manhart can sue for false imprisonment because he suffered the tort under Illinois law, and the people in Manhart's class are a small fraction of "every subject in the kingdom" entitled to use the roads. The district court's—and Justice Thomas's—

concern is resolved by the requirement of Article III standing, which is why the quote the district court used came from a leading standing case. A17 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 345 (2016) (Thomas, J., concurring)).

The public policy precluding a public-nuisance claim here does not preclude Manhart's tort claims for personal damages, and the district court erred in failing to consider the public policy of inhibiting intentional torts. Intentional torts with specific intent to do harm are extremely inefficient behavior; the optimal number of *malicious* libels and batteries and road blockades is close to zero, limited only by enforcement costs (here borne privately by a public-interest law firm). *Cf.* William M. Landes and Richard A. Posner, *An Economic Theory of Intentional Torts*, 1 INT'L REV. L. & ECON. 127 (1981). A road blockade is pure deadweight loss; a defendant has to expend a lot of effort to organize dozens of people into a sleeping dragon, and suffers no cost whatsoever to just simply not do it beyond loss of the enjoyment Defendants exhibited at regular civilians' suffering here. There's no beneficial baseline activity to protect by refusing to allow people harmed by the intentional wrongdoing to sue for recovery. The district court erred in refusing to apply the law.

## II.   Manhart stated a claim for negligence under Illinois law.

Negligence is pleaded when a plaintiff shows (1) "duty owed by the defendant to the plaintiff," (2) "breach of that duty," and, (3) "the injury [was] proximately caused by that breach." *Lee v. Six Flags Theme Parks, Inc.*, 10 N.E.3d 444, 459 (Ill. App. 2014). The first element is "a question of law," whereas the latter two are "factual matters for the jury." *Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1053-54 (Ill. 2006). Manhart pleaded all three elements.

Manhart's complaint recited *independent* legal duties: one in common-law, the other in statute. *See e.g.*, *Pilotto v. Urb. Outfitters W., L.L.C.*, 72 N.E.3d 772, 781 (Ill.

App. 2017) (defendant owed a duty both by its actions and under Illinois law). The district court erred as a matter of law in dismissing both.

*First*, the district court found no common-law duty because "[i]ntent and negligence are mutually exclusive; intentional acts may not form the basis for a negligence claim." A25 (quoting 57A AM. JUR. 2D NEGLIGENCE § 29). But Illinois tort law does not impose such a false dichotomy; leading negligence cases impose "hybrid" "willful and wanton" negligence liability on, among other things, intentional acts. *Ziarko v. Soo Line R.R. Co.*, 641 N.E.2d 402, 406, 408 (Ill. 1994). Intentional acts thus do not preclude negligence. *Topps v. Ferraro*, 601 N.E.2d 292, 294-95 (Ill. App. 1992).

*Second*, the district court held Manhart's injuries "are not matters of public safety" and dismissed his statutory negligence claim. A20. But it mangled the doctrine. Preliminarily, the statute must be a "public safety statute" to constitute *prima facie* evidence of negligence. The Rules of the Road are. *See Schultz v. Siddens*, 548 N.E.2d 87, 89 (Ill. App. 1989) (interpreting § 5/11-1418); *see also McCoy v. McCoy*, 591 N.E.2d 124, 127 (Ill. App. 1992). From here, Manhart need only show that "the statute or ordinance was intended to protect a class of persons to which he belongs from the kind of injury that he suffered." *Kalata v. Anheuser-Busch Companies, Inc.*, 581 N.E.2d 656, 661 (Ill. 1991). The statute itself expressly describes the "kind of injury." It aims to prevent persons from obstructing highways "so as to interfere with the effective movement of traffic." § 5/11-1416. Interference of movement is the *precise* injury Manhart suffered. The district court re-read the "public safety" requirement into "kind of injury," but these are distinct components of *prima facie* negligence. *Kalata* does not require a "public safety" injury, and the court erred by failing to consider the statute's plain intent.

## A. Manhart may bring a common-law negligence claim based on intentional acts.

Manhart's common-law negligence claim is based on the observation that Defendants owe a duty to "exercise due care" to every driver on that road. *Palausky v.*

*Landers*, 385 N.E.2d 751, 752 (Ill. App. 1978) (drivers and pedestrians owe a "mutual obligation"). Instead, Defendants "rushed the I-190 off-ramp [] heading into O'Hare and used PVC pipe to connect their arms and block the entire" highway. A47 ¶ 3. "It is well settled that every person owes a duty … to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act." *Widlowski v. Durkee Foods*, 562 N.E.2d 967, 968-69 (Ill. 1990). "[S]uch a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons." *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1097 (Ill. 2012) (duty to employee's spouse injured by asbestos on employee's clothes depends on employer's knowledge of risks).

Relying on a multistate treatise, the district court found instead that Manhart's common-law negligence argument fails because it pleads intentional acts. A25. But Illinois lacks such prohibition. While negligence for intentional acts sounds counterintuitive, Illinois courts "allow recovery in negligence for such 'intentional' acts." *Topps*, 601 N.E.2d at 294. Rather than the standard treatise categories of negligence, recklessness, and intentional conduct (*Second Restatement* § 500), Illinois has a "hybrid" category of "willful and wanton conduct" that encompasses more than mere recklessness. *See generally Ziarko*, 641 N.E.2d 402. "Willful and wanton conduct" may sometimes be intentional, but it is not a separate tort; it is "regarded as an aggravated form of negligence." *Krywin v. Chicago Trans. Auth.*, 938 N.E.2d 440, 452 (Ill. 2010); *accord* OTTLEY § 14.04. "Willful and wanton conduct" includes an "actual or deliberate intention to harm." *Ziarko*, 641 N.E.2d at 408.

*Topps* is instructive: Topps sued in negligence and the defendant argued his intentional act precluded relief. No dice. *Topps* reversed the trial court's defense summary judgment, noting that Illinois courts "allow recovery in negligence for such intentional acts." *Id.* at 294. The admission of intentionality "neither mystically

transmutes the allegations in plaintiff's complaint to an intentional tort nor precludes recovery in negligence." 601 N.E.2d at 295; *see also Scott v. Aldi, Inc.*, 703 N.E.2d 526, 530 (Ill. App. 1998) (allowing *prima facie* negligence claim based on intentional acts like "operation of an unlicensed, uninsured for-hire vehicle service").

Negligence claims don't "fail simply because they mirror allegations for" an intentional tort and "merely change the state of mind." *Block v. Lohan Assocs., Inc.*, 645 N.E.2d 207, 225 (Ill. App. 1993). The difference is one of "degree" with a "thin line" of separation. *Ziarko*, 641 N.E.2d at 406. Moreover, a "party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. Proc. 8(d)(3).[4] The district court committed reversible error to hold otherwise.

Had the district court not erred, it should have concluded Manhart's injuries of lost time and liberty (A47, A65-A66) "naturally flow as a reasonably probable and foreseeable consequence of" Defendants' blockade. *King v. Mid-State Freight Lines*, 126 N.E.2d 868, 875 (Ill. App. 1955) (duty where defendant's "mosquito fog" obstructed highway). The legal duty to Defendants was a *de minimis* burden—they need only not blockade highways to avoid liability, and no adverse economic consequences justify excusing liability on public-policy grounds. *Compare Tinder v. Ill. Power Co.*, 758 N.E.2d 483, 487 (Ill. App. 2001). The Defendants were in "the best position to prevent the injury," *Whittaker v. Honegger*, 674 N.E.2d 1274, 1277 (Ill. App. 1996) (duty where defendant allowed gravel from its land to accumulate on highway).

---

[4] It is not even clear that there is any separation here requiring pleading in the alternative. Willful and wanton negligence "is generally considered in that area of fault between ordinary negligence and actual malice." *Ziarko*, 641 N.E.2d at 406. But a false-imprisonment intentional tort claim does not require a showing of actual malice. Nothing appears to preclude bringing both a willful and wanton negligence claim and a false-imprisonment intentional tort claim in Illinois.

Therefore, Defendants' actions breached a legal duty.

**B.    The district court erred because Manhart satisfies the *prima facie* negligence standard under *Kalata*.**

In addition to their common-law duty, Defendants have an independent duty through the Illinois Vehicle Code, 625 ILCS 5/11-1416, which prohibits "willfully and unnecessarily hinder[ing], obstruct[ing] or delay[ing]…any other person in lawfully driving or traveling along or upon any highway within this State…" Violation of a statute that promotes public safety establishes *prima facie* liability, meaning that both duty and breach are rebuttably presumed. *Kalata*, 581 N.E.2d at 661.

The district court questioned whether the statute was a public safety statute, A20, but it clearly is. Section 5/11-1416, as part of the State's Rules of the Road, is "concerned with the safe movement of traffic" like the "majority of subsections in this portion of the [] Code." *Schultz*, 548 N.E.2d at 89; *see also McCoy*, 591 N.E.2d at 127; *Heitz v. Hogan*, 480 N.E.2d 185, 193 (Ill. App. 1985) (no error to hold defendant drivers did not violate § 11-1416, because statute aimed at pedestrians). While the district court stated (A20) "No court has addressed whether 625 ILCS 5/11-1416 is designed to protect public safety," the Illinois Supreme Court assumed as much in *Watkins v. Schmitt*, 665 N.E.2d 1379, 1388 (Ill. 1996) (reversing summary judgment to defendants because of factual question of whether they violated § 5/11-1416) (implicitly holding that statute applied also to drivers).

After "assuming *arguendo*" that the statute is designed to protect public safety, the lower court rejected Manhart's *prima facie* negligence argument because the statute allegedly was not "intended to protect… ***from the kind of injury that he suffered***." A20 (emphasis in original, quoting *Kalata*, 581 N.E.2d at 440). But the court did not evaluate statutory intent. It instead concluded Manhart's "injuries d[id] not implicate public safety." A21. It attributed this requirement to *Kalata*, but that case does not say that the

"kind of injury" must be a *public safety* injury. The district court apparently blended the "public safety statute" and "kind of injury" requirements into a new, unsupported requirement. In fact, the connection between the harm and statute comes from what "the legislature had in mind when it enacted the statute." *Bier v. Leanna Lakeside Prop. Ass'n*, 711 N.E.2d 773, 783 (Ill. App. 1999) (citing *Noyola v. Bd. of Educ.*, 688 N.E.2d 81, 84 (Ill. 1997)). The statute itself spells out the intent: "No person shall willfully and unnecessarily hinder, obstruct or delay, … or offer for barter or sale merchandise… *so as to interfere with the effective movement of traffic.*" 625 ILCS 5/11-1416 (emphasis added). Manhart's complaint thickly documents how he suffered injuries due to exactly this hazard: the lack of effective movement caused by the illegal blockade.[5]

The district court wrongly implies *Kalata* requires a *physical* aspect of injury for public safety statutes; Manhart can demonstrate "kind of injury" with intangible harm. For example, in *Rodgers*, the plaintiff "c[a]me within the scope of the protection afforded by the [violated] statute" when the defendant failed to "preserve [plaintiff's] X rays," causing damage by hobbling plaintiffs' malpractice suit. *Rodgers v. St. Mary's Hosp. of Decatur*, 556 N.E.2d 913, 916 (Ill. App. 1990), *aff'd*, 597 N.E.2d 616 (Ill. 1992). Similarly, a federal district court allowed a negligence count based on a violation of state law, 740 ILCS 14/20, the Biometric Information Privacy Act (BIPA), which led to the intangible but concrete loss of "right to privacy in and control over one's biometric data." *Dixon v. Wash. & Jane Smith Cmty.*, No. 17 C 8033, 2018 WL 2445292, 2018 U.S. Dist. LEXIS 90344, at *44 (N.D. Ill. May 31, 2018). *Dixon* quoted the purpose from statute and found it "clear that BIPA was intended to prevent the type of injury Dixon alleges here: the violation of her right of privacy in her biometric data." *Id*. at *43. The district court's

---

[5] The district court questions in a footnote whether Manhart is within in the class of persons protected by the statute. A21 n.6. The Vehicle Code is intended to protect motorists. *McCoy*, 591 N.E.2d at 127.

failure to evaluate the statute itself to determine the "type of injury" contemplated is reversable error.

