No. 25-2382

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

CHRISTOPHER MANHART,

*individually and on behalf of all others similarly situated*,

Plaintiff-Appellant

v.

WESPAC FOUNDATION INC., *et al.*,

Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:24-cv-8209
Judge Mary M. Rowland

Reply Brief
of Appellant Christopher Manhart

HAMILTON LINCOLN LAW INSTITUTE
Theodore H. Frank
1629 K St. NW, Suite 300
Washington, D.C. 20006
(703) 203-3848
ted.frank@hlli.org

*Attorneys for*
    *Plaintiff-Appellant Christopher Manhart*

# Table of Contents

Table of Contents ................................................................................................. i

Table of Authorities ........................................................................................... iii

Table of Acronyms ............................................................................................ xiv

Introduction and Summary of Argument ........................................................ 1

I.    Manhart stated a claim under Illinois law for false imprisonment. ......................... 3

      A.    There is confinement under both the Second and Third Restatements. Defendants fail to defend the district court's erroneous application of Section 36(3) and comment *d* of the *Second Restatement*. ............................................................................. 5

      B.    The district court erred in finding a reasonable means of escape. ................. 8

      C.    Public policy supports application of false imprisonment law to Defendants' acts intended to cause injury. ...................................... 11

II.   Manhart states a claim for negligence under Illinois law. ...................................... 12

      A.    Manhart adequately pleaded *prima facie* negligence under *Kalata*. .............. 13

      B.    Manhart's complaint also supports common-law negligence. ...................... 13

III.  Manhart stated a derivative claim against WESPAC for NSJP's torts. .................. 16

      A.    NSJP's liabilities are WESPAC's liabilities because WESPAC's fiscal sponsorship took no steps to establish a separate corporate structure for NSJP. .............................................................. 16

      B.    The district court erred when it failed to apply the Illinois test for duty. ...................................................................................................... 19

IV.   Defendants' other spaghetti-at-the-wall arguments do not save the district court's dismissal. ...................................................................................... 21

      A.    There is Article III standing. ........................................................................ 21

            1.    Manhart alleges injury-in-fact. ........................................................ 21

            2.    Traceability is met. ........................................................................... 24

            3.    Defendants do not and cannot contest redressability. .................. 24

B.   Manhart's derivative in-concert, aiding-and-abetting, and conspiracy claims are adequately pleaded: Manhart pleaded that the parties agreed to aim tortious behavior at Chicago through the A15action conspiracy. For the same reason, there is specific personal jurisdiction and traceability. ..............................................................24

   1.   Conspiracy and joint-action support specific jurisdiction. .....................29

   2.   Tides is liable for derivative claims for offering the inducement of legal defense to future tortfeasors in Chicago; there is personal jurisdiction and traceability for the same reason. ....................................30

   3.   The complaint adequately pleads derivative claims against NSJP, and there is personal jurisdiction over NSJP and WESPAC. ...................35

C.   The complaint does not implicate the First Amendment. ..............................37

V.   Reassignment is appropriate under Circuit Rule 36. ................................................ 39

Conclusion ............................................................................................................................. 41

Certificate of Compliance with Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 30(d).......... 42

Proof of Service..................................................................................................................... 43

# Table of Authorities

<u>Cases</u>

*Access Living of Metro. Chi. v. Uber Techs., Inc.,*
    958 F.3d 604 (7th Cir. 2020) ........................................................................... 20

*Adcock v. Brakegate, Ltd.,*
    164 Ill. 2d 54 (Ill. 1994) ................................................................................ 34

*Ahmed v. Quinn,*
    124 F.3d 203, 1997 WL 471335 (7th Cir. 1997) (unpublished) ................................ 29

*Array Techs., Inc. v. Mitchell,*
    305 F. Supp. 3d 1256 (D. N.M. 2018) .................................................................. 31

*Askew v. Sheriff of Cook County, Ill.,*
    568 F.3d 632 (7th Cir. 2009) ........................................................................... 39

*Avila v. CitiMortgage, Inc.,*
    801 F.3d 777 (7th Cir. 2015) ....................................................................... 17-18

*Baltimore & Ohio R. Co. v. Goodman,*
    275 U.S. 66 (1927) ........................................................................................ 7

*Bird v. Jones,*
    7 Q.B. 742, 115 Eng. Rep. 668 (1845) ............................................................. 4, 8

*Boim v. Quranic Literacy Inst. & Holy Land Found.,*
    291 F.3d 1000 (7th Cir. 2002) ......................................................................... 39

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985) ................................................................................. 29, 37

*Calder v. Jones,*
    465 U.S. 783 (1984) ..................................................................................... 37

*Chapman v. Yellow Cab Cooperative,*
875 F.3d 846 (7th Cir. 2017) ....................................................................17, 19

*Chemtreat Inc. v. Kinsman,*
2006 U.S. Dist. LEXIS 108400 (C.D. Ill. Sept. 15, 2006) ................................32

*Cooper v. Martin Luther King Jr. Boys & Girls Club of Chicago,*
193 N.E.3d 197 (Ill. App. 2021) ............................................................... 32-33

*Cox v. Louisiana,*
379 U.S. 536 (1965)......................................................................................36

*C&K Coal Co. v. United Mine Workers,*
704 F.2d 690 (3d Cir. 1983) ..........................................................................31

*Deslandes v. McDonald's United States, LLC,*
81 F.4th 699 (7th Cir. 2023) ..................................................................... 27-28

*Dieffenbach v. Barnes & Noble, Inc.,*
887 F.3d 826 (7th Cir. 2018) ..............................................................21, 23, 28

*Doe v. Smith,*
429 F.3d 706 (7th Cir. 2005) ..................................................................... 27-28

*Enoch v. Tienor,*
570 F.3d 821 (7th Cir. 2009) ..........................................................................39

*Ewing v. Med-1 Sols., LLC,*
24 F.4th 1146 (7th Cir. 2022) .........................................................................21

*Felton v. City of Chicago,*
827 F.3d 632 (7th Cir. 2018) ..........................................................................40

*Fowler v. Valencourt,*
435 S.E.2d 530 (N.C. 1993)......................................................................22, 23

*Freedom from Religion Foundation, Inc. v. Obama*,
    641 F.3d 803 (7th Cir. 2011) ..................................................................21

*Gable v. Universal Acceptance Corp.*,
    338 F. Supp. 3d 943 (E.D. Wisc. 2018) .............................................11

*Gadelhak v. AT&T Servs.*,
    950 F.3d 458 (7th Cir. 2020) ..................................................................22

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ..............................................................33

*Helmann v. Codepink*,
    2025 WL 3030582 (C.D. Cal. June 13, 2025) ..........................16-17

*Holmes v. Village of Hoffman Estate*,
    511 F.3d 673 (7th Cir. 2007) ..................................................................39

*Indlecoffer v. Vill. Of Wadsworth*,
    671 N.E.2d 1127 (Ill. App. Ct. 1996) ..............................................14

*Kalata v. Anheuser-Busch Companies, Inc.*,
    581 N.E.2d 656 (Ill. 1991) ......................................................................12

*Kansas v. Nebraska*,
    574 U.S. 445 (2015) ....................................................................................6

*Karow v. Student Inns, Inc.*,
    357 N.E.2d 682 (Ill. App. 1976) ..........................................................7

*Los Angeles v. Lyons*,
    461 U.S. (1983) ..........................................................................................24

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................21-22

*Madsen v. Women's Health Ctr.*,
    512 U.S. 753 (1994).................................................................37

*Mancavage v. City of Chicago*
    659 F.3d 626 (7th Cir. 2011)...................................................38

*Marcano v. Nw. Chrysler-Plymouth Sales, Inc.*,
    550 F. Supp. 595 (N.D. Ill. 1982) ...........................................11

*Marshall v. Burger King Corp.*,
    856 N.E.2d 1048 (Ill. 2006)...................................... 13-14, 19

*Morris v. Faulkner*,
    361 N.E.2d 112 (Ill. App. 1977) .................................................7

*M.U. v. Team Ill. Hockey Club, Inc.*,
    215 N.E.3d 286 (Ill. App. 2022) .............................................32

*Nat'l Organization for Women, Inc. v. Scheidler*,
    267 F.3d 687 (7th Cir. 2001)
    *rev'd on other grounds*,
    *Scheidler v. Nat'l Org. for Women, Inc.*, 537 US 393 (2003)....................38-39

*New York v. Operation Rescue National*,
    80 F.3d 64 (2d Cir. 1996) .......................................................35

*Palausky v. Landers*,
    385 N.E.2d 751 (Ill. App. 1978) .............................................15

*Pearson v. Target Corp.*,
    968 F.3d 827 (7th Cir. 2020) ..................................................39

*Pennell v. Global Trust Management, LLC*,
    990 F.3d 1041 (7th Cir. 2021) ................................................22

*Pinkerton v. U.S.*,
   328 U.S. 640 (1946) ...................................................................34

*Priddy v. Health Care Service Corp.*,
   870 F.3d 657 (7th Cir. 2017) ......................................................39

*Protect Our Parks, Inc. v. Chicago Park Dist.*,
   971 F.3d 722 (7th Cir. 2020) ......................................................22

*Reynolds v. Beneficial Nat. Bank*,
   288 F.3d 277 (7th Cir. 2002) ......................................................39

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984)...................................................................38

*Robinson v. Miller*,
   1985 Ill. App. LEXIS 2179 (Ill. App. 1985) (unpublished)............7

*Samuels v. Wilder*,
   906 F.2d 272 (7th Cir. 1990) ......................................................40

*Schiavone v. Fortune*,
   477 U.S. 21 (1986),
   *superseded by 1991 rule on other grounds*, Fed. R. Civ. P. 15(c)............16, 35

*Schultz v. Siddens*,
   548 N.E.2d 87 (Ill. App. 1989) ...................................................13

*Sea-Land Services, Inc. v. Pepper Source*,
   993 F.2d 1309 (7th Cir. 1993) ....................................................18

*Shank v. Fields*,
   869 N.E.2d 261 (Ill. App. Ct. 2007).......................................14-15

*Sierra v. City of Hallandale Beach*,
   996 F.3d 1110 (11th Cir. 2021) ..................................................24

*Simmons v. Homatas,*
        925 N.E.2d 1089 (Ill. 2010) ................................................................. 25, 32, 33-34, 36

*Simpkins v. CSX Transp., Inc.,*
        965 N.E.2d 1092 (Ill. 2012) ................................................................. 14, 19-20

*Spokeo, Inc. v. Robins,*
        578 U.S. 330 (2016) ................................................................. 22-23

*Summers v. Earth Island Inst.,*
        555 U.S. 488 (2009) ................................................................. 22

*Tamburo v. Dworkin,*
        601 F.3d 693 (7th Cir. 2010) ................................................................. 29-30, 33, 36

*Textor v. Bd. Of Regents,*
        711 F.2d 1387 (7th Cir. 1983) ................................................................. 30, 31

*Thomas v. JBS Green Bay, Inc.,*
        120 F.4th 1335 (7th Cir. 2024) ................................................................. 12

*Ticketserve, Inc. v. Viagogo, Inc.,*
        656 F. Supp. 2d 775 (N.D. Ill. 2009) ................................................................. 36

*TransUnion LLC v. Ramirez,*
        594 U.S. 413 (2021) ................................................................. 22

*Triad Assocs., Inc. v. Chi. Hous. Auth.,*
        892 F.2d 583 (7th Cir. 1989) ................................................................. 40

*Umble v. Sandy McKie & Sons, Inc.,*
        690 N.E.2d 157 (Ill. App. 1998) ................................................................. 33