While Manhart's harms are intangible, they all have a plausible nexus with "the effective movement of traffic" addressed by § 5/11-1416 and the willful lack of due care shown by Defendants at common-law. Manhart's loss of time and liberty is an injury compensable in negligence. *See Olson v. Ferrara Candy Co.*, 2025 IL App (1st) 241126. In *Olson*, plaintiffs brought a common-law negligence claim against the defendant for a data breach. The defendants argued plaintiffs lacked an adequate tort injury, but the court disagreed, remarking that "both plaintiffs alleged that they spent time and resources to protect themselves from fraud and identity theft after the data breach" and that this loss of time was "sufficient to support [] negligence." *Id.* ¶ 42. Just like in *Olson*, Manhart spent "time and resources" in traffic and then adjusting his travel plans after Defendant's blockade. *Accord Flores v. AON Corp.*, 2023 IL App (1st) 230140 ¶¶ 7, 23 (negligence damages from data breach include "lost time, annoyance, interference, and inconvenience").

Manhart adequately pleaded common-law and statutory duties. The district court erred as a matter of law by dismissing Count II based on a false intentional/negligence dichotomy and ignoring the "kind of injury" described by the statute itself.

### III. Manhart's derivative in concert, aiding-and-abetting, and conspiracy claims are revived.

The district court, having dismissed claims for underlying torts, dismissed the attendant derivative conspiracy, in concert, and aiding-and-abetting claims. A25-A26. But, as Sections I and II above show, Manhart *did* state viable state-law claims for relief against the wrongful behavior.

The district court incorrectly criticized (and sanctioned) Manhart for alleging a conspiracy to commit negligence. A37 n.11. But in Illinois, "once a defendant knowingly agrees with another to commit an unlawful act or a lawful act in an unlawful manner, that defendant may be held liable for any tortious act committed in furtherance of the conspiracy, *whether such tortious act is intentional or negligent in nature*." *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 64 (Ill. 1994) (emphasis in original). The district court is simply wrong. And as noted in Section II.A above, negligence in Illinois includes "willful" or intentional behavior.

With the premise of the district court's decision gone, and tortious conduct adequately pleaded, the dismissal of the in-concert, aiding-and-abetting, and conspiracy claims must also be vacated.

## IV.    Manhart stated a derivative claim against WESPAC for NSJP's torts.

Manhart alleged that WESPAC was liable for NSJP's conduct for two reasons. *First*, WESPAC was NSJP's direct fiscal sponsor in April 2024, structuring the arrangement so that the tax-exempt WESPAC could accept third-party tax-exempt donations on behalf of NSJP, which not only was not a 501(c)(3), but had no separate corporate structure from WESPAC. As the beneficiary of a *direct* fiscal sponsor (as opposed to a being an entity with independent corporate structure from the fiscal sponsor), NSJP's assets were WESPAC's assets, and NSJP's liabilities were WESPAC's liabilities. A49-A50 & A57-A60; Gregory T. Colvin and Stephanie L. Petit, Fiscal Sponsorship: 6 Ways to Do It Right 14-17 (3d ed. 2019) ("Colvin").

Under direct fiscal sponsorship, "the sponsor takes the project in-house," treating it as an internal program rather than a separate legal entity. Colvin 19. "The project has no separate legal existence." *Id.* The sponsored group operates as an extension of the sponsor, lacking a separate legal identity—its actions are legally attributable to the

sponsor. *Id.* at 16-17, 23, 109. "Legally, [the] project is no different than any other activity carried out by the sponsor directly." *Id.* at 17. This liability stems from the sponsor's legal identity encompassing the sponsored group—because the group lacks separate incorporation or tax-exempt status, its acts are not merely supported but owned by the sponsor.

The district court never reached this theory of liability, but it is worth noting that it is the same theory of liability that makes Tides liable for CJE's torts, and Tides does not dispute that it is liable for conspiracy and aiding and abetting to the extent that CJE is. Any other result would give WESPAC and NSJP the benefit of separate corporate structures that they did not even attempt to comply with. NSJP's liabilities are WESPAC's liabilities, and that should end the matter.

But because WESPAC took the extraordinary position that it had no liability for NSJP's actions because, in violation of federal tax law, it did not "control" the project it was collecting tax-deductible money for, Manhart pled in the alternative a second theory of liability: negligent supervision of NSJP, effectively admitted by WESPAC's arguments. But, citing no Illinois law, the district court held WESPAC had no duty to supervise NSJP. A26. This is wrong.

In Illinois, "every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons." *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1097 (Ill. 2012) (collecting cases). "[I]f a course of action creates a foreseeable risk of injury, the individual engaged in that course of action has a duty to protect others from such injury." *Id.*

Illinois recognizes a duty to third parties to control others who are the source of harm when the defendant "has a special relationship with that person," such as parent-

child, master-servant, or employer-employee. There is no reason not to include direct fiscal sponsorship in that "special relationship" bucket. The relationship between a direct fiscal sponsor and its beneficiary is closer than employer-employee: an employee is often off the clock, but a 501(c)(3) beneficiary project without separate corporate structure is always part of the underlying sponsor. And federal tax law requires a tax-exempt organization to retain "control and discretion" over the funding of a non-exempt activity and ensure compliance with the sponsor's charitable mission. IRS Pub. 5781 at 51-52 (Rev. 2-2024) (citing Rev. Rul. 68-489, 1968-2 C.B. 210); *accord, e.g.,* *New York ex rel. TZAC, Inc. v. New Isr. Fund*, 520 F. Supp. 3d 362, 388-89 (S.D.N.Y. 2021) (attributing electioneering activity of grantees to fiscal sponsor in finding complaint that 501(c)(3) filed false certification under state law adequately pleaded). Acting as a mere conduit is illegal. For example, the IRS has revoked tax-exempt status of fiscal sponsors who could not confirm the end use of funds, and thus failed to verify its discretion and control. *E.g.*, IRS PLR 201740022 (Oct. 6, 2017) (citing Rev. Rul. 68-489); IRS PLR 201712014 (Mar. 24, 2017) (same).

Whether that duty exists involves a four-part test in Illinois: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Simpkins*, 965 N.E.2d at 1098 (duty of employer to employee's spouse injured by employee's clothing's asbestos residue depends on employer's knowledge of asbestos harms). All four elements support, with reasonable inferences, finding WESPAC's duty to supervise NSJP here. *First*, it was reasonably foreseeable that NSJP would commit torts against motorists. NSJP had previously engaged in illegal road blockades under WESPAC's fiscal sponsorship, and the A15action conspiracy announced its promised intent to harm others weeks in advance. A58-A61 ¶¶ 45, 47-48, 54-57. *Second*, injury was likely: A15action promised "economic impact." A48 ¶¶ 1-2.

*Third*, the marginal burden on WESPAC was negligible: WESPAC already had a legal obligation to prevent NSJP from engaging in illegal behavior and a legal obligation to exercise control and discretion over NSJP's funding. Indeed, WESPAC *did* eventually cut NSJP off. A49-A50 ¶¶ 13-14. And *fourth*, the only public-policy consequences are that direct fiscal sponsorships would require control and supervision of the beneficiaries of the fiscal sponsorship if the beneficiaries do not seek independent 501(c)(3) status. But that is already standard boilerplate in direct fiscal sponsorship agreements drafted by competent counsel. COLVIN 104-05. That is because fiscal sponsors are already required by the IRS to comply with tax law, which require the same sort of control and supervision.

In capsule form, NSJP's liabilities are WESPAC's liabilities as a matter of law. WESPAC argued below for a court to infer a separate corporate entity that WESPAC never claimed existed. Even if it were *ever* appropriate to disregard corporate law here (and WESPAC cited no authority that it is), under the four-part *Simpkins* test, WESPAC's duty to supervise NSJP's acts in Illinois extended to the class, and Manhart has plausibly alleged a breach of that duty. The district court committed reversible error in ignoring *Simpkins* entirely and in failing to analogize to other Illinois "special relationships" imposing a duty to control. WESPAC is liable for NSJP's torts.

## V.     Manhart requests reassignment under Circuit Rule 36.

Under Circuit Rule 36, this Court may "direct in its opinion" that this case "be reassigned by the district court." And this Court reassigns cases often and in a variety of circumstances on reversal and remand. *See* Toby J. Heytens, *Reassignment*, 66 STAN. L. REV. 1, 18 (2014); *see also AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611 (7th Cir. 1993). These circumstances include when the district court has already "made up [its] mind," *Kusay v. United States*, 62 F.3d 192, 196 (7th Cir. 1995), or "to avoid the

operation of [] mindset which seems likely to have developed from consideration and decision of motions to dismiss." *Cange v. Stotler & Co.*, 913 F.2d 1204, 1208 (7th Cir. 1990). Reassignment is also warranted when the court wrongly issues sanctions. *Cf. M.D. v. Abbott*, 119 F.4th 373, 389 (5th Cir. 2024) (citing "the district judge accus[ing] Defense counsel of Rule 11 violations" as a factor in reassignment).

The district court's opinion below exemplifies *all* of these flaws—and thus this Court should order reassignment on remand under Circuit Rule 36.

The district court has already "made up [its] mind," *Kusay*, 62 F.3d at 196, and a new judge would "avoid the operation of [] mindset which seems likely to have developed from consideration and decision of [the] motion[] to dismiss." *Cange*, 913 F.2d at 1208. There are several errors in the district court's order that "might reasonably cause an objective observer to question" the district court's ability to adjudicate Manhart's claims on remand. *United States v. Microsoft Corp.*, 56 F.3d 1448, 1463 (D.C. Cir. 1995) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988)). For example, the district court made more than one *ipse dixit* statement of law that directly contradicted the Second Restatement's comments and illustrations in the section it relied upon. *See* Section I.A above.

Such errors weren't isolated. The lower court went out of its way to admonish and even sanction Manhart for making valid legal arguments.[6]

---

[6] The Rule 11 decision is non-final because the fee-shifting amounts have not been fixed, and thus not yet ripe for review; we thus are not asking the Court to adjudicate the sanctions. But Manhart raises an incomplete sample of the Rule 11 issues now because they demonstrate that the district court's legal errors on the merits are not atypical of the district court's treatment of his case. *Cf. M.D.*, 119 F.4th at 389. All of this "might reasonably cause an objective observer to question" the district court's fairness, *Microsoft*, 56 F.3d at 1463, and evidence that the court has "made up [its] mind" on his case. *Kusay*, 62 F.3d at 196.