*United States v. All Funds on Deposit with R.J. O'Brien & Assocs.,*
        787 F.3d 607 (7th Cir. 2014) ................................................................. 20

*United States v. Guest,*
    383 U.S. 745 (1966) ................................................................. 8, 30-31

*United States v. Wilson,*
    154 F.3d 658 (7th Cir. 1998) ............................................... 37-38

*Uzuegbunam v. Preczewski,*
    592 U.S. 279 (2021) ..............................................................24

*Vincent v. City Colleges of Chicago,*
    485 F.3d 919 (7th Cir. 2007) ...............................16, 17, 19, 20

*Walden v. Fiore,*
    571 U.S. 277 (2014) ..............................................................30

*Weddington v. Zatecky,*
    721 F.3d 456 (7th Cir. 2013) ................................................39

*Yee v. City of Escondido,*
    503 U.S. 519 (1992) ..............................................................19


Rules and Statutes and Constitutional Provisions

7th Cir. R. 26.1 ...........................................................................17

7th Cir. R. 36 ....................................................................... 3, 39-41

18 U.S.C. § 241 ..................................................................... 30-31

18 U.S.C. § 3282(a) ...................................................................31

430 ILCS § 70/3 .........................................................................15

625 ILCS 5/4-201 .........................................................................9

625 ILCS 5/4-203 ...............................................................................................9

625 ILCS 5/11-1416 ..................................................................................... 13-14

735 ILCS 110 ....................................................................................................12

C.D. Cal. L.R. 7.1-1 ........................................................................................17

Fed. R. Civ. Proc. 7.1(a)(1) .............................................................................17

Fed. R. Civ. Proc. 8 ...............................................................................2, 12, 40

Fed. R. Civ. Proc. 8(d) .....................................................................................19

Fed. R. Civ. Proc. 9(b) .....................................................................................28

N.D. Ill. L.R. 3.2 ..............................................................................................17

U.S. Const., am. i .................................................................... 12, 14, 15, 37-39

U.S. Const., Art. III .............................................................................. 2, 21-24

## Other Authorities

ACLU of Illinois,
   *Can protestors block traffic or entrances to a building to draw attention to their
   cause?* (Mar. 15, 2012) .................................................................................38

ALTMAN, ROY K.,
   ISRAEL ON TRIAL: EXAMINING THE HISTORY, THE EVIDENCE, AND THE LAW
   (forthcoming 2026).............................................................................................2

3 BLACKSTONE, WILLIAM
   COMMENTARIES ON THE LAWS OF ENGLAND Ch. 8 (1768) .............................................23

Bureau of Pub. Roads, U.S. Dep't of Commerce,
  *Highway Statistics Summary to 1955* (1957) ...................................................................6

Complaint,
  *All. of Nonprofits for Ins. Risk Retention Grp. v. WESPAC Found., Inc.*,
  No. 1:25-cv-01320, Dkt. 1 (S.D.N.Y. Feb. 13, 2025) ....................................................18

COLVIN, GREGORY T., AND STEPHANIE L. PETIT,
  FISCAL SPONSORSHIP: 6 WAYS TO DO IT RIGHT (3d ed. 2019) ("COLVIN") ...... 16-17, 20

Exec. Order No. 14188,
  90 F.R. 8847 (Feb. 3, 2025) .......................................................................................31

Geering, Emma,
  *The Legal Value of Fiscal Sponsorship: A Proposal of New Law*,
  72 HASTINGS L.J. 1605 (2021) .........................................................................................17

Herrick, F. Andrew,
  *Cases, Controversies, and Diversity*,
  109 NW. U. L. REV. 57 (2015)........................................................................................24

Johnson, Samuel,
  Fiscal Sponsorship in Truly Independent Film: Entity and Model Choice
  and Legal Risks, 21 WASH. J. L. TECH. & ARTS 33 (2026) ...........................................17

Lilley, Brian,
  *'Hamas is the genocidal entity':*
  *Warfare experts on what the world is getting wrong on Gaza*,
  NAT. POST (Oct. 4, 2025)....................................................................................................2

NSJP website,
  https://www.nationalsjp.org/about/........................................................................ 35-36

Redacted Complaint,
  *United States v. Levy-Armstrong*,
  Dkt. 23, No. 0:26-cr-25 (D. Minn. Jan. 20, 2026) ........................................................31

RESTATEMENT (SECOND) TORTS, introduction...........................................................6

RESTATEMENT (SECOND) TORTS § 36...................................................................10

RESTATEMENT (SECOND) TORTS § 36, comment *a* ............................................10

RESTATEMENT (SECOND) TORTS § 36, comment *d* ...................................... 3-6, 8

RESTATEMENT (SECOND) TORTS § 36, Illustration 2 ..........................................8

RESTATEMENT (SECOND) TORTS § 36, Illustration 11 ....................................3-4, 6-7

RESTATEMENT (SECOND) TORTS § 36(3) ......................................................... 4-7

RESTATEMENT (SECOND) TORTS § 37 ............................................................3, 6

RESTATEMENT (SECOND) TORTS § 43 ...............................................................6

RESTATEMENT (SECOND) TORTS § 43, comment *a*.............................................6

RESTATEMENT (SECOND) TORTS § 876, comment *d* ........................................25

RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 7,
    comment *c* (Tentative Draft No. 3) ....................................... 7-8

RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 7,
    comment *d* (Tentative Draft No. 3)...................................................11

RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 8
    (Tentative Draft No. 3) ......................................................4

RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 8,
    comment *b* (Tentative Draft No. 3)..................................... 1, 3-5, 8

RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 8,
    comment *h* (Tentative Draft No. 3)........................................ 9-10

RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 8,
    comment *i* (Tentative Draft No. 3) ............................................................ 9-10

RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 10
    (Tentative Draft No. 1) (formerly § 110) ....................................................6

Takagi, Gene,
    *Fiscal Sponsorship: A Balanced Overview*
    NONPROFIT Q. (Jan. 28, 2020) ...................................................................17

# Table of Acronyms

A .................................................................Appendix

AGB.............................................................Brief of Iowa and Eleven Other States (Appeal
Dkt. 28)

ALI...............................................................American Law Institute

Appeal Dkt..................................................Docket in No. 25-2382 (7th Cir.)

IDB...............................................................Individual Defendants' and Dissenters Brief
(Appeal Dkt. 50)

JumpB ........................................................Jump Start Legal Center *amicus*
(Appeal Dkt. 65)

JVP..............................................................Jewish Voice for Peace

JVPB ...........................................................JVP Brief (Appeal Dkt. 54)

MIB .............................................................Manhattan Institute *amicus* (Appeal Dkt. 32)

NSJP ...........................................................National Students for Justice in Palestine

NSJPB.........................................................NSJP Brief (Appeal Dkt. 53)

OB...............................................................Manhart's Opening Brief (Appeal Dkt. 22)

R..................................................................Docket in No. 1:24-cv-08209 (N.D. Ill.)

SJP Chicago ...............................................Students for Justice in Palestine Chicago

TB................................................................Tides Brief (Appeal Dkt. 51)

WB ..............................................................WESPAC Brief (Appeal Dkt. 52)

WESPAC.....................................................WESPAC Foundation Inc.

## Introduction and Summary of Argument

"[I]f a person desires to go in a particular direction that is the only means of exit then available, an actor who prevents the person from proceeding in that direction is subject to liability for false imprisonment." *Third Restatement* § 8 cmt. *b*, Tentative Draft No. 3 at 45. Manhart pleaded that activists bound themselves into a human barricade to cause standstill traffic on I-190 to O'Hare Airport during the morning rush hour. OB3.[1] The conspirators had targeted it as a "logistical hub" to "cause pain to the economy." *Id.* Thousands of motorists like Manhart were trapped in their cars for hours. OB5.

Defendants complain (TB25) that Manhart asks that "this Court should be the first to hold that intentional conduct creating a traffic jam amounts to false imprisonment," but that's the nature of a question of first impression. Defendants are asking this Court to be the first appellate court to hold that conduct intending to create gridlock that confines drivers to their cars *is not* unlawful confinement—even though they concede (TB24-TB25) that unlawful restraint of an individual's liberty against her will is actionable.

Manhart alleged that the Defendants intentionally paralyzed traffic, yet the district court incorrectly absolved them of responsibility. Manhart's opening brief identified numerous legal errors the district court committed in reaching this conclusion.

Defendants repeatedly shy away from defending the district court's reasoning. Sure, they sometimes *repeat* the reasoning, but they often fail to address Manhart's refutations entirely, despite having a combined 24,000 words available in their briefs to do so. At times they don't even acknowledge the district court's reasoning and leave

---

[1] One can find a Table of Acronyms on page xiv of this brief above.

Manhart's arguments entirely unanswered. Manhart stated a claim for false imprisonment, and the district court got the law of confinement, indirect causation, and escape wrong, and also bungled the public-policy considerations. OB20-OB24; *see* Section I below. Manhart also stated a viable claim for negligence under Illinois law. OB24-OB30; *see* Section II below. And Manhart stated a derivative claim against WESPAC for NSJP's torts, given either basic corporate-law principles or the Illinois law of duty. OB31-OB34; *see* Section III below.

Instead, Defendants spend thousands of words raising over a dozen different alternative grounds for affirmance—Article III standing, personal jurisdiction, sufficiency of derivative liability allegations. These are easily discarded. Arguments against Article III standing ignore Supreme Court and Seventh Circuit precedent. *See* Section IV.A below. For most of the other alternative grounds, Defendants ignore that the Seventh Circuit has repeatedly held that Fed. R. Civ. Proc. 8 calls for the pleading of claims, rather than particularized facts or legal theories; they attack strawman characterizations of the complaint instead of relevant complaint allegations and fail to draw reasonable inferences. *See* Section IV.B below. Drive-by invocations of freedom of speech or protest fare no better, given the wealth of controlling precedent directly on point in the opposite direction. *See* Section IV.C below.[2]

---

[2] Manhart's opening brief does not mention the words "Israel," "Gaza," "Iran," or "Hamas," but defendants try to derail the appeal with geopolitical claims. *E.g.*, IDB1; NSJPB4. Whether Defendants blockaded innocents on behalf of Hamas winning or to support rainbows and unicorns is immaterial to their civil liability. For those interested in evaluating Defendants' "genocide" claim, *see generally*, *e.g.*, ROY K. ALTMAN, ISRAEL ON TRIAL: EXAMINING THE HISTORY, THE EVIDENCE, AND THE LAW (forthcoming 2026); Brian Lilley, *'Hamas is the genocidal entity': Warfare experts on what the world is getting wrong on Gaza*, NAT. POST (Oct. 4, 2025).

Reassignment under Circuit Rule 36 is appropriate. OB34-OB38; *see* Section V below. The Court should reverse and restore Manhart's complaint against each of the defendants.