For example, the district court scolded Manhart and granted sanctions because "Count V would necessarily fail because a claim for negligence cannot support [a] conspiracy claim, something which Plaintiff would have known after a reasonable inquiry." A37 n.11. But Manhart was correct and the district court was wrong. *See* Section III. Another example is the district court's treatment of Manhart's citation of *Robinson v. Miller*. 1985 Ill. App. LEXIS 2179 (Ill. App. 1985). The district court erroneously held (A11) that the unpublished *Robinson* opinion "has no … persuasive value" because of Ill. Sup. Ct. R. 23(e), and then found it frivolous because Manhart "relied … on an unpublished case" and "claim[ed] that a non-precedential case establishes precedent." A36. But Rule 23(e), an amendment made nearly a decade after *Robinson*, does not apply to pre-1994 cases like *Robinson*, which is governed by the more permissive 1982 version of Ill. Sup. Rule 23. Further, Illinois courts *do* read unpublished cases persuasively. *See* p.18 n.3, above. More concerning, while discussing *Robinson*, the court below materially misquoted a case it relied on for its determination that an unpublished Illinois case cannot be cited for "persuasive" purposes. A11. The case says only that "Illinois prohibits parties from citing unpublished decisions as *precedent*." *Hartford Accident & Indem. Co. v. Lin*, 97 F.4th 500, 512 (7th Cir. 2024) (emphasis added).

Furthermore, the district court sanctioned Manhart because Manhart did not apply the statutory definition of "abandoned vehicle" to a statute subsection governing "vehicles." A36; *see* Section I.B above. The sanctions are especially troubling, because Manhart had no notice of or opportunity to respond to the court's belief that his § 5/4-201(a) argument was sanctionable. The district court engaged in *sua sponte* research to find 625 ILCS 5/1-101.05 and an interpretation of § 5/4-201(a) that Defendants did not suggest to come to a conclusion—Illinois permits one to park a car on the highway for "at least a week" without penalty—that defied common sense. At a

minimum, it should have double-checked its conclusion to find § 5/4-203 and § 5/11-1303(a)(1)(j), which buttressed Manhart's arguments.

Finally, the district court pointed to "Plaintiff's request for $36 million on behalf of the putative class" as evidence of "Plaintiff's intent … to harass Defendants." A35. The district court never explained why Manhart's request was unreasonable or otherwise harassing. This was an intentional tort affecting thousands of class members. This Court has affirmed punitive damages for recklessness of $186,000 per plaintiff, despite "modest" actual damages. *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003) (bug bites and emotional distress). In a case with more culpable repeated intentional conduct by Defendants, Manhart sought less punitive damages per plaintiff, despite two decades of inflation. Manhart has not just every right to pursue damages to which he (and the class) is entitled under our legal system, but a fiduciary obligation to do so. Fed. R. Civ. Proc. 23(a)(4); *Back Doctors Ltd. v. Metropolitan Prop. and Cas. Ins. Co.*, 637 F.3d 827, 830-31 (7th Cir. 2011). And neither the court nor any Defendant disputed that the jurisdictional amount-in-controversy was more than $5 million, as 28 U.S.C. § 1332(d)(2) requires. *Compare Pratt Cent. Park Ltd. v. Dames & Moore*, 60 F.3d 350 (7th Cir. 2001) (affirming 12(b)(1) dismissal where maximum damages could not satisfy jurisdictional requirement).

Separately, the district court sanctioned Manhart's counsel for use of a Manhattan Institute article in his response briefing. Manhart cited the article twice for the narrow purpose of contrasting the persuasion-centered Civil Rights-era protests with Defendants' destructive actions. Dkt.91 at 1, 6-7 (citing Tal Fortgang, *The Rise of Civil Terrorism*, CITY J. (Winter 2025) in response to Defendants comparing themselves to Martin Luther King's civil disobedience). Defendants weren't protesting laws against blocking roads the way Civil Rights-era sit-ins demonstrated the injustice of segregated lunch counters by getting arrested for violating those laws. Yet the district court first

misrepresented the motives of the Fortgang article (which mentioned the civil litigation in passing, and focused on what the proper government response would be), and then baselessly ascribed those false motives to Manhart. *Compare* A35 (claiming Fortgang, and thus Manhart, intends baseless harassment through "'a dent in the [D]efendants' resources' via a 'slow' discovery process") *with* Fortgang ("Discovery will likely be fruitful, if slow. If [the suit] is successful, [it] may make a dent in the defendants' resources. But public policy is still necessary."). And again, this was reasoning for sanctions that Manhart neither had notice of nor an opportunity to respond to.

Reassignment as well as reversal is merited.

## Conclusion

This Court should vacate and reverse the district court's order and opinion, and reinstate all counts of the complaint. Circuit Rule 36 should apply on remand.

Dated: October 6, 2025

Respectfully submitted,

HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS

*/s/Theodore H. Frank*
Theodore H. Frank
1629 K Street, NW, Suite 300
Washington, DC 20006
(703) 203-3848
ted.frank@hlli.org

*Attorneys for*
    *Plaintiff-Appellant Christopher Manhart*

**Statement Regarding Oral Argument**

Manhart requests under Cir. R. 34(f) that the Court hear oral argument in his case because exploration at oral argument of these novel issues of law would aid this Court's decisional process and benefit the judicial system. This case has received national attention for the potential of litigation to address the public policy problem of NGO-supported civil terrorism. Fortgang, *supra*; Jason L. Riley, *If Police Won't Back Up 'Mr. Brooklyn,' Maybe a Lawyer Will*, WALL ST. J. (Jan. 24, 2024).

Manhart is working with the *pro bono* assistance of the nonprofit Hamilton Lincoln Law Institute. This Court and the national press have repeatedly recognized the Institute's good faith and success in raising novel issues of law. *See, e.g., In re Stericycle Sec. Litig.*, 35 F.4th 555, 572 & n.11 (7th Cir. 2022) (citing cases); Editorial Board, *The Anthem Class-Action Con*, WALL ST. J. (Feb. 11, 2018). Manhart's counsel is an experienced appellate advocate and elected member of the American Law Institute who has argued in the Supreme Court and this Court, and has spoken at the Seventh Circuit Judicial Conference.

**Certificate of Compliance with Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 30(d)**

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, Type Style Requirements, and Appendix Requirements:

1.      This brief complies with the type-volume limitation of Cir. R. 32(c) because:

This brief contains 12,162 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 12-point Palatino Linotype font.

3.      All materials required by Cir. R. 30(a) & (b) are included in the appendix.


Executed on October 6, 2025.

*/s/ Theodore H. Frank*

**Proof of Service**

I hereby certify that on October 6, 2025, I caused to be electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Seventh Circuit using the CM/ECF system pursuant to Cir. R. 25(a), thereby effecting service on all counsel of record, who are registered for electronic filing.

/s/ Theodore H. Frank

# REQUIRED SHORT APPENDIX

# APPENDIX
## TABLE OF CONTENTS
Required Short Appendix

Appendix Page

Memorandum Opinion and Order of the Honorable Mary M.
 Rowland filed August 7, 2025 (Docket No. 109) ................................ A-1

Minute Entry before the Honorable Mary M. Rowland filed
 August 7, 2025 (Docket No. 108) ........................................................ A-41

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHRISTOPHER MANHART, individually and on behalf of all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>WESPAC FOUNDATION, INC., NATIONAL STUDENTS FOR JUSTICE IN PALESTINE, DISSENTERS, JEWISH VOICE FOR PEACE, TIDES CENTER d/b/a COMMUNITY JUSTICE EXCHANGE, JINAN CHEHADE, SUPERIOR MURPHY, RIFQA FALANEH, SIMONE TUCKER<br><br>Defendants. | Case No. 24-cv-08209<br><br>Judge Mary M. Rowland |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Manhart has brought this putative class action against Defendants WESPAC Foundation, Inc. ("WESPAC"), National Students for Justice in Palestine ("NSJP"), Jewish Voice for Peace ("JVP"), Tides Center d/b/a Community Justice Exchange ("Tides Center"), Dissenters (collectively, "Organizational Defendants"), Jinan Chehade, Superior Murphy, Rifqa Falaneh, and Simone Tucker (collectively, "Individual Defendants"). Plaintiff's complaint arises out of a pro-Palestinian protest held on Interstate 190 and the surrounding interstates on April 15, 2024. Before the Court now are the following motions:

- Tides Center's motion for sanctions [71] and motion to dismiss [73].

A-1

- JVP's motion to dismiss pursuant to the Illinois Citizen Participation Act ("ICPA")[1] and for failure to state a claim [75].

- Individual Defendants' and Dissenters' motion for sanctions [76], motion to strike [77][2], and motion to dismiss for failure to state a claim [82].

- WESPAC's motion to dismiss for failure to state a claim and lack of personal jurisdiction [78].

- NSJP's motion to dismiss for failure to state a claim and lack of personal jurisdiction [80].

## I. Factual Background

### A. Overview

The following factual allegations taken from the operative complaint [69] are accepted as true for the purposes of the motion to dismiss. *See Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021).

On April 15, 2024, at around 7:00 AM, Individual Defendants and other activists walked onto a portion of the I-190 highway that leads to O'Hare International Airport and linked their arms together with PVC piping to create a continuous wall across the interstate. [69] ¶ 70, 80. The "blockade" lasted until around 9:30 AM, and during that time, traffic on I-190 came to a standstill. [69] ¶¶ 66, 71. Defendants allegedly organized and/or participated in the blockade to protest the United States's support

---

[1] Individual Defendants and Dissenters incorporate by reference JVP's arguments in support of its motion to dismiss pursuant to the ICPA. [82] at 4.
[2] WESPAC joined Individual Defendants' motion to strike. [84].

2

A-2

of Israel in the war that has ensued between Israel and Hamas following Hamas's attack on Israel on October 7, 2023. *See generally* [69].

Plaintiff alleges he and other putative class members were trapped in their cars and in many cases missed their flights. *See* [69] ¶ 79. For his part, Plaintiff asserts that the protest caused him to miss his flight and as a result "miss[] an important work dinner and networking session." [69] ¶ 79.

The I-190 protest was done as part of an organizing effort called "A15 Action," which organized similar protests in other cities around the nation. [69] ¶¶ 52-56. The A15 Action website states that its purpose was "to coordinate a multi-city economic blockade on April 15th in solidarity with Palestine," aiming to "cause pain to the economy" and "to disrupt and blockade economic logistical hubs and the flow of capital." [69] ¶ 57

### B. Defendants

#### i. Defendant Tides Center

Defendant Tides Center is a nonprofit 501(c)(3) that allegedly "assisted the other Defendants in creating a bail fund for A15 Action activists and helped advertise and manage this fund." [69] ¶ 64. Tides Center also sponsors the public interest law firm Palestine Legal, where Defendant Falaneh works. [69] ¶ 20

#### ii. Defendant JVP

Defendant JVP is a California corporation and tax-exempt organization with multiple chapters across the United States, including one in Chicago. [69] ¶ 16. JVP describes itself as the "largest progressive Jewish anti-Zionist organization in the

3

world." [69] ¶ 16. Defendant Tucker is a student organizer for JVP's Chicago chapter. [69] ¶ 21. Along with NSJP, JVP allegedly participated in organizing the A15 Action protests. [69] ¶ 60. Specifically, JVP selected the area for the Chicago protest, coordinated funding to purchase supplies for the blockade, recruited individuals to participate in the blockade, and promoted the bail fund and the O'Hare blockade on social media during and after the event. [69] ¶ 60.

### iii.   Defendant NSJP

Defendant NSJP is an unincorporated association with no formal principal place of business. [69] ¶ 13. Plaintiff alleges that NSJP has multiple affiliates in Chicago-area universities, including at Northwestern University, the University of Chicago, and others. [69] ¶ 13. The day after the attack in Israel, NSJP released a "toolkit" to its local chapters which called for its members to "engage in meaningful actions that go beyond symbolism and rhetoric" in furtherance of its pro-Palestinian aims. [69] ¶ 39. Like JVP, Plaintiffs allege that NSJP "was instrumental in coordinating the national A15 Action plan" and helped organize the protest on I-190. [69] ¶ 60. NSJP likewise promoted the bail fund on social media during and after the protest. [69] ¶ 60.