## I.     Manhart stated a claim under Illinois law for false imprisonment.

Defendants assume (*e.g.*, TB25) that the Third Restatement is applicable for Manhart's false imprisonment claim, and don't dispute that the U.S. and Illinois Supreme Courts rely on it. OB12 n.2. They concede (TB25) that there is no requirement of physical violence. They do not contest that a plaintiff who attempts to escape, but fails to "immediately escape the confinement" still has a wrongful confinement claim. OB13.[3] Defendants do not dispute Manhart's argument (OB15-OB17) that the district court erred when it failed to hold defendants responsible for indirect causation; the words "indirect" and "transferred intent" are absent from their briefs. "If an act is done with the intent to confine another, and such act is the legal cause of confinement to another, it is immaterial whether the act directly or indirectly causes the confinement." *Second Restatement* § 37; OB16. But the district court relied on the false premise that defendants cannot be liable for creating third-party confinement that defendants intended to create. They do not dispute Manhart's argument (OB15-OB16) that Illustration 11 (the roadblock hypothetical where motorists can simply turn around) and the Third Restatement together demonstrate that comment *d* does not apply here; they do not even mention Illustration 11. They do not dispute, or even mention, the Third Restatement's position that "[I]f a person desires to go in a particular direction

---

[3] Defendants' argument about timing (TB27 n.19) is thus inconsistent with drawing reasonable inferences in the plaintiff's favor. That Manhart attempted to escape by exiting the highway, and was unsuccessful until after over an hour of confinement in gridlock, does not absolve the Defendants from wrongful confinement.

that is the only means of exit then available, an actor who prevents the person from proceeding in that direction is subject to liability for false imprisonment." *Third Restatement* § 8 cmt. *b*, Tentative Draft No. 3 at 45.

All of this should end the inquiry of whether there has been confinement. The Third Restatement establishes that there is no exemption for unlawful confinement upon a highway. And the other theory credited by the district court and Defendants—that other cars, not the Defendants, caused the confinement—does not withstand scrutiny under the uncontested law of causation.

Nevertheless, Defendants stand by the district court's misapplication of the Second Restatement to find no confinement, but ignore several of Manhart's refutations (OB14-OB17) of the district court's reasoning. They make no effort to defend the district court's failure to apply the law of transferred intent; and never mention Illustration 11, the limits of *Bird v. Jones*,[4] or comment *b* of *Third Restatement* § 8. *See* Section I.A below.

Manhart argued (OB20-OB23) that the district court erred in finding a reasonable means of escape and in its extension of *Marcano* to this case. Defendants simply repeat the district court's erroneous analysis, and then misrepresent the Third Restatement. TB29. Their attempts (TB28) to distinguish the Second Restatement's Illustrations from this case fail. *See* Section I.B below.

Manhart argued (OB23-OB24) that the district court's public-policy analysis was a fatally flawed *non sequitur*. Defendants do not even attempt to defend it, nor do they contest Manhart's analysis that public policy supports allowing blockade victims harmed by intentional wrongdoing to sue for recovery.

---

[4] *Bird v. Jones* inspired Illustration 11. OB15. It held that blocking a footpath to a would-be regatta spectator was not false imprisonment, because he remained "at liberty to stay where he is or to go in any other direction if he pleases." 7 Q.B. 742, 752 (1845).

The question of first impression should be resolved in Manhart's favor. He has stated a claim for unlawful confinement or false imprisonment.

### A.    There is confinement under both the Second and Third Restatements. The district court erred in applying Section 36(3) and comment *d* of the Second Restatement.

As Manhart demonstrated (OB14-OB19), the district court erroneously held (A10-A14) that false imprisonment does not include *any* road blockade, relying on an inapposite Second Restatement comment and, in the process, contradicting Illinois precedent and the Third Restatement.

1. As an initial matter, § 36(3) and comment *d* are superseded by the ALI-approved Third Restatement. "[I]f a person desires to go in a particular direction that is the only means of exit then available, an actor who prevents the person from proceeding in that direction is subject to liability for false imprisonment." *Third Restatement* § 8 cmt. *b*, Tentative Draft No. 3 at 45. The Third Restatement expressly acknowledges that the broader application of § 36(3)'s "particular direction" language that the district court used is incorrect, and rephrases the question as one of whether "exit" is blocked. *Id*. Illinois courts never adopted comment *d*; there is no precedent to overturn. Defendants do not argue the Third Restatement is the wrong statement of the law; they do not argue (and cannot, OB12 n.2) that Illinois would choose the Second Restatement over the Third Restatement. That ends the inquiry. Section 36(3) and comment *d*, much less the district court's extension of it beyond its illustrations (OB18-OB19 & n.3), is not the law, and the Restatement does not block Manhart's claim. Rather, Manhart's claim fits squarely within the Third Restatement's language.

2. But even if a dated section of the Second Restatement is what Illinois courts would apply here, the district court and Defendants are wrong in their interpretation. The district court's interpretation of comment *d* to apply to Manhart cannot be

reconciled with Illustration 11 and the law of transferred intent. OB14-OB15. If, as the district court found (A13-A14), comment *d* applied to preclude liability not just for detours, but also for blockades that trap a driver in gridlock, then the "puts no obstacle in the way of his leaving" condition in Illustration 11 would be surplusage. The district court gilds the lily by asserting that the Defendants "*did not place any obstacles* on Plaintiff's way of leaving." A13 (emphasis in original). This badly misconstrues the facts and the law of indirect causation. OB16; *Second Restatement* § 37; *id*. § 43 & cmt. *a* (transferred intent); *Third Restatement* § 10 (Tentative Draft No. 1, former § 110) (same). Defendants make no effort to defend the district court's reading of Illustration 11; they do not even mention Illustration 11. Nor do they address Section 37, indirect causation, or transferred intent.

Importantly, the Second Restatement is largely a *restatement*, a description of the state of the general common law, not a model statute like the UCC or Model Penal Code.[5] To this end, it cites *cases* as exemplars of the comments and illustrations it uses. And as Manhart noted (OB15), *all* of the cases cited in comment *d* and its illustrations involve *partial* blockades permitting an immediate detour or U-turn,[6] and none involve

_____

[5] *But cf. Kansas v. Nebraska*, 574 U.S. 445, 483 (2015) (Scalia, J., concurring and dissenting) (criticizing more recent Restatements for sometimes adopting aspirational "novel extensions" of law). Neither Defendants nor the Illinois courts contend that the Second or Third Restatements have done that with respect to the generally uncontroversial ancient tort of false imprisonment law.

[6] The preliminary draft for the Second Restatement was presented in 1955. *Second Restatement*, introduction. Eisenhower signed the Federal-Aid Highway Act of 1956 the next year. While traffic existed then (TB28), divided highways were rare in this country before the Interstate System. *See* Bureau of Pub. Roads, U.S. Dep't of Commerce, *Highway Statistics Summary to 1955* (1957) (vast majority of highways were two-lane roads with intersections). This perhaps explains why Illustration 11 assumes that a

gridlock that confines a driver who cannot move his car. Defendants mention none of
these cases. Manhart is suing over confinement, not a detour. The Second Restatement
must be read in that context, and does not preclude Manhart's claim.

3. Illinois law is also inconsistent with *Second Restatement* § 36(3), which would
bar liability for "preventing another from going in a particular direction." OB11-OB12;
OB17-OB19. Defendants protest (TB29-TB31) that the *results* in the cases Manhart cites
(except for *Robinson*) can be reconciled with the Restatement. But Manhart never said
otherwise. What's important is the *rule of decision* in *Morris*, *Karow*, and *Robinson*. In each
of those cases, Illinois courts could have quickly resolved a case under § 36(3) by
holding there was no cause of action for preventing "another from going in a particular
direction." Instead, they assumed that preventing another from going in a particular
direction *is* actionable, and ruled against plaintiffs on other grounds—or, in the case of
*Robinson*, ruled for plaintiffs.

4. Defendants incorrectly argue (TB8) that "conduct to confine an individual in a
particular place … is materially different" than confining a driver in a gridlocked
vehicle. *Accord* TB28 n.20 ("the driver's car has less freedom of movement in the latter
scenario cannot be dispositive for a false imprisonment claim requiring confinement of
a person").[7] This contradicts the Third Restatement. "It is not quite accurate to say that

---

motorist can necessarily "leav[e] by the way in which he entered." (Common law did
not immediately adjust well to the automobile in the first decades of its existence. *E.g.*,
*Baltimore & Ohio R. Co. v. Goodman*, 275 U.S. 66 (1927).) Had Defendants blocked an old-
fashioned two-lane highway, they may not have successfully trapped motorists: cars
could simply turn around and go back.

[7] It's not clear what Defendants are arguing here, but if a driver is confined to the
car because it's not reasonable to exit the car, confining the car confines the person—
and elsewhere Defendants agree. TB27 (car driver surrounded and held at gunpoint).
*See* Section I.B below.

the actor must 'fix' the boundaries within which the plaintiff is confined (or that the actor must intend a confinement of that nature). Rather, it is sufficient that the actor precludes the plaintiff's exit from a limited or circumscribed area, even if nature or another person created those limits." *Third Restatement* § 7, comment *c*, Tentative Draft No. 3 at 2. This "Section refers to whether the plaintiff's freedom to 'exit' an area has been improperly restricted. However, false imprisonment also occurs if the actor compels the person to move or travel in a highly restricted way …" *Third Restatement* § 8, comment *b*, Tentative Draft No. 3 at 44.

5. Defendants repeatedly claim (TB28, TB30) that Manhart has no right to use the highway, or that Manhart does not assert such a right. But this isn't true. Manhart does have the civil right to use the highway. The Supreme Court recognizes a "fundamental" right to travel "secured … by the Constitution or laws of the United States." *United States v. Guest*, 383 U.S. 745, 753, 757 (1966).[8] And while Manhart's "right" to be on the highway might matter to the *Bird v. Jones* scenario of a forced detour before entering a highway, it should not be material to whether he can be falsely imprisoned once already on the highway. For example, a plaintiff can be wrongfully confined to a room, though there is no "right" to be in that room. *E.g.*, *Second Restatement* § 36 Illus. 2.

Manhart's claim is permitted by the Third Restatement, and the Second Restatement does not bar Manhart's claim under Illinois law or otherwise.

**B.    The district court erred in finding a reasonable means of escape.**

The district court held that the supposed lack of confinement meant that whether Manhart had a reasonable means of escape was irrelevant (A14), but went on to erroneously hold that Manhart "could have abandoned his car on the side of the road

---

[8] This post-Second Restatement decision, incidentally, undermines the premise of comment *d* that "the public is merely privileged to travel the public highways."

without facing legal penalties" "for at least a week" (*id.*) and then sanctioned Manhart for failing to read the Illinois Vehicle Code the same way the court did. A36; OB20-OB23. The district court read 625 ILCS 5/4-201 incorrectly (OB20-OB21), and its *sua sponte* conclusion contradicts 625 ILCS 5/4-203 (OB21).

Defendants do not address Manhart's statutory interpretation arguments; they do not even mention 625 ILCS 5/4-203. They simply repeat (TB29) the district court's erroneous conclusion that Manhart, a driver, could have abandoned his car on the highway and walked because some taxicab passengers close to the airport walked. Defendants absurdly assert (TB29) Manhart "could have returned within hours, when the protest ended, to move his vehicle" when he was several states away after his rescheduled flight. Of course, if thousands of people responded to Defendants' wrongful behavior by abandoning their vehicles in the middle of the highway, as the district court and Defendants posit is "reasonable," that would have required thousands of tows before anyone could return to move his or her vehicle—while preventing thousands more from using the highway at all for several hours. Defendants wouldn't even risk their own cars in the blockade, though six cars parked on the highway would create the same gridlock that a sleeping dragon would—why is it "reasonable" to demand that Manhart do so?