### iv.   Defendant WESPAC

At times relevant to this action, WESPAC acted as the fiscal sponsor and legal entity for tax-exempt donations to NSJP. [69] ¶ 14. During the relevant time, the donation link on NSJP's website showed that donations NSJP received were funneled

4

A-4

to WESPAC. [69] ¶ 14. Some time after the protest, WESPAC began to "dissociate[]
itself from NSJP." [69] ¶ 14.

### v. Defendant Dissenters

Defendant Dissenters is an Illinois corporation and tax-exempt organization
based in Chicago. [69] ¶ 15. Dissenters describes its mission as "leading a new
generation of young people to reclaim our resources from the war industry, reinvest
in life-giving services, and repair collaborative relationships with the earth and
people around the world." [69] ¶ 15. Dissenters helped organize the I-190 protest and
helped select the location of the blockade. [69] ¶ 61.

### vi. Individual Defendants

Defendants Chehade, Murphy, Falaneh, and Tucker were present at the I-190
protest and participated in blocking traffic. [69] ¶ 65. They and other activists linked
arms with PVC piping, held signs, and broadcasted their activity across social media.
[69] ¶ 70. Chehade was "a primary organizer" of the protest and she was arrested by
the Chicago Police Department for her role in it. [69] ¶ 18. Murphy was present at
the protest and narrated a video describing the blockade. [69] ¶ 19. Falaneh was an
organizer of the protest. [69] ¶ 20. Tucker helped organize the protest and later posted
on social media: "we made our point. We stood in solidarity with our comrades in
Palestine, and we disrupted business as usual." [69] ¶ 21.

## II. Procedural Background

On September 9, 2024, Plaintiffs filed their original complaint in this action. [1].
This complaint contained three underlying causes of actions: (1) statutory violation

of the Illinois Vehicle Code, (2) public nuisance, and (3) false imprisonment. [1] ¶¶ 90-101. It also contained (as does each subsequent complaint) additional causes of action seeking to hold various of the Organizational Defendants liable under theories of in-concert liability, aiding and abetting liability, and conspiracy. [1] ¶¶ 102-157.

On October 23, 2024, counsel for WESPAC sent Plaintiff's counsel a letter informing counsel of their intent to move for sanctions under Rule 11. [64-1]. In the letter, counsel for WESPAC argued that the original complaint was deficient as to WESPAC because it failed to allege that anyone acting on behalf of WESPAC had any involvement at all with the I-190 protest and because it was filed with an improper purpose. *Id*.

On November 11, 2024, Plaintiffs filed a first amended complaint ("FAC"). [33]. The FAC contained new allegations seeking to tie NSJP's conduct to WESPAC. [33] ¶¶ 114-15. Otherwise, the FAC contained substantially similar factual allegations and brought the same causes of action as the original complaint. On January 6, 2025, WESPAC sent Plaintiffs' counsel another letter explaining their intent to move for Rule 11 sanctions, [64-2], and subsequently filed the contemplated motion. [63].[3]

On January 6, 2025, Tides Center sent Plaintiff's counsel a letter explaining Tides Center's intent to move for sanctions. [59-1]. In the letter and its attachment, Tides Center argued, among other things, that Plaintiff's tort claims were facially frivolous. *Id*. The same day, the Individual Defendants and Dissenters sent a letter and draft

---

[3] After Plaintiff filed the SAC, this motion was dismissed without prejudice. [68, 69]. WESPAC did not file a subsequent motion for sanctions.

6

Rule 11 motion to Plaintiff, arguing that his complaint was frivolous for similar reasons. [76-1].

Plaintiff filed his second amended complaint ("SAC") on January 29, 2025. [69]. The allegations contained in the SAC are substantially similar to those in the FAC, though the SAC again brings new allegations seeking to tie NSJP's conduct to WESPAC. *E.g.*, [69] ¶¶ 14, 42, 50. In the SAC, Plaintiff dropped his claims for public nuisance and statutory violation of the Illinois Vehicle Code. [69]. The SAC includes a new claim for "Common-Law Tort for Foreseeable Injury Caused by Intentional Breach of Duty." [69] ¶ 14. The SAC also dropped all claims against two Defendants who were accordingly dismissed from the litigation with prejudice. *See* [68].

In response to Plaintiff's SAC, Defendants filed the motions now before the Court.

## III. Motions to Dismiss Pursuant to Rule 12(b)(6)

### A. Legal Standard

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); see also Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] all well-pleaded facts as true, and draw[s] all reasonable inferences in the plaintiff's

7

favor." *Lax*, 20 F.4th at 1181. However, the court need not accept as true "statements of law or unsupported conclusory factual allegations." *Id.* (quoting *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021)). "While detailed factual allegations are not necessary to survive a motion to dismiss, [the standard] does require 'more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action to be considered adequate.'" *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019) (quoting *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Deciding the plausibility of the claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

### B. Overview

The SAC contains nine counts. Count I is a claim for false imprisonment against Individual Defendants; Count II is a "common-law tort for foreseeable injury caused by intentional breach of duty" against Individual Defendants; Count III is a claim for "Highway Obstruction In-Concert" against NSJP, JVP, Dissenters, and WESPAC; Count IV is a claim for false imprisonment in-concert against NSJP, JVP, Dissenters, and WESPAC; Count V is a claim for "conspiracy to obstruct highways" against all Defendants; Count VI is a claim for conspiracy to commit false imprisonment against all Defendants; Count VII is a claim for "aiding and abetting obstructing a highway"

8

A-8

against all Organizational Defendants; Count VIII is a claim for aiding and abetting false imprisonment against all Organizational Defendants; and Count IX is a claim for "negligence or recklessness" pled in the alternative against WESPAC.

Defendants argue that Plaintiff has failed to state a claim because (1) he has failed to state a claim for false imprisonment, (2) "foreseeable injury caused by intentional breach of duty" is not a valid cause of action under Illinois law, (3) he has not alleged facts sufficient to show he has Article III standing.[4] The Court addresses each in turn.

## C. False Imprisonment

### i. Plaintiff has failed to state a claim

Under Illinois law, false imprisonment "is the unlawful restraint of an individual's liberty or freedom of locomotion." *Morris v. Faulkner*, 361 N.E.2d 112, 114 (Ill. App. Ct. 1977). "Imprisonment has been defined as any unlawful exercise or show of force by which a person is compelled to remain where he does not wish to remain or to go where he does not wish to go." *Hale v. Pace*, 2011 WL 1303369, at *11 (N.D. Ill. Mar. 31, 2011) (citations omitted). "In order for a false imprisonment to be present, there must be an actual or legal intent to restrain." *Marcano v. Nw. Chrysler-Plymouth*

---

[4] Various Defendants argued for dismissal of the SAC for various other reasons, including for lack of personal jurisdiction, that the Court does not address here because the Court holds that dismissal is appropriate for the reasons explained here. However, the Court notes multiple Defendants argued that Plaintiff insufficiently alleged Defendants' involvement in the April 15 blockade. See, e.g., [75] at 28 (arguing that the SAC did not plausibly allege JVP's involvement); [82] at 5 (arguing that the SAC contained only threadbare allegations as to each Individual Defendant's involvement). Without reviewing the specific allegations as to each Defendant, the Court notes as a general matter that these arguments are unavailing. The SAC alleges that, for example, JVP and NSJP planned and organized the April 15 protest, and their involvement included picking the location of the protest and recruiting individuals to participate in the protest. [69] ¶ 60. The SAC further alleges that Individual Defendant Tucker was an active participant in the blockade. [69] ¶ 16. If the case were to continue, discovery may have demonstrated that those allegations were false. But the Court is disinclined to think dismissal on that basis would be appropriate at the pleadings stage where the Court is to draw plausible factual inferences in Plaintiff's favor.

9

*Sales, Inc.*, 550 F. Supp. 595, 603 (N.D. Ill. 1982). "[A]ctual force is not a requisite to an action for false imprisonment, [but] not every inducement to remain can rise to the level of false imprisonment." *Id*. "In the tort of false imprisonment, it is not enough for the plaintiff to have felt 'compelled' to remain in" a place, "the evidence must establish a restraint against the plaintiff's will, as where she yields to force, to the threat of force or the assertion of authority." *Lopez v. Winchell's Donut House*, 466 N.E.2d 1309, 1312 (1984) (citing Restatement (Second) of Torts §§ 38–41 (Ill. App. Ct. 1965)).

Plaintiff argues that Defendants falsely imprisoned him within his car by halting the flow of traffic while Defendant was on the highway. Defendants argue that Plaintiff failed to state a claim for false imprisonment because, although they may have prevented him from proceeding down I-190, they did not "confine" him to his car or anywhere else. The Court agrees with Defendants.

The Second Restatement of Torts squarely addresses the factual situation before the Court now:

> *Blocking highway*. In order to make the actor liable for false imprisonment . . . , it is necessary that he shall have confined another in a particular area, the boundaries of which are fixed by the will of the actor. ***It is not enough that the other's freedom of movement has been improperly restricted. Thus, one who blocks off a highway, intending to prevent the public from passing along it, is not liable for false imprisonment to one whose privilege to use the highway has been thus denied.*** Indeed, the actor does not incur any liability by so doing, since the public is merely privileged to travel the public highways and has not a right to do so; that is, the interest of the members of the public in such travel is not protected by a right of action in them.

Restatement (Second) of Torts § 36, *comment d* (1965) (emphasis added). The Restatement further provides that one is not liable for false imprisonment even if they "intentionally prevent[] another from going in a particular direction in which he has a right or privilege to go." *Id.* § 36(3). Other secondary authorities stand for the same principle. *See* W. Prosser, W. Keeton, Prosser and Keeton on Torts at 47 (5th ed. 1984) ("[T]he restraint must be total, rather than a mere obstruction of the right to go where the plaintiff pleases.") (hereinafter "Prosser and Keeton").

In response, Defendants argue that § 36 of the Restatement was "supersede[d]" in Illinois law in *Robinson*, where an Illinois appellate court held that a defendant who blocked a public road could be liable to the plaintiffs for false imprisonment. [91] at 22 (citing *Robinson v. Miller*, 1985 Ill. App. LEXIS 2179 at *8-*9 (Ill. App. Ct., May 14, 1985)). But *Robinson,* an unpublished 40-year-old decision, has no precedential or persuasive value outside of "contentions of double jeopardy, res judicata, collateral estoppel or law of the case." Il. Sup. Ct. R. 23(e); *see also Hartford Accident & Indem. Co. v. Lin*, 97 F.4th 500, 512 (7th Cir. 2024) (noting that an unpublished Illinois case cannot be cited for persuasive purposes except under "limited circumstances" not present here). *Robinson* thus does not represent good law and cannot save Plaintiff's claim here. Moreover, even if *Robinson* were good law, the factual circumstances in *Robinson* are too dissimilar to Plaintiff's to command a different outcome. In *Robinson*, the plaintiffs were trapped on a 30-acre plot of wooded land that they owned and which was only accessible by a single dirt road after the defendants blocked the road with a locked chain and a truck. 1985 Ill. App. LEXIS 2179 at *2,

11

*8. Unlike Plaintiff here, who apparently saw several people get out of their cars and walk to their destination without interference, [69] ¶ 75, the *Robinson* defendants blocked the plaintiffs' *only path* out of the area of confinement with a locked chain and barricaded it with a truck.