Defendants' assertion (TB29) that the prospective financial liability is not "duress" squarely contradicts the Third Restatement. *First*, Defendants incorrectly represent (TB29) the law of *Third Restatement* § 8 comment *h*. That comment does *not* say duress "generally" excludes "economic pressure." Rather, comment *h* merely leaves open the possibility that there might exist "moral or economic pressures *that are insufficient* to undermine [plaintiff's] consent if she chooses to remain. See Comment i, below." *Id.*, Tentative Draft No. 3 at 53 (emphasis added). And comment *i* is about *privileged* economic pressure; for example, an employer who threatens an employee's

9

job if "she does not stay to answer questions about a theft on the premises." *Third
Restatement* § 8 comment *i*, Tentative Draft No. 3 at 53-55.

    *Second*, that very next paragraph of comment *h expressly* puts in the category of
"duress" the concept of "any risk to harm to chattels" and "unpalatable choice" of the
*Second Restatement* involved here:

> The Restatement Second, Torts § 36 addresses within a different
> category some cases that this Restatement characterizes as duress.
> Under § 36, a confinement must be "complete" and does not
> qualify as complete if the plaintiff knows that he has a "reasonable
> means of escape." Comment *a* to that Section states that a known
> means of exit is not "reasonable" if it would require the plaintiff to
> "run any risk of harm to . . . his chattels" or if, under the
> circumstances, taking the avenue of escape would be "offensive to
> a reasonable sense of decency or personal dignity." This
> Restatement instead treats such cases as instances of duress,
> because they involve the actor wrongfully putting the plaintiff to
> an unpalatable choice.

*Third Restatement* § 8 comment *h*, Tentative Draft No. 3 at 53. Contrary to Defendants'
misstatement of the law, "duress" under the *Third Restatement* includes "risk of harm"
to a plaintiff's chattels as a matter of law, and that includes the reasonable risk of
Manhart facing a tow for parking his car on a highway. *See* discussion at OB13 and
OB21.

    Defendants try (TB28) to distinguish the *Second Restatement*'s Illustrations that
Manhart cites because "those illustrations presume the actor's intent to imprison an
individual (an intent absent here)." Aside from the fact that the question of intent is
entirely separate from the question of a "reasonable means of escape," *of course*
Defendants intended to confine drivers in gridlock. It's not only a reasonable inference
that one is required to make at this procedural stage, but Defendants also never
seriously explain how intentionally blockading a highway during rush hour "to cause

10

pain to the economy" is not an intent to create gridlock. And Defendants never dispute, or even mention, the Restatement's concept of indirect causation or transferred intent. OB16; *see also Third Restatement* § 7, comment *d*, Tentative Draft No. 3 at 3-4.

The dicta in *Marcano* that the district court relied upon is thus inapplicable to this case and, as applied by the district court here, contradicts the Third Restatement's language about "unpalatable choices." OB21-OB23. Tides repeats (TB31) the citation to *Marcano*, but does not acknowledge or address *Manhart's* refutation of district court's extension.

Defendants cite *Gable* (TB31-TB32), but that Wisconsin-law case is irrelevant. The plaintiff was parked on the street, and blocked by a tow truck; the occupants could (and did) safely exit; and the district court found no intent to confine. *Gable v. Universal Acceptance Corp.*, 338 F. Supp. 3d 943, 957 (E.D. Wisc. 2018). Here, there was intent to confine and no reasonable means of escape; the lack of a reasonable means of escape is "duress" as a matter of law under the *Third Restatement*. Wrongful confinement has occurred.

## C. Public policy supports application of false imprisonment law to Defendants' acts intended to cause injury.

*Manhart* refuted at length the district court's erroneous public-policy arguments against applying the false-imprisonment tort here. OB23-OB24. (Illinois follows a similar analysis in deciding whether to create the burden of duty in negligence law. OB33-OB34.) Defendants make no effort to address *Manhart's* arguments; nor any attempt to defend the district court's erroneous reasoning, mentioning it in the Statement of the Case, but not in the argument.

At times, Defendants make cursory public-policy arguments, but these are wrong. Judicial recognition of *Manhart's* claim is not "a basis for limitless private lawsuits" (TB2) unless future defendants continue to commit easily avoidable *intentional*