Further, the Restatement specifically carves out an exception for plaintiffs like those in *Robinson* whose access to or from property they own and are living on is blocked. Restatement (Second) of Torts § 36, *comment d* (noting "obstruction of a highway is an actionable wrong to" one whose "right of access to his" home is deprived). The plaintiffs in *Robinson* were temporarily living on the blockaded plot of land, *see* 1985 Ill. App. LEXIS 2179 at *2, and thus had a claim for false imprisonment under the Restatement. Rather than "supersed[ing]" the Restatement, as Plaintiff argues, *Robinson* comports with it.

Plaintiff also argues that *comment d* "does not even apply here" because "by its own language" it only describes a scenario where a blockade had already started and a driver gets on the highway, rather than one where a blockade impedes a driver who is already on the highway. [91] at 22-23. But the Court does not read *comment d* to impose or foreclose liability based on the timing of the blockade *vis-à-vis* the timing of a plaintiff getting onto the highway.[5] The salient point is that the interest of the

---

[5] Even if the Restatement *did* contain this temporal condition, it is not clear that would not help Plaintiff here. Plaintiff alleges that "[a]ll traffic into the airport stopped for almost three hours because of the blockade," [69] ¶ 4, but that he himself was stuck in traffic for "over an hour," [69] ¶ 6, suggesting that the blockade had already been going for at least an hour before he drove into the traffic it produced.

12

traveler "is not protected by a right of action." Restatement (Second) of Torts § 36, *comment d.*

Plaintiff points to Illustration 11 to § 36 of the Restatement to buttress this point, which provides in its entirety (emphasis added):

> A unlawfully encloses a part of the highway. *B enters the enclosure, and A prevents him from passing out of it on the other side, but puts no obstacle in the way of his leaving by the way in which he entered.* This is not an actionable confinement of B, though B has the right or privilege of an unobstructed passage along the highway.

This illustration—detailing a situation in which a defendant *would not be liable* for false imprisonment—accurately describes the factual circumstances alleged here. Defendants *did not place any obstacles* on Plaintiff's way of leaving. According to Illustration 11, liability does not attach. Plaintiff's apparent argument is that cars appearing behind him on the highway is tantamount to Defendants "put[ing]" an obstacle in the way of his leaving. The Court does not agree. Rather, the Court believes the text of Illustration 11 means what it says — if a defendant encloses a part of the highway "but puts no obstacle in the way of [a plaintiff]'s leaving by the way he entered[, it] is not an actionable confinement." Adopting Plaintiff's reading requires believing that the drafters of the Restatement were unaware that a traffic jam might result from an obstructed highway and that travelers might be temporarily stuck in traffic as a result. Plaintiff cites no legal authority for the proposition that a defendant who blocks an individual from travelling in only one direction can be liable for false imprisonment if other individuals who the defendant does not control subsequently prevent the plaintiff from exiting in another direction. Pursuant to

Illustration 11, however, such conduct does not give rise to liability for false imprisonment.

Plaintiff also argues that he had "no reasonable means of escape" as contemplated by the Restatement. In support, Plaintiff argues that it is illegal under Illinois law to leave one's vehicle unattended on the highway and thus he could not have escaped from the confines of his car. But Plaintiff misunderstands the legal effect of the existence of means of escape. In a claim for false imprisonment, whether a plaintiff had reasonable means of escape is a separate inquiry from whether the defendant confined the plaintiff. *See* Restatement (Second) of Torts § 36(1)-(2). The existence of a reasonable means of escape is a basis to find that a defendant was *not* confined. *Id.* § 36(2), *comment a.* Assuming Plaintiff *was* unable to reasonably escape his car, that does not mean that Defendants confined him there. Whatever conditions prevented Plaintiff from exiting his car on the highway are present every time Plaintiff is in his car on the highway; Defendants did not impose them on Plaintiff.

That aside, it appears that Plaintiff could have abandoned his car on the side of the road without facing legal penalties. Plaintiff cites 625 ILCS 5/4-201 of the Illinois Vehicle Code, which indeed prohibits abandoning a vehicle on a public highway. But the Code defines an "abandoned vehicle" narrowly to include only one that "is in a state of disrepair rendering the vehicle incapable of being driven in its condition" or one that "has not been moved or used for 7 consecutive days or more and is apparently deserted." 625 ILCS 5/1-101.05. Thus, Plaintiff could have left his car without facing liability under 625 ILCS 5/4-201 for at least a week.

14

A-14

The Court does not doubt that Plaintiff felt trapped in his car and in fact could not easily go where he wanted to. His frustrations were no doubt exacerbated because he was on the way to the airport. But to state claim for false imprisonment, the confinement must be "involuntary;" it is not enough for a plaintiff to voluntarily remain in a place even if they believe they are justified in doing so. *Marcano v. Nw. Chrysler-Plymouth Sales, Inc.*, 550 F. Supp. 595, 603 (N.D. Ill. 1982) (applying Illinois law). Although not factually on all fours, *Marcano* is instructive. There, the plaintiff alleged that she was falsely imprisoned when a used car dealership wrongly took her keys away from her while her purse was inside the car, effectively stranding her without a way to get home. *Id.* at 598-99. The court reasoned that although the plaintiff was justified in staying at the dealership with her locked car, the defendants' conduct fell short of involuntary confinement because they did not prevent her from leaving. *Id.* at 603. The same result follows here: Plaintiff felt justified in staying in his car, but that does not mean Defendants involuntarily confined him there. Accordingly, Count I is dismissed for failure to state a claim.

### ii. Centuries-old common law principles warn against Plaintiff's proposed expansion of false imprisonment.

The Court also notes that longstanding common law principles preclude Plaintiff's sweeping false imprisonment claim. Historically, the common law recognized that the tort of public nuisance existed to vindicate the rights violated when someone tortiously obstructed a public highway. 3 W. Blackstone, Commentaries (1768) *135-36 (hereinafter "Blackstone"). But the common law would *only* allow a private

15

plaintiff to bring such an action if the plaintiff "suffer[ed] some extraordinary damage, beyond the rest of the king's subjects, by a public nuisance." *Id*.

Illinois courts have adopted the same approach. In *David M. Swain & Son v. Chicago, B. & Q.R. Co.*, the Illinois Supreme Court considered whether a plaintiff could bring an action against someone who obstructed a highway by digging a trench across it. 97 N.E. 247, 248-49 (Ill. 1911). The court stated a plaintiff could bring a nuisance claim, but *only if* they suffered some special damages beyond those suffered by the public. *Id*. If "the injury was loss of time, business engagements, and the like," a plaintiff could not bring an action because that would constitute "merely an injury to the public right to use the street," rather than one to any individual. *Id*. The Illinois Supreme Court further explained that this principle would hold no matter how long an individual was delayed from the obstruction or how considerable the damage to his business was. *Id*. American and English courts in the 19th century and earlier consistently recognized that the proper cause of action to vindicate rights violated by a highway obstruction was that of public nuisance, and that the tort of public nuisance required special, individualized damages. *See, e.g., Houck v. Wachter*, 34 Md. 265, 269 (1871) ("The obstruction of a highway is a common nuisance, and being a wrong of a public nature, the remedy is by indictment; it is not in itself a ground of civil action by an individual, unless he has suffered from it some special and particular damage, which is not experienced in common with other citizens."); *Stetson v. Faxon*, 36 Mass. 147, 156 (1837) (collecting cases).

Justice Thomas reiterated this limitation on claims seeking to vindicate violations of public rights in his *Spokeo* concurrence: "common-law courts . . . required a further showing of injury for violations of 'public rights' . . . Such rights include 'free navigation of waterways, *passage on public highways*, and general compliance with regulatory law.'") *Spokeo, Inc. v. Robins*, 578 U.S. 330, 345 (2016) (Thomas, J., concurring) (emphasis added) (citations omitted); *see also* Prosser and Keeton at 643-44 ("The *most obvious illustration* [of a public nuisance], of course, is the obstruction of a public highway.") (emphasis added). Justice Thomas explained that the common law required "a further showing of injury" for violations of public rights like highway obstructions because, absent that heightened requirement, "every subject in the kingdom" would be able to "harass the offender with separate actions.") *Id.* (citing Blackstone). The common law has maintained and "uniformly" applied this restriction, designed to "relieve the defendant[]" of the actions that might follow if everyone were free to sue for a violation of public rights, since at least 1536. Prosser and Keeton at 646.

This backdrop sheds light on the confusing tension at the heart of Plaintiff's claim. Plaintiff's first two complaints contained claims for public nuisance, which the common law recognized as the correct tort to bring in response to an obstructed public highway. [1] ¶94; [33] ¶ 93. The SAC—the complaint before the Court now—does not contain any *claim* for public nuisance, but still describes Defendants' conduct as a "public nuisance." [69] ¶ 119, 133. But as Justice Thomas explained (and as Defendants explained in their Rule 11 letters in response to Plaintiff's first two

17

complaints), a plaintiff can only bring a public nuisance suit stemming from the obstruction of a highway if they suffered some special injury beyond that suffered by the general public—something all three complaints have failed to allege. It appears then that Plaintiff is framing what the common law would have recognized as a claim for public nuisance under the guise of a claim for false imprisonment because Plaintiff's injuries are insufficient to a state public nuisance claim.

To allow this claim to proceed would stretch the tort of false imprisonment beyond recognition and supplant the common law's—and Illinois's—long-established limitations on claims meant to vindicate public rights. It would invite precisely what Justice Thomas and William Blackstone warned against by allowing "every subject in the kingdom [to] harass the offender with separate actions." The risk of this approach is clear here, where the putative class seeks $36 million in damages because Defendants allegedly obstructed a highway for a few hours, [39] at 3. Plaintiff cannot use the wrong tort as a backdoor into allowing the public to harass Defendants with a class action where the law would prohibit a claim under the correct tort from proceeding. Count I is dismissed with prejudice.

### D. Count II - Common-Law Tort for Foreseeable Injury Caused by Intentional Breach of Duty

#### i. The Court assumes that Plaintiff intended to bring a claim for a violation of a public safety statute.

Count II is labeled a "common-law tort for foreseeable injury cased by intentional breach of duty." As an initial matter, Defendants argue that this is not a recognized cause of action in Illinois law. Defendants are correct. But although Plaintiff's

phrasing is clumsy, the Court understands from Plaintiff's briefing that he intends to bring a claim for a violation of a public safety statute. In Illinois, "[t]he violation of a public safety statute is *prima facie* evidence of negligence and *creates a cause of action* if it is the proximate cause of the subsequent injury." *Ding v. Kraemer*, 376 N.E.2d 266, 268 (Ill. App. Ct. 1978) (citing *Ney v. Yellow Cab Co.*, 117 N.E.2d 74 (Ill. 1954) (emphasis added)). It is the violation of a public safety statute itself that creates the cause of action. "A party injured by such a violation may recover only by showing that the violation proximately caused his injury and the statute or ordinance was intended to protect a class of persons to which he belongs from the kind of injury that he suffered." *Kalata v. Anheuser-Busch Companies, Inc.*, 581 N.E.2d 656, 661 (Ill. 1991). Accordingly, the Court considers whether Plaintiff has adequately alleged that Defendants violated a public safety statute and whether Plaintiff's injuries were of the kind intended to be protected by the relevant statute.

Plaintiff argues that Defendants violated 625 ILCS 5/11-1416, which makes it unlawful to hinder or obstruct one from driving on Illinois highways. Plaintiff's claim can *only* survive under this theory if 625 ILCS 5/11-1416 is designed to protect public safety. *Gillette v. Anderson*, 282 N.E.2d 149, 152 (Ill. 1972). The statute provides in its entirety:

> No person shall wilfully and unnecessarily hinder, obstruct or delay, or wilfully and unnecessarily attempt to delay, hinder or obstruct any other person in lawfully driving or traveling along or upon any highway within this State or offer for barter or sale merchandise on said highway so as to interfere with the effective movement of traffic.