or willful torts. No Defendant claims that there is a danger from too few illegal road blockades; at most, they suggest there is a chilling of free speech if there is liability here, but this Circuit has previously correctly rejected such claims, and Defendants never mention, much less contest, that precedent. *See* Section IV.C below.

~~~

Manhart has stated a claim for wrongful confinement or false imprisonment under Illinois law, the Third Restatement, and the Second Restatement. Public policy supports the application of the tort here.

## II.     Manhart states a claim for negligence under Illinois law.

Manhart's negligence claim is based on Defendants' affirmative conduct that foreseeably and willfully caused harm to motorists. Tides focuses narrowly on particular words used in the negligence count and then argues against a theory Manhart does not advance. TB32-TB37. As discussed below, Seventh Circuit law does not permit dismissal based on a selective and formalistic reading of how the pleadings were styled. TB32. Plaintiffs need not engage in code pleading; they must only plausibly suggest entitlement to relief. *Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1336 (7th Cir. 2024). Reading the complaint as a whole, as Rule 8 requires, Manhart adequately pleaded negligence.

Tides raises the specter (TB36-TB37) that "finding a duty here would meaningfully curtail people's freedom to protest." Not so. The duty is to avoid *illegally* creating gridlock *intentionally*. There is no "freedom" or First Amendment right to do so. *See* Section IV.C below. There will be no tort for a permitted protest (*contra* TB37), because protestors will have acted reasonably in obtaining a permit; there will be no claim for *prima facie* negligence because protestors will not have violated a statute. In state court, at least, defendants in a suit over a legally permitted protest for legal

12

behavior would have recourse to early dismissal and fee shifting under the Illinois Citizen Participation Act. 735 ILCS 110.

Tides does not dispute the district court erred in finding that intentional conduct cannot support a negligence claim under Illinois tort law. OB26-OB27.

## A.    Manhart adequately pleaded *prima facie* negligence under *Kalata*.

Tides' argument (TB34) that Manhart fails to plead *prima facie* negligence because his injuries are not the "kind" the Illinois Vehicle Code was designed to prevent rests on an artificially narrow view of the statute's purposes. Statutes seldom have a single purpose. The Vehicle Code *is* a public safety statute (OB28) and 625 ILCS 5/11-1416 also ***expressly*** aims to prevent persons from obstructing highways "so as to interfere with the effective movement of traffic." Illinois courts recognize that the Rules of the Road, including § 5/11-1416, serve multiple, overlapping purposes. They are "concerned with the safe movement of traffic" like the "majority of subsections in this portion of the [] Code." *Schultz v. Siddens*, 548 N.E.2d 87, 89 (Ill. App. 1989). Yes, the rules promote "safe[ty]," but also "movement of traffic." The injuries suffered by Manhart stem directly from Defendants' intentional obstruction of the roadway, which foreseeably seized all movement along an important expressway during rush hour. Tides does not distinguish the myriad Illinois courts that have found *prima facie* negligence actions for economic injuries based on the violation of public safety statutes. OB29-OB30. Illinois law is simply inconsistent with Tides' asserted rules of decision, and Manhart has a *prima facie* negligence claim.

## B.    Manhart's complaint also supports common-law negligence.

Under Illinois law, a duty exists where a defendant's own conduct creates a foreseeable risk of harm to others. *Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1057 (Ill. 2006). Thus, a plaintiff need only allege a claim that defendants plausibly acted to

create foreseeable risk to others. Manhart did that by alleging that Defendants knowingly facilitated conduct that trapped motorists on an expressway, failed to take reasonable steps to avoid foreseeable harm to the public, and proceeded despite obvious risks to others. He alleges that Defendants affirmatively participated in (or funded, promoted, and facilitated) blockade activity *knowing* that motorists would be immobilized.

Defendants' slippery-slope argument (TB33)—that any event planner would be liable to increased traffic—fails. A duty to remote persons in Illinois requires, among other things, examining "the magnitude of the burden of guarding against the injury [and] the consequences of placing that burden on the defendant." *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1098 (Ill. 2012); *cf.* OB33. Event planners acting legally and reasonably would thus avoid liability. In contrast, there is no burden on defendants to *not* affirmatively take hours out of their day and chain themselves together inside of PVC-tubes to intentionally block traffic. And the consequences of burdening defendants with liability here will be fewer road blockades, which is a feature, not a bug. *See generally* OB24. And contrary to Tides, venues *are* liable when they do not take reasonable steps to mitigate foreseeable risks they create. *Marshall*, 856 N.E.2d at 1057. This applies even to events with First Amendment-protected programming. *See, e.g.*, *Indlecoffer v. Vill. of Wadsworth*, 671 N.E.2d 1127, 1133 (Ill. App. 1996) (triable negligence where church-sponsored event foreseeably encouraged speeding by participants).

Similarly, there's no slippery slope risk of liability "every time another driver committed a traffic violation that caused a traffic jam." *Contra* TB36. Other traffic violations aren't aimed at avoiding traffic jams like 625 ILCS 5/11-1416, a section that requires willfulness, is.

Tides mischaracterizes *Shank v. Fields*, which simply found there was no "duty to open all lanes by 3 p.m." implied by a government contract. 869 N.E.2d 261, 268

14

(Ill. App. 2007). A contractor disrupting traffic does in fact still owe a duty: "highway authorities have a duty to act reasonably in preventing harm to the public, even harm caused by third-party negligent drivers," and the contractor exercised reasonable care by posting warning signs. *Id*. at 266. Reasonable care and proximate causation are not seriously in dispute here. Defendants plausibly breached their duty and provided *much less* than reasonable care by intentionally binding themselves together on an interstate.[9]

Tides implies that tort law threatens free speech (TB36-TB37; *accord* JB4), but the suggestion is frivolous. If the organizers of an event are "acting under authority of a duly issued municipal or county parade or demonstration permit," they are not violating the law. 430 ILCS § 70/3. Here in contrast, the purpose of the blockade was *to create a blockade*. The First Amendment simply does not protect a hypothetical right to intentionally trap motorists in their cars. Had defendants legally unfurled a banner by the highway, Manhart and thousands of others would not have been injured.  *See generally* Section IV.C below.

Manhart adequately pleaded common-law and statutory duties. The district court erred as a matter of law by dismissing Count II based on a false intentional/negligence dichotomy and ignoring the "kind of injury" described by the statute itself.

---

[9] Tides oddly claims (TB37) in an attempt to distinguish *Palausky* (OB25-26) that the duty of pedestrians "outside a crosswalk" to "yield[] the right of way to oncoming traffic" is irrelevant to Defendants' conduct.

**III.    Manhart stated a derivative claim against WESPAC for NSJP's torts.**

**A.    NSJP's liabilities are WESPAC's liabilities because WESPAC's fiscal sponsorship took no steps to establish a separate corporate structure for NSJP.**

WESPAC overly relies (WB7) on a district court that held "fiscal sponsorship alone" does not create liability. *Helmann v. Codepink*, 2025 WL 3030582 (C.D. Cal. June 13, 2025). But Manhart is not arguing that "fiscal sponsorship alone" creates liability. Manhart argues that fiscal sponsorship by a nonprofit (with its attendant oversight responsibilities) *and* lack of a separate corporate identity make the sponsor liable for torts committed by the unincorporated project. For example, in *Schiavone v. Fortune*, Fortune was "an internal division of Time, Inc.," and Time, if properly served, would be liable for Fortune's torts. 477 U.S. 21 (1986), *superseded by rule*, Fed. R. Civ. P. 15(c); *Vincent v. City Colleges of Chicago*, 485 F.3d 919, 921-22 (7th Cir. 2007). *Helmann* did not address this issue. This is a legal conclusion that Tides does not dispute in *this appeal* even as Tides disputes liability for CJE's acts on countless other grounds and has the supposed benefit of *Helmann* and the district court's ruling in favor of WESPAC.

The specific question of "What is the liability of a nonprofit fiscal sponsor for the acts of a non-exempt entity that has no separate corporate existence?" is one of first impression; no appellate court has ruled on it one way or the other. WESPAC's complaint about the lack of precedent imputing liability is irrelevant, as there is also no precedent for shielding WESPAC. Manhart proposes a legal rule: look to the law of corporations. OB5, OB31-OB32 (*citing* COLVIN). And there is a wealth of corporate law on how to shield one entity's liabilities from another's: a separate corporation that follows corporate formalities. WESPAC did not do that here; ergo they are liable. WESPAC denies this reasoning, but provides no alternative legal rule for how to decide the question of first impression, or any reason to reject it other than lack of precedent.

WESPAC dismisses (WB6-WB7) COLVIN's analysis of its fiscal sponsorship as a "pamphlet." COLVIN is a 131-page bound book with a seven-page index. It's "the most quoted resource in the literature of fiscal sponsorship." Samuel Johnson, *Fiscal Sponsorship in Truly Independent Film: Entity and Model Choice and Legal Risks*, 21 WASH. J. L. TECH. & ARTS 33, 38 (2026); *accord*, *e.g.*, Gene Takagi, *Fiscal Sponsorship: A Balanced Overview*, NONPROFIT Q. (Jan. 28, 2020) ("seminal"); Emma Geering, *The Legal Value of Fiscal Sponsorship: A Proposal of New Law*, 72 HASTINGS L.J. 1605, 1615 (2021) ("leading"). WESPAC has no explanation of why COLVIN is wrong, no alternative theory for how fiscal sponsorship works, and identifies no other published authority on the subject. It relies solely on *Helmann*, which did not consider COLVIN, corporate structure, or any authority on the question of fiscal sponsorship. *Helmann* is thus inapposite: it did not opine on the arguments Manhart makes.

WESPAC claims (WB8 n.7) its certifications in a different year in a different case about a different entity WESPAC sponsored prove that NSJP was not legally an alter ego of WESPAC in April 2024. The certification is irrelevant: WESPAC's 2025 notice of no affiliates (R. 48) says nothing about the legal effect of fiscal sponsorship without separate corporate structure in 2024; nothing in the rules requires a disclosure of one's unincorporated alter egos or d/b/a entities or even subsidiaries. Fed. R. Civ. Proc. 7.1(a)(1); N.D. Ill. L.R. 3.2; 7th Cir. R. 26.1; C.D. Cal. L.R. 7.1-1. Tides, which concedes liability for CJE's torts, has not disclosed the hundreds of other organizations without separate corporate structure it fiscally sponsors, nor did it need to.

WESPAC argues (WB7) that "Plaintiff has failed to plead that NSJP is a 'Direct Project' of WESPAC." This misunderstands federal complaints, where "the plaintiff pleads claims, not facts or legal theories." *Vincent*, 485 F.3d at 923-24; *accord Chapman v. Yellow Cab Cooperative*, 875 F.3d 846, 848 (7th Cir. 2017); *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 783 (7th Cir. 2015). Manhart pleads that WESPAC is the fiscal sponsor of NSJP;

that NSJP has no independent corporate structure; and WESPAC is liable for the torts of NSJP. A78 ¶ 146. "These allegations gave [WESPAC] and the court adequate notice of the scope of, and basis for" liability. *Avila*, 801 F.3d at 783 (plaintiff can argue fiduciary relationship created through escrow though complaint does not mention escrow).

If NSJP had a separate corporate structure from WESPAC in April 2024, then WESPAC could not be independently liable for NSJP's actions unless a plaintiff could pierce the corporate veil. The lack of *any* corporate formalities might permit veil-piercing here. But there isn't a question in this case of whether "separate corporate existence" is merely a "fiction" (*Sea-Land Services, Inc. v. Pepper Source*, 993 F.2d 1309, 1311 (7th Cir. 1993)) because WESPAC cannot assert *any* separate corporate existence. Nevertheless WESPAC asks this court to treat NSJP as if it were a separate corporation that limits WESPAC's liabilities. But WESPAC does not get the benefit of corporate formalities it never attempted to observe or establish.

WESPAC appears surprised at this consequence and premises its entire argument on the fiction that a legal relationship under the same corporate umbrella has no legal consequences. Perhaps discovery will reveal that WESPAC is sincere in its surprise, and did not know what it was getting into with its fiscal sponsorships. If so, WESPAC might have causes of action against its officers, directors, or attorneys for getting it into a fiscal sponsorship without adequate corporate formalities or contractual protection for or understanding of what it was undertaking (or for failing to get appropriate insurance coverage).[10] Perhaps NSJP breached agreements it made with

---

[10] *See* Complaint, *All. of Nonprofits for Ins. Risk Retention Grp. v. WESPAC Found., Inc., et al.*, No. 1:25-cv-01320, Dkt. 1 (S.D.N.Y. Feb. 13, 2025) (declaratory judgment action by insurer alleging WESPAC did not disclose NSJP fiscal sponsorship as insurance policy required). Insurers sensibly require such disclosure from their clients

WESPAC, and WESPAC has a cause of action against it for that or for contractual indemnity. But as to innocent third parties, WESPAC is liable to the extent that NSJP is. NSJP's liabilities in April 2024 are WESPAC's liabilities.

**B.     The district court erred when it failed to apply the Illinois test for duty.**

Because WESPAC asserted the novel theory that its asserted lack of control absolved it for liability for a project under its corporate umbrella, Manhart pled in the alternative derivative liability for negligent supervision of NSJP. OB32-OB34. WESPAC says (WB6) that this is Manhart trying "to have his cake and eat it too." Of course, that's just a misunderstanding of basic civil procedure. Fed. R. Civ. Proc. 8(d). As is WESPAC's protest (WB6) that Manhart "failed to allege any facts substantiating" this theory. *Chapman,* 875 F.3d at 848; *Vincent,* 485 F.3d at 923-24.