19

A-19

No court has addressed whether 625 ILCS 5/11-1416 is designed to protect public safety, but Illinois courts have applied that label to other provisions of the Illinois Vehicle Code liberally. *E.g., Harper v. Epstein*, 306 N.E.2d 690, 692 (Ill. App. Ct. 1974) (statute requiring drivers to remove key from ignition before exiting car concerns public safety); *Schultz v. Siddens*, 548 N.E.2d 87, 89 (Ill. App. Ct. 1989) (statute regulating the operation of farm tractors on public highway concerns public safety). Notably, though, one Illinois court held that a statute prohibiting anyone from obstructing a pedestrian walkway was "not enacted as a public safety measure, but rather as a measure to facilitate the free flow of pedestrian traffic." *Cecola v. Illinois Bell. Tel. Co.*, 264 N.E.2d 809, 813 (Ill. App. Ct. 1970). It is not clear to the Court that the same isn't true for 625 ILCS 5/11-1416—by its plain language it appears to concern itself with "the effective movement of traffic" rather than public safety. Nevertheless, the Court assumes *arguendo* that 625 ILCS 5/11-1416 is a statute designed to protect public safety.

Even making that assumption, Count II fails because Plaintiff's alleged injuries do not implicate public safety. As noted above, "[a] party injured by such a violation [of a public safety statute] may recover only by showing that the violation proximately caused his injury and the statute or ordinance was intended to protect a class of persons to which he belongs ***from the kind of injury that he suffered***." *Kalata*, 581 at 661. Plaintiff's alleged injuries are that he was caught in traffic for a few hours and missed a networking event. These are not matters of public safety. *C.f. Duncavage v. Allen*, 497 N.E.2d 433, 440 (Ill. App. Ct. 1986) (landlord-defendant

20

whose violation of the Chicago Building and Housing Code caused decedent's death was liable because statute implicated public safety and human life).

In response, Plaintiff argues that the protest could have prevented emergency vehicles from responding to various emergencies. [91] at 30. Maybe, but Plaintiff was not injured by any delayed emergency vehicles or anything else that bears on public safety. His claim cannot proceed on the basis of some hypothetical person's hypothetical injury; *he* must have suffered the kind of injury the statute is designed to protect against. *Kalata*, 581 N.E.2d at 661. Because he has alleged no such injuries, his claim fails.[6]

> ### ii. Plaintiff's argument in the alternative—that the Court should imply a right of action—is precluded by Illinois law.

In his brief, Plaintiff argues in the alternative that the Court should imply a private right of action to sue for violations of 625 ILCS 5/11-1416. He makes this argument despite the fact that he also asserts, confusingly, that in Count II he "***does***

---

[6] It is also not clear that Plaintiff is in a class that is designed to be protected by the statute. Illinois courts have held that "statutes seeking to secure the enjoyment of rights to which individuals are entitled as members of the public, *such as ordinances relating to the public right of an unobstructed passage on a public highway*" are meant to benefit "municipalit[ies] at large." *Nichols by Nichols v. Sitko*, 510 N.E.2d 971, 974 (Ill. App. Ct. 1987) (emphasis added). When a statute purports to impose a duty that is "plainly for the benefit only of the public at large, a violation of the [statute] is of no evidential value upon the question of negligence." *Id*. Illinois courts have dismissed plaintiffs' claims premised on the violation of a public safety statute where the plaintiff is a member only of the public generally rather any specific class identified by the statute. *See Buerkett v. Illinois Power Co.*, 893 N.E.2d 702, 713 (Ill. App. Ct. 2008) (plaintiff could not sue for violations of the Illinois Public Utilities Act because although the statute was "designed for the protection of the public generally," the plaintiff did not establish that he was a member of any class of individuals meant to be protected). However, at least some Illinois courts have allowed plaintiffs to bring claims for violations of public-safety-focused sections of the Illinois Vehicle Code without directly addressing whether the plaintiff was in a class the statute was meant to protect. *E.g. Kacena v. George W. Bowers Co.*, 211 N.E.2d 563, 567 (Ill. App. Ct. 1965). Because Plaintiff's claim fails for other reasons, the Court declines to resolve this issue.

21

*not plead an implied cause of action.*" [91] at 27 (emphasis in original). One or the other of these positions is disingenuous, at best.

To imply a private right of action, Illinois courts have held that the following four factors must be satisfied:

> (1) the plaintiff is a member of the class for whose benefit the statute was enacted,
> (2) the plaintiff's injury is one the statute was designed to prevent,
> (3) a private right of action is consistent with the underlying purpose of the statute, and
> (4) implying a private right of action is necessary to provide an adequate remedy for violations of the statute.

*Pilotto v. Urban Outfitters W., L.L.C.*, 72 N.E.3d 772, 781 (Ill. App. Ct. 2017). Plaintiff argues that "[a]ll four factors point to giving" him a right to sue under an implied right of action theory. [91] at 28. Assuming that 625 ILCS 5/11-1416 is indeed a public safety statute, the Court has already addressed why Plaintiff's injury is not one that the statute was designed to protect. But if the statute is designed to promote the efficient flow of traffic, then Plaintiff has satisfied the second factor. However, the fourth factor forecloses any argument that a private right of action can be implied into the statute.

The Illinois Supreme Court has explained that it will "impl[y] a right of action under a statute *only in cases* where the statute would be ineffective, as a practical matter, unless a private right of action were implied." *Abbasi ex rel. Abbasi v. Paraskevoulakos*, 718 N.E.2d 181, 186 (Ill. 1999) (emphasis added). In assessing whether a statute contains adequate enforcement mechanisms, Illinois courts look to the language of the statute itself. *See Carmichael v. Prof'l Transp., Inc.*, 239 N.E.3d

22

512, 519 (Ill. App. Ct. 2021) (holding that the Illinois "Vehicle Code provides for a framework for enforcement" and declining to imply a private right of action). And the statute contains multiple provisions explaining how it is enforced. 625 ILCS 5/16-102 ("The Illinois State Police shall patrol the public highways and make arrests for violation of the provisions of this Act.")[7]; 625 ILCS 5/11-208(a)(2) (the Code enables "local authorities with respect to streets and highways under their jurisdiction and within the reasonable exercise of the police power" to "[r]egulat[e] traffic by means of police officers"). Further, any suggestion that the statute would be "ineffective[] as a practical matter" unless a private right of action is implied is observably false because Plaintiff alleges that Defendants were arrested for blocking traffic. [69] ¶¶ 18-19, 44. A private cause of action thus cannot be implied into the statute under any reasonable reading of Illinois law.

### iii. To the extent that Plaintiff intended to plead a claim for negligence arising from a breach of a common law duty, that claim fails.

Plaintiff also argues that all Defendants owed and breached a common-law duty of care to Plaintiff that duty. [91] at 31-32. In Illinois, courts consider the following four factors when determining whether a defendant had a duty of care: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of

---

[7] Plaintiff argues that Defendants' reliance on 625 ILCS 5/16-102 is "misplaced" because it appears in Chapter 16 rather than Chapter 11 of the Illinois Vehicle Code. [91] at 27. But the subsection describes the Illinois State Police's responsibility to enforce "the Act." The Illinois Vehicle Code defines "the Act" to mean *everything contained in the Illinois Vehicle Code*, including Chapter 11. *See* 625 ILCS 5/1-101.1. The Court finds no support for Plaintiff's attempt to cabin the Illinois Vehicle Code's enforcement mechanism in Chapter 16.

placing that burden on the defendant." *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1097 (Ill. 2012) (quoting *Widlowski v. Durkee Foods*, 562 N.E.2d 967, 968 (Ill. 1990)).

The Court does not know whether Plaintiff intended to plead a common law negligence claim. Defendant JVP, understandably confused by the unusual nature of Count II and its legal basis, argued in its opening brief that (1) a private right of action could not be implied into the Illinois Vehicle Code and (2) *if* Plaintiff intended Count II to function as a claim for negligence, Plaintiff's claim failed because, under the *Simpkins* factors, Defendants did not owe Plaintiff a common law duty of care. [75] at 23.

Plaintiff responded to the latter argument by analyzing the *Simpkins* factors and arguing that Defendants *did* owe Plaintiff a common law duty of care. [91] at 31. But the SAC nowhere pleads a claim for negligence against Defendants premised on a common law duty of care to Plaintiff or the putative class. Rather, the SAC alleges that Defendants are liable to Plaintiff for violating a duty arising out of the Illinois Vehicle Code. [69] ¶¶ 97-100. And Plaintiff states in his brief that Count II can be "consider[ed] the common law tort [of] negligence insofar that there was a breach of duty (*implied by the Vehicle safety rules*)." [91] at 29 n.9 (emphasis added). Because Plaintiff claims that the duty arose out of a statutory violation, the existence of a common law duty of care is not germane to any claims in the SAC. *See Gauchas v. Chicago Transit Auth.*, 206 N.E.2d 752, 756 (Ill. App. Ct. 1965) (distinguishing

24

between a claim premised on breach of a common law duty and a claim premised on violation of a statute meant to protect public safety).

In any event, even if Plaintiff had pled a negligence claim based on a violation of a common law duty arising from the *Simpkins* factors, that claim would fail. As a general principle in tort law, "[i]ntent and negligence are mutually exclusive; intentional acts may not form the basis for a negligence claim." 57A Am. Jur. 2d Negligence § 29. "[I]f there is substantial certainty that an injury will result from an act or there is a deliberate act to cause the injury, that act is an intentional act, not a negligent act." *Id*. Plaintiff does not argue or allege that Defendants (notwithstanding WESPAC's alleged negligence with respect to NSJP) were negligent in causing his injuries. To the contrary, he alleges and argues that Defendants intended to cause exactly the injuries he suffered. *See, e.g.*, [91] at 31 ("Defendants' causing injuries through blockades was not just foreseeable but intended); [91] at 32 ("[T]he intentional and unlawful conduct of Defendants is the direct and proximate cause of Manhart's injury. . ."); [69] ¶ 75 (describing injuries that occurred "because of the intentional efforts of Defendants."). Because "there is no claim of negligence that flows from intentionally tortious conduct," 57A Am. Jur. 2d § 29, Plaintiff could not state a claim for common law negligence against Defendants.

### E.  Counts III – VIII: Claims for In-Concert, Aiding and Abetting, and Conspiracy Liability

Claims III through VIII seek to hold Defendants liable for the conduct underlying Counts I and II under a theories of in-concert liability, aiding and abetting liability, and conspiracy liability. All three theories require some underlying tortious conduct.

25

*See Chadha v. N. Park Elementary Sch. Ass'n*, 123 N.E.3d 519, 537–38, 542 (Ill. App. Ct. 2018) (dismissing claims for civil conspiracy and aiding and abetting where underlying tort claims failed because they "are not independent torts" and they "require underlying conduct that is tortious"); *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1025 (7th Cir. 2018) (in-concert liability provides a means to hold an individual liable for the tortious conduct of another). Because Counts I and II are dismissed, there is no underlying tort for which any Defendants could be held liable in Counts III – VIII. Accordingly, those counts are also dismissed.