Again, under Illinois law, a duty exists where a defendant's own conduct creates a foreseeable risk of harm to others. *Marshall*, 856 N.E.2d at 1057. WESPAC does not and cannot dispute that the district court simply asserted a lack of duty rather than applying the *Simpkins* test to determine whether a duty existed. A26; OB32. Instead WESPAC asserts a lack of foreseeability (WB9-WB10); and a lack of breach (WB12-WB13). But WESPAC only does so by contesting the facts alleged, despite the requirement at this procedural stage of drawing reasonable inferences in Manhart's favor. Manhart sufficiently alleged both. Before the April 15 blockade, NSJP had repeatedly and openly engaged in other illegal road blockades (A58-A59), yet WESPAC, by its own account, did nothing to exercise control over NSJP to stop its illegal and intentionally tortious behavior that injured thousands of commuters. WESPAC continued to use its exempt

---

because fiscal sponsors bear risk from the activities of unincorporated sponsored groups.

status to raise money for NSJP (A58),[11] though it knew or should have known from NSJP's past behavior that NSJP was using nonprofit money for illegal and tortious activity. WESPAC's "overheating" hypothetical (WB12) is distinguishable; the Palsgrafian "zone of duty" expanded to foreseeable victims of illegal blockades after NSJP established this as a regular tactic.

Manhart establishes that all four factors of the *Simpkins* test are met. OB33-OB34. WESPAC's arguments to the contrary are about the supposed failure to plead facts and thus, again, WESPAC misunderstands federal procedure. *Vincent*, 485 F.3d at 923-24. WESPAC's forfeiture assertion (WB11) runs afoul of the facts and the law. R.91 at 41-43 (going through four-part *Simpkins* test) *and* OB12 n.2 (discussing forfeiture standards and citing cases such as *Yee v. Escondido*, 503 U.S. 519 (1992)).

WESPAC asks (WB13): what should WESPAC have done? Simple: reasonably fulfill its duty to supervise NSJP's behavior so that NSJP stopped illegal behavior or (as WESPAC belatedly did, OB5) cut NSJP off so that it could not use WESPAC's money to commit torts. This is a "manageable burden" (WB11), handled by competent fiscal sponsors through establishing contractual rights in the fiscal sponsorship agreement. *E.g.*, COLVIN 104-05. And such "control and discretion" are things nonprofit tax law already requires. OB33. (The IRS rule does not "create a legal duty" (A27); Illinois law does. Tax law is relevant to whether a defendant's behavior was reasonable and its burden manageable.) If WESPAC is not strictly liable (Section IV.A above), WESPAC may try to demonstrate that it acted reasonably to supervise NSJP to stop NSJP's torts, and that NSJP was unavoidably recalcitrant. Until then, Manhart's Count IX survives under Illinois law.

---

[11] WESPAC's assertion (WB13) that "Plaintiff does not allege that WESPAC actually provided such funding" to NSJP is frivolous, given that money is fungible. A50-A51; A57-A60.

IV.  **Defendants' other spaghetti-at-the-wall arguments do not save the district court's dismissal.**

Defendants, with 24,000 words to work with, spend surprisingly little time defending the district court's actual reasoning for dismissing the case. Instead they blizzard the Court with a swarm of alternative grounds for affirmance, but all of them are meritless, ignoring or misrepresenting relevant precedent or the language of the complaint.

A.  **There is Article III standing.**

Defendants make no serious quarrel with the district court's finding that Manhart has Article III standing. *See* A29 ("loss of time is sufficient to confer standing" (citing *Freedom from Religion Foundation, Inc. v. Obama*, 641 F.3d 803, 807 (7th Cir. 2011)). *Accord Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 828 (7th Cir. 2018) ("the value of one's own time needed to set things straight *is* a loss from an opportunity-cost perspective" (emphasis added)).[12] Article III standing requires injury-in-fact, traceability, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Manhart has each. Defendants' arguments otherwise rest on fundamental misunderstandings of standing jurisprudence and of Manhart's complaint.

1.  **Manhart alleges injury-in-fact.**

Injury in fact requires "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. "Concrete" means that an injury must be real, rather than abstract. But, though Defendants fail to acknowledge this, "intangible

---

[12] Defendants incorrectly claim (TB38) that this sentence means that Manhart is required to show opportunity cost with particularity, but *Dieffenbach* simply held that it "is a loss" *because* of the opportunity cost for purposes of standing, and requires no additional showing.

injuries can nevertheless be concrete"—even if "difficult to prove"—provided that they bear a "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016); *accord TransUnion LLC v. Ramirez*, 594 U.S. 413, 425, 433 (2021). Thus, for example, if a defendant maintains false credit reports in violation of the Fair Credit Reporting Act, a plaintiff whose false credit report is disseminated has standing to sue over the statutory violation, while one whose credit report remains internal does not because disseminated reports resemble the historical tort of defamation. *TransUnion*, 594 U.S. at 436-37. Congress's attempt to confer standing through the FCRA without linking it to a harm with a "close historical or common-law analogue" impermissibly stretched Article III beyond its original scope. *Id.* at 433-34. Congress cannot create jurisdiction by the fiat of a bare statutory violation. Otherwise, statutory claims risk turning courts into enforcers of abstract policy, exceeding Article III's bounds. *Lujan*, 504 U.S. at 577; *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009); *Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 731 (7th Cir. 2020).

The Article III separation-of-powers concern does not arise when a plaintiff, using diversity jurisdiction, brings a cause of action that is not merely a "close historical or common-law analogue," *but the actual common-law cause of action for particularized intangible harm itself*. Contrast Manhart's ancient false imprisonment tort with *Pennell v. Global Trust Management, LLC*, (cited at TB38), which declined to find standing for technical violations of the FDCPA. 990 F.3d 1041 (7th Cir. 2021). The tort pleaded in Count II is not merely "a bare procedural violation" (*Pennell*, 990 F.3d at 1044), but a breach of the duty not to harm others.

Here, a historical analysis shows that common-law intentional torts are among the easiest, longest-standing, and most direct avenues to Article III standing. Common-law injuries reflect a historical judicial consensus about what counts as "real" harm,

while statutory innovations face judicial skepticism unless tethered to that tradition. For example, *Spokeo* cited defamation and privacy torts as examples of intangible yet concrete injuries: "[T]he law has long permitted recovery by certain tort victims even if their harms may be difficult to measure." 578 U.S. at 341 (citations omitted). False imprisonment claims, such as Manhart's Count I, predate the Founding, and were discussed by Blackstone as a civil action to recover "the damage sustained by the loss of time and liberty." 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND Ch. 8 at 137 (1768). Manhart was involuntarily trapped in his car, and the harms of lost time and liberty and dignity resulting from that intentional tort were historically cognizable at the Founding. Manhart's Count II for the tortious violation of a statutory duty is directly analogous to that common-law torts of false imprisonment, with the same historically cognizable injury. Manhart's alleged injuries track the common law, were justiciable at the Founding, and are thus concrete for purposes of Article III.

Defendants acknowledge that the district court recognized that "[l]oss of time can be a concrete injury." A38 (citing cases); *see also Dieffenbach*, 887 F.3d at 828. Tides argues that the "particularized" injury is not concrete enough, but, as already mentioned, under federal rules for pleadings, a complaint is not required to supply the extensive details Tides claims are missing. *Access Living of Metro. Chi. v. Uber Techs., Inc.*, 958 F.3d 604, 613-14 (7th Cir. 2020), relied on by Defendants (TB39), instead discusses Article III's particularity—or "individualization" requirement. There, the plaintiff alleged that Uber unlawfully discriminated by failing to provide equivalent response times to wheelchair users like herself, despite admitting she does not even have an Uber account. In contrast, Manhart supplied demonstrated his own injury in spades, detailing the individual harm he incurred in the form of lost liberty and lost time. This is injury in fact, and there is Article III standing.

### 2. Traceability is met.

Tides is the only defendant that argues that traceability is lacking. The argument lacks merit, and is rebutted by the same analysis of the complaint that rebuts Tides' assertion that Manhart failed to state a claim for derivative liability. *See* Sections IV.B and IV.B.2 below. In a nutshell, Tides applies the wrong pleading standard for a federal complaint and misstates the scope of the complaint and of Illinois conspiracy law to assert that the complaint does not reach its behavior at all. Once those faulty premises are corrected, its traceability argument similarly disappears.

### 3. Defendants do not and cannot contest redressability.

There is no dispute that Manhart's past injury and that of the class can be redressed by damages. *See also Uzuegbunam v. Preczewski*, 592 U.S. 279, 285-289 (2021) (redressability through even nominal damages confers standing).

Manhart has demonstrated Article III standing.[13]

### B. Manhart's derivative in-concert, aiding-and-abetting, and conspiracy claims are adequately pleaded: Manhart pleaded that the parties agreed to aim tortious behavior at Chicago through the A15action conspiracy. For the same reason, there is specific personal jurisdiction and traceability.

Manhart alleges a coordinated plan culminating in the intentional blockade *directed* toward Chicago; that each appellee *knowingly* participated in, funded, organized, or facilitated that plan; and that the resulting *injury* occurred in Illinois. JVP,

---

[13] Because Manhart does not travel often enough to Chicago, he agrees both here and in the district court that Supreme Court precedent currently precludes him from standing to seek injunctive relief in federal court. *Los Angeles v. Lyons*, 461 U.S. 95 (1983). That said, some have criticized that precedent. *E.g.*, F. Andrew Herrick, *Cases, Controversies, and Diversity*, 109 Nw. U. L. Rev. 57 (2015); *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1115-40 (11th Cir. 2021) (Newsom, J., concurring). Manhart reserves the right to reopen the issue should the law change over the course of the litigation.

NSJP, Dissenters, and Chehade participated in multiple blockades between October 2023 and April 2024, often employing PVC pipe to create "sleeping dragons" to interfere with police removal efforts. A58-A59 ¶¶ 44-48. Manhart pleaded a coordinated "A15action" economic blockade targeting specific "choke points," including Chicago, beginning public organization in March. A60-A61 ¶¶ 56-57. Manhart alleges that defendants JVP and NSJP (a part of WESPAC) selected A15action blockade areas nationwide, including Chicago, where Dissenters participated in the planning and execution. A61 ¶ 60. The April 15 blockade used the same sleeping-dragon m.o. as previous blockades. Throughout the blockade, organizational Defendants posted *co-authored* social-media posts contemporaneously filming and celebrating the blockade, possible only if they knew of the blockade in advance and coordinated their posting about it. A64-A65 ¶¶ 73-74. After the blockade, Dissenters, NSJP, and JVP posted Instagram messages that explained why O'Hare was selected as the blockade site for Chicago—possible only if they coordinated with or organized the blockade. *Id*.

This is already more than enough for derivative liability under Illinois law. "[E]ncouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance." *Simmons v. Homatas,* 925 N.E.2d 1089, 1100-1101 (Ill. 2010) (quoting *Second Restatement* § 876, comment *d*).

Manhart pleaded that Tides, through CJE, established a legal defense fund *in advance* of April 15 to specifically support A15action, promoted as the "Economic Blockade to Free Palestine United States Bail & Legal Defense Fund." A62-A63 ¶¶ 63-64; A88 & R.33-1 Ex. 18. This is not "unaffiliated." *Contra* TB2. The funds would be "used for bail, legal defense, and support for defendants." A63; A97; R.33-1 ¶ 26 & Ex. 13 at 64. A reasonable inference is that this was understood to be financial support or compensation for blockaders who may have lost work because of their participation in

the blockade. At the very least, the language suggests that the fund was available to provide financial assistance beyond just bail or legal defense. The fund's establishment was apparently in response to a specific request by the A15action organizers for a bail and legal defense fund to aid demonstrators and activists who, according to the very explicit purpose of A15action, were planning to engage in illegal blockade conduct. A60-64 ¶¶ 54-64. Given that A15action sought to have a legal defense fund, and that Tides established a legal defense fund in support of A15action, one can reasonably infer an agreement to do so to promote A15action and make it more likely to succeed in its mission of disruption. This isn't negligently joining a conspiracy, as Tides implies (though never actually argues). TB21.

There are other reasonable inferences of coordinated behavior. A road blockade with dozens of activists chaining themselves together in PVC tubing at a time specifically announced by the hub of the A15action conspiracy doesn't happen by accident. Blockaders, including specifically defendants Chehade and Murphy, created a "sleeping dragon." A46, A63-A64 ¶¶ 3, 67, 70. Press coverage quotes defendants Tucker and Falaneh as either organizing or participating in the blockade and touting the disruption caused. A52 ¶¶ 20-21.

Manhart alleged other specific actions from which coordination could, at a minimum, reasonably be inferred. He alleged that NSJP promoted and organized the blockade in Chicago through the dissemination of real-time video on social media, used coordinated messaging with other Defendants including the @a15actions account, and shared the conspiratorial objective of blocking "major choke points" to "cause pain." A61-A62, A64-A65 ¶¶ 60-61, 73-74. JVP planned and organized the A15action blockade of O'Hare (A61 ¶ 60) and had planned and participated in similar blockades in the Chicago area. A58-A59 ¶¶ 44, 46, 48. Tucker, an agent of JVP, participated in and publicly bragged that the blockade accomplished the goal of disrupting "business as