### F. Count IX: Negligence or Recklessness Claim Against WESPAC

In Count IX, Plaintiff brings a claim in the alternative for negligence or recklessness. Plaintiff alleges that WESPAC was NSJP's "fiscal sponsor" and as such had a "legal duty to control and supervise the activities of NSJP." [69] ¶ 146. Plaintiff thus argues that WESPAC is liable for NSJP's tortious conduct. [91] at 41. Because the Court has found that Plaintiff has failed to allege that NSJP is liable for any tortious conduct, Count IX necessarily fails. Even if NSJP—or any other Defendants—were liable, however, Count IX would fail because Plaintiff has not pled facts sufficient to show that WESPAC owed Plaintiff any duty.

It is not clear from where WESPAC's legal duty arises. Plaintiff alleges in his complaint that it stems from a 1968 revenue ruling from the IRS, which allows a 501(c)(3) entity to fund non-exempt activities if they further the entity's exempted purposes if the sponsor retains "control and discretion" over the funds. [69] ¶ 13; [91] at 41 (citing Rev. Rul. 68-489, 1968-2 C.B. 210). But Plaintiff cites no case or legal

26

authority from any jurisdiction suggesting or even contemplating that *any* IRS rule could *ever* create a legal duty sufficient to substantiate a tort claim. In any event, Count IX fails because Plaintiff failed to state a claim for any tortious conduct against NSJP. For these reasons, Count IX is dismissed.

### G. Article III Standing

Defendants separately argue all of Plaintiff's claims fail because he does not have Article III standing. To satisfy standing, a plaintiff's complaint must claim "to have suffered an injury that the defendant caused and the court can remedy." *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019). The injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), *as revised* (May 24, 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Id*. An injury is "concrete" when it is "real," rather than "abstract." *Spokeo*, 578 U.S. at 340 (citations omitted). An "intangible" injury may still be concrete if the "alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id*. at 341; *see also Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (receiving unwanted text messages can constitute an injury-in-fact because of the alleged injury "is analogous" to those suffered when a defendant commits the tort of intrusion upon seclusion).

Defendants argue that as a general matter, courts in this Circuit have recognized that the kinds of injuries alleged by Plaintiff here—annoyance, inconvenience, lost time, and stress—are not concrete for Article III purposes. *See Keller v. Lvnv Funding*, LLC, 2022 WL 7501335, at *2 (N.D. Ill. Oct. 13, 2022) (allowing Article III standing based on "[a]nnoyance, indignation, stress, intimidation or confusion . . . would blow a hole in the standing requirement"); *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665, 668 (7th Cir. 2021) (stress and anxiety insufficient for Article III standing). Plaintiff responds that because false imprisonment was a recognized cause of action at the time of the nation's founding (and before), he has standing to bring his claims. [91] at 9-10.

Plaintiff does not cite any authority for the notion that pleading the tort of false imprisonment (which the Court has found Plaintiff has failed to do) is sufficient to confer standing. Plaintiff also does not cite any legal source or historical authority suggesting that the tort of false imprisonment was ever used at common law in any factual circumstances bearing any resemblance to his claim here.[8] Plaintiff points out that false imprisonment existed under the umbrella of the "ancient action of trespass," [91] at 10, but Plaintiff has not pled facts or even argued that he has pled facts sufficient to show that he has a claim for the ancient action of trespass.[9] Plaintiff

---

[8] The Court has been able to locate a vanishingly small number of historical sources even contemplating that a plaintiff *could* be falsely imprisoned on a public highway. To the extent they exist, they contemplate a situation where a defendant forcibly detains someone by, for example, holding them at knifepoint. *See Bloomer v. State*, 35 Tenn. 66, 68 (1855).

[9] And he likely could not, because historically, courts limited an action in trespass to challenging confinement behind 'stone walls and iron bars.'" Michael L. Rustad & Thomas H. Koenig, Taming the Tort Monster: The American Civil Justice System As A Battleground of Social Theory, 68 Brook. L. Rev. 1, 14 (2002) (citing William L. Prosser, Handbook on the Law of Torts 42 (4th ed. 1971))

28

cannot rely on the existence of the tort of false imprisonment at the time of the founding to establish Article III standing when the actions forming the basis for his claim could not themselves substantiate a false imprisonment claim under either the common law at the time of the founding or under Illinois law today. *See U.S. v. All Funds on Deposit with R.J. O'Brien & Associates*, 783 F.3d 607, 616 (7th Cir. 2015) (to have standing, a plaintiff must have "a colorable claim.").

Plaintiff's historical arguments aside—and although Plaintiff never makes the argument—the Seventh Circuit has held that loss of time is sufficient to confer standing. *Freedom From Religion Found., Inc. v. Obama*, 641 F.3d 803, 807 (7th Cir. 2011) (citing *American Civil Liberties Union v. St. Charles*, 794 F.2d 265 (7th Cir. 1986) ("What did provide standing, we held, is that the plaintiffs had altered their daily commute, thus incurring costs in both time and money, to avoid the unwelcome religious display."). Some courts in this circuit have considered lost time insufficient to provide standing when a plaintiff voluntarily sacrifices time out of a desire to prevent a future injury that is not certainly impending, *see Dusterhoft v. OneTouchPoint Corp*, No. 22-CV-0882-BHL, 2024 WL 4263762, at *7 (E.D. Wis. Sept. 23, 2024), or where the plaintiff's lost time was spent fighting a legal action that was ultimately dismissed, *see Price v. Vill. of Homewood*, No. 24-1896, 2024 WL 4502106, at *1 (7th Cir. Oct. 16, 2024). Neither rationale exists here. Plaintiff's alleged injuries are thus sufficient to confer standing.

## IV. Motions for Sanctions under the Illinois Citizen Participation Act.

29

A-29

Defendants also seek to dismiss the SAC and recover fees and costs pursuant to the ICPA. The ICPA was created to combat SLAPPs (Strategic Lawsuits against Public Participation). *Kenyon v. Bd. of Educ. of Twp. High Sch. Dist. 113*, No. 24-CV-09878, 2025 WL 1101615, at *8 (N.D. Ill. Apr. 14, 2025). SLAPPs are lawsuits "aimed at preventing citizens from exercising their political rights or punishing those who have done so." *Sandholm v. Kuecker*, 962 N.E.2d 418, 427 (Ill. 2012) (citing *Wright Development Group, LLC v. Walsh*, 939 N.E.2d 389 *Ill. 2010)). "Plaintiffs in SLAPP suits do not intend to win but rather to chill a defendant's speech or protest activity and discourage opposition by others through delay, expense, and distraction." *Sandholm*, 962 N.E.2d at 427. To deter SLAPPs, the ICPA awards prevailing movants with attorney's fees and costs. 735 ILCS 110/25.

When a party moves "to dispose of a claim" pursuant to the ICPA, the statute provides that "a hearing and decision on the motion must occur within 90 days after notice of the motion is given to the respondent." 735 ILCS 110/15; 735 ILCS 110/20(a). Unless the reviewing court "finds that the responding party has produced clear and convincing evidence that the acts of the moving party are not immunized from, or are not in furtherance of acts immunized from, liability," the motion should be granted. 735 ILCS 110/20(c).

Plaintiff argues that the ICPA is a state procedural rule and thus inapplicable in federal court. The Court agrees that, at least at the pleadings stage, the ICPA cannot be used to dismiss a complaint in federal court. The Supreme Court explained in *Shady Grove* that if a Federal Rule of Civil Procedure answers or covers a question

30

in dispute, the federal rule governs unless that rule is invalid. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 397 (2010). Federal Rules of Civil Procedure 12 and 56 "establish the exclusive criteria for testing the legal and factual sufficiency of a claim in federal court." *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1333 (D.C. Cir. 2015) (citations omitted) (emphasis added). Defendants cannot rely on state statutes to dismiss Plaintiffs' claims in federal court where federal rules already provide the exclusive means to do so.

The Court notes that at least some courts in this district have held that the ICPA is a substantive rule and can be applied by a court sitting in diversity. *See, e.g., Chi v. Loyola Univ. Med. Ctr.*, 787 F. Supp. 2d 797, 808 (N.D. Ill. 2011). Respectfully, however, those decisions have not addressed whether the ICPA passes muster under *Shady Grove*'s standard. Instead, the Court is persuaded by the *Intercon Solutions* court's thorough analysis of Washington's substantially similar anti-SLAPP law. Like the ICPA, the Washington anti-SLAPP law asked district courts to review and dismiss a plaintiff's claims based on the merits of the claims rather than the standards set forth in Rule 12 or Rule 56. *Intercon Sols., Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1047 (N.D. Ill. 2013), *aff'd on other grounds*, 791 F.3d 729 (7th Cir. 2015). In other words, the statute provided an answer to a question governed by a Federal Rule of Civil Procedure, and the court held that it could not be applied in federal court. The same result follows here: the Federal Rules provide the exclusive means for federal courts to rule upon a pretrial motion to adjudicate whether a

31

Plaintiff has stated a viable cause of action, so the ICPA cannot be used in federal court for the same purpose.

The Court understands that this holding frustrates the important policy goals that the Illinois legislature furthered in the ICPA and may encourage forum shopping. But neither concern alleviates the Court's obligation to follow Supreme Court precedent. *See Burlington N. R. Co. v. Woods,* 480 U.S. 1, 3-4 (1987) (holding that state procedural law intended to deter frivolous litigation was inapplicable in federal court); *Shady Grove*, 559 U.S. at 415-16 ("The short of the matter is that a Federal Rule governing procedure is valid whether or not it alters the outcome of the case in a way that induces forum shopping.").

Accordingly, Defendants' requests for relief pursuant to the ICPA is denied.

## V.     Motion to Strike

Individual Defendants and Dissenters also moved to strike certain allegations in the SAC. Rule 12(f) provides that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). District courts have discretion in deciding whether to strike portions of a pleading. *Talbot v. Roberts Matthews Distrib. Co.*, 961 F.2d 654, 664 (7th Cir. 1992). Motions to strike pleadings "are not favored" and will generally not be granted unless "it is clear that [the pleading] can have no possible bearing on the subject matter of the litigation" and "the moving party will be prejudiced" by the pleading. *Anderson v. Bd. of Educ. of City of Chicago*, 169 F. Supp. 2d 864, 868 (N.D. Ill. 2001) (citations omitted). "Prejudice results when the matter complained of has the effect of confusing

32

the issues or where it is so lengthy and complex that it places an undue burden on the responding party." *Id.*

Defendants argue that multiple factual allegations in the SAC should be stricken because they are intended to inflame and harass rather than further any legitimate litigation goals. *See generally* [77]. Because the SAC is dismissed in its entirety, Defendants are not required to answer any of Plaintiff's allegations and are thus not prejudiced. Accordingly, Defendants' motion to strike [77] is denied as moot.

## VI.   Motions for Sanctions

Individual Defendants, Dissenters, and Tides Center move for sanctions against Plaintiff pursuant to Rule 11. The purpose of Rule 11 is to deter baseless filings. *Royce v. Michael R. Needle, P.C.*, 950 F.3d 939, 957 (7th Cir. 2020). The decision to impose Rule 11 sanctions "is within the sound judgment of the district court." *Cooney v. Casady*, 735 F.3d 514, 523 (7th Cir. 2013). Rule 11(b) provides that:

> by presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
>
> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary

support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

*Malec Holdings II Ltd. v. Eng.*, 217 F. App'x 527, 529 (7th Cir. 2007) (citing Fed. R. Civ. P. 11(b)).

Here, the Court believes that Plaintiff's filings were presented for the improper purpose of harassment and that Plaintiff made legal contentions that were neither supported by existing law nor nonfrivolous arguments in favor of the extension or modification of existing law. Accordingly, and for the reasons explained in further detail below, Defendants' motions for sanctions [72]; [76] are granted.