usual." A52, A62-A63 ¶¶ 21, 62, 67-68. Dissenters helped plan and organized the illegal April 15 blockade. A62 ¶ 61. Its agent Murphy was present and broadcasting at the blockade, A52 ¶ 19. JVP's and Dissenters' and NSJP's self-broadcasted presence at this blockade, which required premeditated knowledge and planning, combined with its presence and participation at other blockades, leads to the reasonable inference that they each participated in the A15action conspiracy.

Defendants do not dispute that Illinois permits liability for negligent acts committed in furtherance of a conspiracy, and do not defend the district court's assertion of law otherwise criticizing and sanctioning Manhart. OB31 (addressing A37 n.11).

Instead Defendants raise a variety of assertions about the sufficiency of the complaint with respect to the derivative claims in Counts III through VII. *E.g.*, TB21 ("Plaintiff alleges no specific facts"); TB39 ("Plaintiff gives no details"); IDB7 ("Plaintiff failed to allege with any specificity" derivative claims); NSJPB6 ("Plaintiff never pled any non-conclusory facts"); JVPB8 ("Plaintiff failed to adequately allege…").

But most of these assertions rest on fundamental misunderstandings of federal procedure:

> Plaintiffs need not plead facts; they need not plead law; they plead claims for relief. Usually they need do no more than narrate a grievance simply and directly, so that the defendant knows what he has been accused of. … [Any defendant] tempted to write "this complaint is deficient because it does not contain…" should stop and think: What rule of law *requires* a complaint to contain that allegation?

*Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005) (emphasis and second ellipsis in original); *accord Deslandes v. McDonald's United States*, LLC, 81 F.4th 699, 705 (7th Cir. 2023) (*Twombly* does not change that complaint need only "make out a plausible claim" not

"plead law or match facts to elements of legal theories"). "Rule 9(b) has a short list of things that plaintiffs must plead with particularity, but" the supposedly absent facts Defendants complain about are "not on that list." *Doe*, 429 F.3d at 708. Defendants point (*e.g.*, TB21) to Illinois state-court cases about pleading standards of "specific facts" for conspiracy, but these state-procedure cases are irrelevant. In "federal court it is the federal rules that determine what must be in a complaint." *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 828 (7th Cir. 2018) (cited at TB38).

This disposes of nearly all of the arguments Defendants make against derivative liability. Other arguments about the insufficiency of the conspiracy allegations or lack of personal jurisdiction rely on misstatements about the complaint or about Illinois law, or fail to draw reasonable inferences that are required at this stage, but we address them below.

Three appellees (Tides, NSJP, and WESPAC) ask this Court to affirm on the alternative ground that the district court lacked personal jurisdiction. Their arguments fail because Manhart plausibly alleged specific jurisdiction through conduct purposefully directed at Illinois. *See* Section IV.B.1 below.

Tides goes on at length (TB6-TB7, TB18-TB20) about the lack of bail in the state criminal courts, but ignores that the complaint alleges that Tides established a legal defense fund with other financial inducements besides state-court bail. Tides' "traceability" argument similarly evaporates once one applies correct Illinois law and reasonable inferences. *See* Section IV.B.2 below.

NSJP plays a shell game and tries to deflect responsibility entirely onto SJP Chicago. But it's a reasonable inference that SJP Chicago, which has no corporate structure, is either an internal division of NSJP that NSJP controls or an agent of NSJP. As with WESPAC (Section III.A above), NSJP cannot hide behind corporate-law rules

designed to limit liability for separate corporate structures when it utterly fails to observe corporate formalities. *See* Section IV.B.3 below.

### 1.     Conspiracy and joint-action support specific jurisdiction.

Specific jurisdiction exists where a defendant "purposefully directed" conduct at the forum and the plaintiff's injury arises from that conduct. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *Tamburo v. Dworkin*, 601 F.3d 693, 703 (7th Cir. 2010). And the Illinois long-arm statute permits personal jurisdiction "to the full extent permitted by the United States Constitution." *Tamburo*, 601 F.3d at 679.

Jurisdiction must indeed be "defendant-focused" (WB15, TB43), but Manhart pleads defendant-specific conduct. Defendants mischaracterize the pleaded conduct as mere "affiliation" rather than coordinated, Illinois-directed conduct.[14] Disputed facts must be resolved in favor of the plaintiff. *Tamburo*, 601 F.3d at 700. A *prima facie* showing supports personal jurisdiction in pleadings. Manhart makes it.

Defendants contend that allegations of coordination or conspiracy cannot substitute for minimum contacts. But the relevant inquiry remains whether the defendant purposefully joined intentional, forum-directed conduct. Thus, it does not matter whether any "meeting of the minds" occurred in Illinois. *Contra* TB43-TB44. The unpublished 1997 *Ahmed* opinion concerned a *pro se* complaint with an implausible claim that a Massachusetts hospital directed conduct toward Illinois. *Ahmed v. Quinn*, 1997 WL 471335 (7th Cir.). Manhart also never argued that fiscal sponsorship or corporate affiliation alone create jurisdiction. *Contra* TB42-TB43; WB14-WB15. *See* Section III.A. Nor did he argue jurisdiction based on plaintiff's residence or "unconnected activities." *Contra* TB43, WB15.

---

[14] Some appellees also argue (TB41-TB42; NSJPB8) they are not "at home" in Illinois. But Manhart never asserted *general* jurisdiction for these defendants.

In the context of intentional torts, the inquiry focuses on whether the plaintiff has shown: "(1) intentional conduct (or intentional and allegedly tortious conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Tamburo*, 601 F.3d at 703 (cleaned up). Conspiracy allegations are attributable to members of the conspiracy and sufficient to demonstrate minimum contacts to establish personal jurisdiction. *See Textor v. Bd. of Regents*, 711 F.2d 1387, 1392-93 (7th Cir. 1983).

### 2. Tides is liable for derivative claims for offering the inducement of legal defense to future tortfeasors in Chicago; there is personal jurisdiction and traceability for the same reason.

For Tides, the creation of a legal defense fund, the "Economic Blockade to Free Palestine United States Bail & Legal Defense Fund," *in advance* to support specific "blockades" in several U.S. jurisdictions demonstrates defendant-specific conduct. (This is a different animal than a general bail fund without a specific future crime or category of crimes in mind, or a legal defense fund created after the fact of criminal charges. *Contra* TB22. In contrast, Tides' proposed rule (TB23) suggests that one may create a bail-and-legal-defense-and-support fund for anyone arrested for an attack on a health insurance company executive without aiding-and-abetting liability.) Because the fund supported an economic blockade, "Defendant Tides Center was fully aware of the risks associated with the blockade and… promotion of a fund that incentivized and encouraged conduct that violated both state *and federal laws*." A63 (emphasis added). Tides argues it could not have targeted Illinois because the state abolished cash bail (TB43), but this ignores that (1) Tides promised activists the financial inducement of "legal defense" and "support for defendants" (A62-A63); and (2) the activists also violated federal law, which has bail—as Manhart pleaded. A62 at ¶ 63; R.91 at 11-12.

Tides claims (TB24) there was no risk of federal prosecution, but *Guest* endorsed a federal indictment under 18 U.S.C. § 241 for a conspiracy to prevent citizens from

using a Georgia highway. 383 U.S. at 757. The government has used § 241 in nationally-publicized indictments to prosecute other group "direct actions" intended, like the blockade here, to interfere with innocents' rights. *E.g., United States v. Levy-Armstrong*, No. 0:26-cr-25 (D. Minn.); *see also* EO 14188, Additional Measures to Combat Anti-Semitism (Jan. 29, 2025), published at 90 FR 8847 (Feb. 3, 2025). It's plausible that such an indictment could happen within a statute of limitations that does not expire until 2029. 18 U.S.C. § 3282(a).

Separate from bail, the fund's procurement of attorneys' fees for arrestees would provide them with legal counsel that a criminal defendant might prefer to a public defender—indeed, neither of the criminally charged defendants in this case used a public defender to negotiate a plea for the least serious criminal count for community service. *See* TB6-TB-7. And one can draw inferences from the fund's promises of other "support." So the complaint's allegation that Tides incentivized criminal acts in Chicago, creating aiding-and-abetting liability, remains viable.

As discussed above, Manhart pleads that Tides willingly joined the A15action conspiracy to blockade a handful of places in America, ***known in advance*** to include Chicago. A87-A88; R.33-1 Ex. 17. Thus Tides itself, not third-parties, voluntarily directed support toward Chicago by establishing the CJE "blockade" legal defense fund. *Contra* TB43-TB44. "The 'conspiracy theory' of personal jurisdiction is based on the time honored notion that the acts of a conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy." *Textor*, 711 F.2d at 1392 (cleaned up). Four individual defendants and Dissenters are citizens of Illinois and participated in the O'Hare blockade, a stated objective of the conspiracy that Appellees purposefully joined. This is enough to establish personal jurisdiction for the non-Illinois defendants.

*Ex ante* agreements to pay bail or legal expenses expose entities to civil liability. For instance, in *C&K Coal Co. v. United Mine Workers*, union locals set up a payment voucher system and "in anticipation of illegal secondary activity created legal defense funds which would pay attorneys' fees and fines for picketing members who were arrested." This triggered liability because it was "an encouragement for illegal activity." 704 F.2d 690, 696 (3d Cir. 1983). Similarly, in *Array Techs., Inc. v. Mitchell*, a defendant's *ex ante* promises to pay an alleged co-conspirator's legal expenses, thereby inducing the co-conspirator to breach a fiduciary duty, amounted to a plausible conspiracy claim sufficient to survive a motion to dismiss. 305 F. Supp. 3d 1256, 1274 (D.N.M. 2018). CJE's A15action bail and legal defense fund similarly encouraged and induced individuals to conduct unlawful actions on April 15, 2024, and Tides should not escape liability for providing such a "fringe benefit."

It is reasonable to infer that the fund provided "substantial assistance" to the blockaders by acting as a legal and financial safety net for individuals who expected to be arrested. As a matter of Illinois law, "encouragement to act" is "substantial assistance." *Simmons*, 925 N.E.2d at 1101; *cf. also M.U. v. Team Ill. Hockey Club, Inc.*, 215 N.E.3d 286, 302 (Ill. App. 2022) (decision to join others to violate law sufficient to demonstrate knowledge and substantial assistance); *see also Chemtreat Inc. v. Kinsman*, 2006 U.S. Dist. LEXIS 108400 at *32 (C.D. Ill. Sept. 15, 2006) ("parties working in concert to advance" common goal are aiding and abetting). One can reasonably infer that the A15action organizers thought a bail and legal defense fund was a critical inducement for effective recruitment of participants into the conspiracy, or they would not have wasted effort to recruit Tides into the fold; it is also a reasonable inference that they were rational to think so. "It would defy all logic and reason to hold that literally paying someone to perform an act does not constitute, at the very least, 'substantial encouragement' to perform that act." *Cooper v. Martin Luther King Jr. Boys & Girls Club of*

*Chicago*, 193 N.E.3d 197, 208 (Ill. App. 2021). So too the offer to provide financial benefit to offset or prevent criminal consequences.

Tides' claim (TB21) of being an ostrich ignorant of the specific torts A15action participants were going to commit is a factual dispute irrelevant to the dismissal of a complaint, but, even if true, would not shield it from liability. *See, e.g., Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). In *Halberstam*, defendant Hamilton knew that Welch was engaged in a criminal enterprise involving stolen goods, and helped Welch launder the stolen goods, but did not know specifics of the victims or the burglaries. Nevertheless, she was civilly liable for a murder Welch committed in the course of one of his burglaries, despite being ignorant of the burglary and the murder—both as a civil conspirator and for aiding and abetting. "Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." *Id.* at 477 (citing authority). And a murder was a foreseeable consequence of stealing goods, even if Hamilton did not know how Welch was stealing the goods. *Id.* at 488. So too here, where it was certain the A15action planned to commit intentional torts in many places including Chicago, and previous blockades had caused gridlock; victims like Manhart were foreseeable.

Tides incorrectly argues (TB23) that if the tortfeasor would have engaged in the same tortious conduct even without the defendant's involvement, then Illinois courts hold that does not rise to substantial participation. But that misstates the law.[15] *Umble v. Sandy McKie & Sons, Inc.*, 690 N.E.2d 157, 158 (Ill. App. 1998), simply held that fixing a drunk driver's car did not constitute "substantial assistance" to engage in the tortious impaired driving; failing to prevent conduct was not encouraging the conduct—especially when the repair shop had no right to refuse to return a vehicle. *Simmons*

---

[15] It is also requires drawing unpled factual inferences against Manhart, and thus cannot be relied upon by Defendants. *Tamburo*, 601 F.3d at 700.

establishes substantial assistance in this case as a matter of law without requiring but-for causation.