Plaintiff's improper purpose is evident from the SAC. The SAC is rife with allegations that are irrelevant to Plaintiff's stated causes of action and which are only a hair's breadth away from calling Defendants terrorists and placing the loss of innocent lives at their feet. Among other things, the SAC alleges that Defendants engaged in a "propaganda offensive" on behalf of Hamas, [69] ¶ 5, and that at least some Defendants acted "as Hamas's propaganda arm in the United States," [69] ¶ 55. The SAC also alleges that Defendants are responsible for "extend[ing] the war" in Gaza, "resulting in the deaths of thousands of Palestinians and Israelis." [69] ¶ 2. An earlier version of Plaintiff's complaint alarmingly urged the Court to "punish[] [Defendants] without remorse or hesitation." [33] ¶ 8.

34

Plaintiff's briefing takes on a similar tenor: Plaintiff cites extensively from an article from a think tank that accuses Defendants of engaging in "civil terrorism," being "anti-Western," and working to "make life intolerable for Americans who support . . . the U.S. in its current form." [91] at 6-7.

The article goes on to discuss *this* litigation and describes it approvingly as a vehicle through which Plaintiff's counsel "may make a dent in the [D]efendants' resources" via a "slow" discovery process. That same article also calls for the "civil terrorists" who participated in the protest at issue in this action—that is, Defendants—to be denaturalized and deported. This is the opinion of a think tank, the Manhattan Institute, not necessarily Plaintiff's counsel. But counsel approvingly cited several paragraphs of this article, [91] at 1, 6-7, and it sets the context for the litigation. Taken together with Plaintiff's request for $36 million on behalf of the putative class,[10] [39] at 3, the Court is persuaded that Plaintiff's intent in bringing this action was not to recover the damages actually sustained, but instead to harass Defendants.

The Court is also troubled by the frivolity of several of Plaintiff's legal arguments. To be clear, there is nothing *per se* frivolous about the legal theories identified in the SAC. Outside of secondary sources like the Restatement, the Court is not aware of any case or legal authority that has squarely addressed Plaintiff's false imprisonment theory here. And plaintiffs are allowed to make nonfrivolous arguments that the law

---

[10] Although not relevant to whether Plaintiff stated a claim, the Court has a difficult time imagining how potential members of the class might be identified and how Rule 23 questions might be answered if this case were to go forward.

35

A-35

should be extended or modified. Fed. R. Civ. P. 11(b)(2). A creative lawyer may be able to make a non-frivolous argument that there is a tort available that should be expanded to encompass Defendants' conduct, and such an argument would be permissible under Rule 11 (if ultimately unsuccessful).

What is not permissible, however, is for Plaintiff to make false representations of law in support of his novel legal arguments. This is where Plaintiff has gone too far. For example, in arguing that Illinois law had "superseded" *comment d* of § 36 of the Restatement, Plaintiff relied exclusively on an unpublished case with no relevant precedential value that in fact comported with *comment d*. It is impermissible to ascribe nonexistent holdings to cases, or to claim that a non-precedential case establishes precedent.

Plaintiff's false imprisonment claim also hinges on his argument that 625 ILCS 5/4-201 would have made it illegal for Plaintiff to exit his car during the blockade. But for the reasons discussed above, that is not correct. Rule 11 imposes a duty on parties to conduct a "reasonable inquiry into the law." *Brown,* 830 F.2d at 1435. It does not reflect a reasonable inquiry into the law for Plaintiff to premise his claim for false imprisonment on a section of the Illinois Vehicle Code that pertains to abandoning vehicles without being aware of how the Illinois Vehicle Code defines an abandoned vehicle.

Plaintiff's arguments with respect to Count II also do not evince a reasonable inquiry into the law. Plaintiff's brief describes Count II as representing at least three different potential causes of action: one premised on a violation of a public safety

statute, one (articulated only in a footnote) premised on a common-law negligence claim[11], and one arguing that the Court should imply a right of action into the Illinois Vehicle Code. None of these causes of action are identified with any degree of specificity in the SAC and each fails for the reasons discussed above. And when Defendants pointed to controlling law that, for example, the Court could *not* imply a private right of action into a statute unless that statute would be otherwise ineffective, Plaintiff's response was to ignore that law and to misrepresent the text of the Illinois Vehicle Code. *See* [91] at 28-29 (arguing that 625 ILCS § 5/16-102 applies only to Chapter 16 of the Illinois Vehicle Code despite it saying otherwise).

Defendants raised many of these exact arguments in draft Rule 11 motions that were shared with Plaintiff in response to earlier versions of the complaint that contained claims for violations of the Illinois Vehicle Code. *See* [59-1] at 12 (explaining that a private plaintiff could not bring a claim for a violation of the relevant portion of the Illinois Vehicle Code). Presumably in response those draft motions, Plaintiff dropped his statutory violation claim from the SAC and replaced it with the common law claim premised on the violation of a public safety statute. But in his response brief, Plaintiff functionally revived the claim by arguing in the alternative that a right should be implied, despite simultaneously arguing that he "***does not plead an implied cause of action***." [91] at 27 (emphasis in original). Plaintiff's confusing defense of Count II leaves the Court with the definite conclusion

---

[11] Further, to the extent that Plaintiff intended Count II as a negligence claim, Plaintiff ignored Defendants' correct argument that Count V would necessarily fail because a claim for negligence cannot support conspiracy claim, something which Plaintiff would have known after a reasonable inquiry into the law. *Rogers v. Furlow*, 699 F. Supp. 672, 675 (N.D. Ill. 1988)

37

that he adopted a "throw spaghetti at the wall and see what sticks" approach. Rule 11 requires more rigor than that. Plaintiff's counsels' actions forced Defendants to spend time and money shadowboxing a myriad of possible arguments to support a legal theory that Plaintiff was not able to sufficiently articulate himself.

Separately, and as explained above, the Court agrees with Plaintiff that the ICPA cannot be applied in federal court. Plaintiff argued both that the *Shady Grove* doctrine precluded ICPA application and, in the alternative, that even if it could be applied the ICPA did not reach Plaintiff's conduct in this case. In making the latter argument, Plaintiff cited to the Seventh Circuit's decision in *Intercon Solutions* in support of the proposition that "the [ICPA] is not a defense to intentional torts." [91] at 14 (citing 791 F.3d at 731-33). Plaintiff also argued that in *Intercon Solutions*, the court "strongly hinted its skepticism of [the ICPA]'s validity." [91] at 22. But in that case, the Seventh Circuit said almost nothing about ICPA other than noting that it was *not at issue*. 791 F.3d at 732.[12] Rather, the Seventh Circuit considered whether Washington's anti-SLAPP statute could be applied in federal court. *Id.* The court ultimately decided that the issue was moot because while the appeal was pending, Washington's supreme court held that the statute was unconstitutional. *Id.*

---

[12] The entirety of the Seventh Circuit's discussion of the ICPA is reproduced below:

> Illinois has its own anti-SLAPP statute . . . which creates a qualified immunity that can be resolved in federal court on a motion for summary judgment or at trial. [The ICPA] contains a few procedural rules, but they differ from [the Washington statute], and [appellee] has not invoked them; indeed, it does not mention the Illinois statute at all.) We therefore arrive at the same outcome as the district court, but on the holding of *Davis* rather than the district court's reasons. This circuit's resolution of questions about how the procedural aspects of other states' anti-SLAPP statutes work in federal court will have to await some other case.

38

Of a similar vein, while arguing that the ICPA cannot be used in federal court, Plaintiff falsely attributed a quote to the Illinois Supreme Court. Plaintiff wrote that in *Sandholm*, "[t]he Illinois Supreme Court itself calls [the ICPA] a 'procedural tool.'" [91] at 20 (purporting to quote *Sandholm*, 962 N.E.2d at 429). This quote does not exist in *Sandholm* and, beyond citing to Illinois's rules of civil procedure, *Sandholm* does not comment on whether the ICPA is a procedural or substantive tool. The Court cannot find any other case in Illinois that calls the ICPA a "procedural rule."

Plaintiff's counsel Theodore Frank filed a declaration with the Court urging that the Court deny Defendants' motions for sanctions. [92-1]. In his declaration, Mr. Frank described his longstanding and successful practice of bringing novel theories and questions of first impression before courts. He further urged that he would not bring a frivolous lawsuit, and that he has been contemplating the legal theories that led to this lawsuit since at least 1999. The Court appreciates that Mr. Frank has a genuine and personal concern with Defendants' alleged conduct. But that concern does not give Plaintiff *carte blanche* to make frivolous legal arguments, ignore controlling precedent, and misrepresent existing law in support of his case.

Defendants sent Plaintiff multiple draft Rule 11 motions explaining the flaws in Plaintiff's legal theories. Instead of taking heed, Plaintiff doubled down on arguments that a reasonable inquiry into the law would have revealed were baseless. That, combined with the inflammatory allegations in this case, evince Plaintiff's intent to harass rather than a genuine desire to vindicate any violated rights. Accordingly, Defendants' motions for sanctions [71, 76] pursuant to Rule 11 are granted.

39

A-39

### I.  Dismissal with Prejudice

For similar reasons, the SAC is dismissed with prejudice. While it is common to grant a plaintiff leave to amend their complaint, dismissal with prejudice is appropriate when any amendment would be futile. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 520 (7th Cir. 2015). Dismissal is also appropriate where the action is "intended to harass." *Showers v. Spectrum Charter Commc'ns*, No. 1:24-CV-00242-SEB-KMB, 2024 WL 5108157, at *2 (S.D. Ind. Dec. 12, 2024) (citing *Georgakis v. Illinois State Univ.*, 722 F.3d 1075, 1078 (7th Cir. 2013)). Dismissal with prejudice is thus appropriate here.

### II.  Conclusion

For the reasons stated herein, Defendants' motions to dismiss [73, 75, 78, 80, 82] are granted in part and denied in part. They are granted insofar as they seek to dismiss the SAC for failure to state a claim under Rule 12(b)(6). They are denied to the extent they seek relief under the ICPA. Defendants Tides Center [71] and Individual Defendants' and Dissenters' [76] motions for sanctions pursuant to Rule 11 are granted. Defendants' motions to strike [77] and NSJP's motion to join the motion to strike [81] are denied as moot. Civil case terminated.

E N T E R:

Dated: August 7, 2025

_____
MARY M. ROWLAND
United States District Judge

40

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF NextGen 1.8 (rev. 1.8.3)
### Eastern Division

Christopher Manhart

                                        Plaintiff,

v.                                                      Case No.: 1:24–cv–08209
                                                        Honorable Mary M. Rowland

Wespac Foundation Inc., et al.

                                        Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, August 7, 2025:

        MINUTE entry before the Honorable Mary M. Rowland: Defendants' motions to
dismiss [73, 75, 78, 80, 82] are granted in part and denied in part. They are granted insofar
as they seek to dismiss with prejudice the SAC [69] for failure to state a claim under Rule
12(b)(6). They are denied to the extent they seek relief under the ICPA. Defendants'
motions to strike [77] and NSJP's motion to join the motion to strike [81] are denied as
moot. Defendants Tides Center [71] and Individual Defendants' and Dissenters' [76]
motions for sanctions pursuant to Rule 11 are granted. Counsel for Tides Center,
Individual Defendants, and Dissenters are to meet and confer with Plaintiff's counsel
pursuant to the procedures laid out in Local Rule 54.3(d) regarding an appropriate
calculation of attorneys' fees. Counsel are to file a joint statement as contemplated by
Local Rule 54.3(e) by 10/16/25. Additionally, all parties are to file a joint status report
with the Court by 9/4/25 indicating whether, because of an appeal, the deadline regarding
fees should be stayed. Civil case terminated. Mailed notice. (jg, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.