In addition, the complaint alleges Tides conspired to promote and incentivize A15action in general. A75 ¶ 120. In a hub-and-spoke conspiracy, conspiring with the hub in the broader conspiracy makes a conspirator jointly and severally liable for damages foreseeably caused by the other spokes of the conspiracy, even if the defendant did not participate in that particular spoke. *Pinkerton v. U.S.*, 328 U.S. 640 (1946). For example, if C conspired with the hub of the conspiracy for spoke A's tortious asbestos distribution, and spoke B's related actions foreseeably caused injury, C would be liable for the full harm, even if it did not participate in spoke B of the conspiracy. *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888 (Ill. 1994). "A defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives, however, is liable as a conspirator." *Id.* at 894. "[O]nce the conspiracy is formed, all of its members are liable for injuries caused by *any* unlawful acts performed pursuant to and in furtherance of the conspiracy." *Id.* at 895. Whether or not establishing a "blockade" bail and legal defense fund aimed at reducing the cost of particular future criminal acts was itself tortious, and even if the legal defense fund would never possibly spend a penny in Chicago (which wasn't the case here), Tides' agreement to "further the objectives" of the illegal A15action nationwide creates liability in Chicago under Illinois conspiracy law if it was foreseeable that a "direct action" to "cause pain" in Chicago would do so. The conspiracy claims create traceability and personal jurisdiction by themselves. The complaint adequately pleads derivative claims against Tides, and personal jurisdiction and Article III jurisdiction follow.

3.    **The complaint adequately pleads derivative claims against NSJP, and there is personal jurisdiction over NSJP and WESPAC.**

While NSJP operates without incorporation, it is not an abstract concept beyond the reach of any court in the corporeal realm. Manhart pleaded that NSJP, along with JVP, selected Chicago as a target and was instrumental in coordinating plans and strategy for A15action. A61 ¶¶ 59-60. NSJP and its chapters and affiliates share resources, and Chicago-area chapters are "are centrally organized under the umbrella of SJP Chicago." A49-A50 ¶ 13. The complaint thus alleges centralized governance and coordinated direction from NSJP to its Chicago affiliates. NSJP tries (NSJPB8) to deflect blame on SJP Chicago, but a reasonable inference from the complaint is that it is just an internal division of NSJP with no separate corporate identity. NSJP does not provide evidence that SJP Chicago can even be sued. *Cf. Schiavone*, 477 U.S. at 28; *Vincent*, 485 F.3d at 921-22. Unlike the intended defendant in *Schiavone*, the identity of the unincorporated defendant and their structure is *not* "readily ascertainable." 477 U.S. at 25. The complaint's remark about "formal[] control" simply stresses that NSJP is entirely unformalized, for the apparent purpose of evading accountability. *Cf. New York v. Operation Rescue National*, 80 F.3d 64, 70-71 (2d Cir. 1996) (no error in finding contempt for "similarly constituted groups of individuals mov[ing] fluidly between multiple unincorporated associations that share the same basic leadership and goals").

NSJP's own website supports this reasonable inference.[16] To the extent SJP Chicago is somehow a separate entity from NSJP, Manhart raises a plausible inference

---

[16] The NSJP website says it "seeks to empower, unify, and support the Student Movement for Palestinian" ("Our Purpose") describing local chapters as "National Network of SJP Chapters"; NSJP "aims to craft an ideologically, politically, and *organizationally unified* Student Movement." https://www.nationalsjp.org/about/

that it was acting as an agent under principal NSJP's instructions, as well as an independent reasonable inference that NSJP provided substantial assistance and encouragement to SJP Chicago in the latter's illegal activities. A49-A50 ¶ 13; *Simmons*, 925 N.E.2d at 1101. SJP Chicago, acting under the NSJP umbrella, repeatedly engaged in road blockades without being told to stop the blockades or stop using the SJP name in taking credit for the blockades. A58-A59 ¶¶ 45-48 (describing three prior SJP Chicago blockades, at least two of which were expressly endorsed by NSJP). When a national organization coordinates and implements a plan to blockade a specific interstate leading to an Illinois airport, there is purposeful direction toward Illinois. This satisfies the minimal *prima facie* showing of personal jurisdiction. *Tamburo*, 601 F.3d at 700 (all factual disputes are resolved in the plaintiff's favor).[17]

The complaint pleads WESPAC acted as NSJP's fiscal sponsor and exercised or was required to exercise control and discretion over its use of funds. A50, A59-A60 ¶¶ 14, 50-51. To the extent that NSJP is legally indistinguishable from WESPAC (*see* Section III.A above), specific personal jurisdiction exists for WESPAC. It also exists with respect to WESPAC's breach of its duty to supervise. NSJP has Illinois chapters, announced its intent to commit a tort in Illinois (making it foreseeable to WESPAC), and

_____

(emphasis added, found on webpage under the "Our Vision" pulldown) (last accessed Mar. 5, 2026). Manhart is entitled to a reasonable inference of unity or other control.

Manhart does not "disclaim" the possibility that NSJP and SJP Chicago may have an agent-principal relationship. *Contra* NSJPB8. His pleadings instead make a *prima facie* case of unity or at least material cooperation based on their own publicity.

[17] Even if Manhart's pleadings were mistaken, "[g]enerally, courts grant jurisdictional discovery if the plaintiff can show that the factual records is at least ambiguous or unclear on the jurisdiction issue." *Ticketserve, Inc. v. Viagogo, Inc.*, 656 F. Supp. 2d 775, 782 (N.D. Ill. 2009).

then committed that tort. These facts tie WESPAC's conduct to Illinois. In *Calder v. Jones*, a Florida tabloid and its editor faced California jurisdiction for a defamatory article targeting a Californian; their "intentional, and allegedly tortious, actions were expressly aimed at California." 465 U.S. 783, 789-90 (1984). A15action's announced plans to blockade Chicago means WESPAC's failure to supervise NSJP satisfies *Calder*'s "effects test" for specific personal jurisdiction.

Jurisdiction is also warranted under the *Burger King* "fair play" factors: burden on the defendant; the forum's interest; the plaintiff's interest; judicial efficiency; and interstate policy. 471 U.S. at 477. WESPAC faces a manageable burden litigating in Illinois, given modern travel and the nationwide scope of its sponsorship of NSJP. Illinois has a strong interest in remedying torts on its highways. Manhart seeks local redress. And efficiency favors one forum for related claims. Policy supports holding sponsors accountable for supervised torts, aligning with IRS oversight duties.

<div align="center">~~~</div>

Counts III through VIII should be restored against all defendants.

## C.    The complaint does not implicate the First Amendment.

Defendants (*e.g.*, TB20 n.16) and *amicus* Jump (JumpB3) try to imply that the complaint here chills First Amendment rights or targets protected speech. Bosh and nonsense. It is not a coincidence that the Defendants and amicus cite only broad general cases about chilling, and fail to mention relevant Supreme Court and Seventh Circuit precedent directly on point.

There is a distinction between speech and conduct. *Madsen v. Women's Health Ctr.* 512 U.S. 753, 773-74 (1994) (blockading abortion clinics). The "First Amendment does not extend to joining with others for the purpose of depriving third parties of their lawful rights." *Id.* at 776. The First Amendment only extends to those who "engage in peaceful nontrespassory picketing which does not deprive others of their personal

liberty." *United States v. Wilson*, 154 F.3d 658, 663 (7th Cir. 1998) (blockading abortion clinics). "[T]here is no constitutional protection for association for illegal purposes." *Id.* at 665.

The Supreme Court has long held that freedom of speech doesn't apply to blockades of public streets or buildings. "A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations." *Cox v. Louisiana*, 379 U.S. 536, 555 (1965).

*Mancavage v. City of Chicago* provides a good example. 659 F.3d 626 (7th Cir. 2011). Religious proselytizers wished to preach to visitors to the Gay Games at Soldier Field and Wrigley Field. Though they were doing so on the sidewalks, a traditional public forum, it did not violate the First Amendment for police to order the plaintiffs not to impede the pedestrian traffic flow, and then arrest the plaintiffs when they refused to move. *Id.* at 630-31; *accord* ACLU of Illinois, *Can protestors block traffic or entrances to a building to draw attention to their cause?* (Mar. 15, 2012) ("Protesters do not have a First Amendment right to block pedestrian or vehicle traffic").

The Seventh Circuit has elsewhere addressed this. *Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001), *rev'd on other grounds*, *Scheidler v. Nat'l Org. for Women, Inc.*, 537 US 393 (2003). *Scheidler* rejected a First Amendment defense in a civil RICO case against activists orchestrating a nationwide campaign that included blockading clinic entrances. While peaceful picketing and economic pressure constitute protected speech, the act of "blocking access to clinics" is "illegal conduct unprotected by the First Amendment." *Id.* at 703. "As the Supreme Court has explained, 'violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact ... are entitled to no constitutional protection.'" *Id.* at 702 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984)). The Supreme Court reversed

*Scheidler* on its statutory interpretation, but its First Amendment analysis remains good law. *E.g.*, *Boim v. Quranic Literacy Inst. & Holy Land Found.*, 291 F.3d 1000, 1024 (7th Cir. 2002) ("That Hamas may also engage in legitimate advocacy or humanitarian efforts is irrelevant for First Amendment purposes if [defendants] knew about Hamas's illegal operations."). A road blockade "produce[s] special harms distinct from their communicative impact" and gets no First Amendment protection. *Scheidler*, 267 F.3d at 702.

Neither the *amicus* nor any of the Defendants address this binding precedent. Accordingly, references to the First Amendment or the risk of danger to "protest activity" are meritless.

## V.    Reassignment is appropriate under Circuit Rule 36.

Contrary to Tides' claim (TB45), Manhart's request for discretionary reassignment is not "extraordinary." Reassignment doesn't require meeting the § 455 recusal standard, and this Court routinely reassigns cases on remand without any hint of a § 455 violation or a finding of "bias." For example, in *Pearson v. Target Corp.*, a litigant made a novel argument for disgorgement. The Seventh Circuit reversed the district court's critical denial of the motion, and reassigned the case. 968 F.3d 827 (7th Cir. 2020). This Court regularly exercises its discretion to reassign cases in procedural postures long before any trial. *E.g.*, *Priddy v. Health Care Service Corp.*, 870 F.3d 657 (7th Cir. 2017) (Rule 23(f) appeal of class certification); *Weddington v. Zatecky*, 721 F.3d 456 (7th Cir. 2013) (habeas dismissal); *Enoch v. Tienor*, 570 F.3d 821 (7th Cir. 2009) (fee award); *Askew v. Sheriff of Cook County, Ill.*, 568 F.3d 632 (7th Cir. 2009) (Rule 19 dismissal); *Holmes v. Village of Hoffman Estate*, 511 F.3d 673 (7th Cir. 2007) (summary judgment); *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277 (7th Cir. 2002) (Rule 23(e) settlement approval).

Tides cites (TB45) a couple of twentieth-century cases declining reassignment, but it is misleading to say those cases "reversed an award of sanctions," as those cases also affirmed the sanctions in part. *Triad Assocs., Inc. v. Chi. Hous. Auth.*, 892 F.2d 583, 596 (7th Cir. 1989); *Samuels v. Wilder*, 906 F.2d 272, 275–76 (7th Cir. 1990). A better analogy would be *Felton v. City of Chicago*, where the district court improperly dismissed a *pro se* complaint and issued sanctions based on its own faulty *sua sponte* independent research. 827 F.3d 632 (7th Cir. 2018) (reassigning on remand).

Manhart identified (OB36-OB38) six examples of the district court being incorrectly critical of his arguments to the point of issuing sanctions against Manhart's attorneys. *Accord* AGB12-AGB16; MIB12-MIB13. Tides makes no substantive defense of the district court's reasoning for sanctions on any of these questions beyond half-heartedly asserting (TB45) it to be "careful" and "reasonable[]." Not only that, but for some of Manhart's arguments the district court deemed frivolous, Defendants abandon on appeal any defense of the district court's position on the merits, effectively conceding that Manhart was sanctioned for positions that were so clearly correct, it wasn't worth any brief space to defend the district court. (The forfeitures are even more striking because Defendants spend thousands of words on arguments for affirmance on alternative grounds squarely foreclosed by Rule 8.) For example, Defendants do not contest that the district court erred (A37 n.11) in holding Illinois does not permit a conspiracy claim for willful and wanton negligence, much less sanctioning Manhart for pleading it. OB31; OB36. They do not defend the district court's interpretation (A14) of the Illinois Vehicle Code that one can park a car on an interstate Illinois highway without consequence for "at least a week." *Compare* Section I.B above; OB20-OB21. And Defendants do not dispute that the district court issued sanctions for certain arguments without any notice or opportunity to respond.

Reassignment is appropriate on remand.

**Conclusion**

This Court should vacate and reverse the district court's order and opinion, and reinstate all counts of the complaint. Circuit Rule 36 should apply on remand.

Dated:  March 5, 2026                     Respectfully submitted,

                                          HAMILTON LINCOLN LAW INSTITUTE

                                          /s/*Theodore H. Frank*_____
                                          Theodore H. Frank
                                          1629 K Street, NW, Suite 300
                                          Washington, DC 20006
                                          (703) 203-3848
                                          ted.frank@hlli.org

                                          *Attorneys for*
                                              *Plaintiff-Appellant Christopher Manhart*

**Certificate of Compliance with Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 30(d)**

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, Type Style Requirements, and Appendix Requirements:

1.    This brief complies with the type-volume limitation of Cir. R. 32(c) and the Court's order of January 6, 2026, because:

This brief contains 12,597 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 12-point Palatino Linotype font.

3.    All materials required by Cir. R. 30(a) & (b) are included in the appendix.


Executed on March 5, 2026.

/s/ *Theodore H. Frank*

**Proof of Service**

I hereby certify that on March 5, 2026, I caused to be electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Seventh Circuit using the CM/ECF system pursuant to Cir. R. 25(a), thereby effecting service on all counsel of record, who are registered for electronic filing.

<span style="text-align:right">*/s/ Theodore H. Frank*</span>