# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

Before
FRANK H. EASTERBROOK, Circuit Judge
KENNETH F. RIPPLE, Circuit Judge
JOHN Z. LEE, Circuit Judge

| | |
|---|---|
| CHRISTOPHER MANHART, *individually and on behalf of all others similarly situated*, <br><br> *Plaintiff-Appellant*, <br><br> v. <br><br> WESPAC FOUNDATION, INC., *et al.*, <br><br> *Defendants-Appellees*. | No. 25-2382 <br><br> Appeal from the <br> Northern District of Illinois, <br> Eastern Division <br> Case No. 1:24-cv-8209 <br><br> Judge Mary M. Rowland |

**Appellant Manhart's Supplemental Memorandum re Jurisdiction**

As the Court ordered on April 9, 2026, Manhart submits this supplemental memorandum on jurisdiction, specifically numerosity and the amount in controversy.

The complaint asserts jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). In particular, paragraph 10 of the operative complaint states:

> There are over a thousand Class Members and the aggregate amount in controversy exceeds Five Million Dollars ($5,000,000) exclusive of interests and costs.

A-48; *accord* A-66-67 ¶¶ 83-84. The class is preliminarily defined as:

1

all non-Illinois residents who were either drivers or passengers of vehicles traveling on the morning of April 15, 2024, between the hours of 7:00 a.m. and 10:00 a.m. in Chicago, Illinois on Interstate 190 and nearby highways that connect to Interstate 190, who were confined in their vehicles because of the activists blockading traffic on Interstate 190 as it approaches the terminals at O'Hare International Airport.

A-66 ¶¶ 80-82. (While some members of this proposed class who were able-bodied passengers may not qualify for a false imprisonment claim as defined by the Restatement to the extent it was a reasonable means of escape to walk with one's luggage to the airport, passengers would still have claims under Illinois law under *Cowper v. Nyberg*, 28 N.E.3d 768 (Ill. 2015), and *Morris v. Faulkner*, 361 N.E.2d 112, 46 Ill. App. 3d 625, 627-29 (1977). *See* Opening Br. 11-12, 17-19, 24-30; Reply Br. 7, 12-15.)

At oral argument, the Court suggested that the allegation is implausible because of the lack of out-of-state "license plates" on Illinois roads, so, it reasoned, the class would be a tiny percentage of the cars trapped on the road. This estimate overlooks the particular Illinois roads at issue here; defendants deliberately blockaded the terminus of the Interstate 190 highway that feeds into O'Hare Airport. The cars on the road—which include not just plaintiffs like Manhart driving to park at O'Hare, but people returning rental cars or taking taxis or rideshares—were *going to the airport*, and people going to the airport, especially in a major tourist destination like Chicago, where most flyers going to O'Hare are not local, are disproportionately from out of state.

We know the number of people taking flights from O'Hare on a typical day during the relevant time. We know from survey data what percentage of those people are local and what percentage were on connecting flights, and can deduce that the rest are potential class members if they were in a vehicle on or near I-190. We can calculate from Chicago's comprehensive tracking of individual rideshare trips how many trips to the airport were materially delayed on April 15 by the blockade (and can refine this

anonymized data further through discovery for both a more precise number and individualized class notice). We can estimate from studies at other airports the number of passengers in a typical rideshare trip. We can estimate from survey data of other large American airports approximately how many of the departing passengers had traveled to the airport in rental cars that the blockade might have interfered with them returning. We can estimate from flight schedule information how many of those April 15 passengers would have tried to return their cars during the blockade. From all of this we can get a conservative lower bound of the number of class members that readily satisfies numerosity—even before we add to that the non-zero number of class members driving their own vehicles, taking conventional taxicabs, or taking shuttle van services from downtown. To avoid any doubt, we confirm this lower bound through an expert report of Katherine Litvak and Bernard Black. *See* Section I below.

The amount in controversy is also met because, for any class size that satisfies numerosity, this circuit's precedent, approved by the Illinois Supreme Court, permits substantial punitive damages for intentional torts that would meet the $5,000,000 jurisdictional minimum. *See* Section II below.

For these reasons, we believe that the operative complaint had already satisfied the Fed. R. Civ. Proc. 8 requirement of stating a plausible jurisdictional basis. But because this memorandum will be Manhart's only chance to demonstrate jurisdiction to the satisfaction of the Court, we use 28 U.S.C. § 1653 to make an amendment to add subparts to Paragraph 10 and clarifications to Paragraph 80 of the operative complaint summarizing the discussion in this memorandum and in the attached Expert Report of Katherine Litvak and Bernard Black. *See* Section III below.

There is federal jurisdiction under the Class Action Fairness Act.

**I.      The proposed class satisfies numerosity.**

   **A.      The Seventh Circuit has a broader definition of numerosity under Rule 23(a) than the Class Action Fairness Act's class-size minimum.**

Under Rule 23(a)(1), a class may be certified only if "the class is so numerous that joinder of all members is impracticable." A "forty-member class is often regarded as sufficient to meet the numerosity requirement." *Orr v. Shicker*, 953 F.3d 490, 498 (7th Cir. 2020) (internal quotation and citation omitted). But even fewer than forty members of a class can satisfy Rule 23(a) numerosity: "The key numerosity inquiry under Rule 23(a)(1) is not the number of class members alone but the practicability of joinder." *Anderson v. Weinert Enterprises, Inc.*, 986 F.3d 773, 777 (7th Cir. 2021) (affirming denial of certification of 37-member class because of lack of geographic dispersion, the ability to easily contact class members, and the availability of statutory attorneys' fees in an individual case). Joinder would not be practicable here: the class, like the tourists who visit Chicago and then travel to the airport, is geographically diverse.

That said, it is not enough to merely satisfy Rule 23(a)(1); the Class Action Fairness Act itself has a jurisdictional minimum of one hundred class members. 28 U.S.C. § 1332(d)(5)(B).  But as stated in the complaint, and demonstrated below, the number of class members is well over a thousand.

   **B.      There are thousands of class members, so the class satisfies numerosity.**

For belt-and-suspenders reasons, we submit the attached Expert Report of Katherine Litvak and Bernard Black to calculate a lower bound of the class. Litvak and Black, professors at Northwestern University Pritzker School of Law (with Black also a professor at Northwestern University Kellogg School of Management), have extensive publication experience in empirical studies, and have previously testified as experts. They determine a lower bound for the size of the class by calculating numbers for two of the ways class members traveled to the airport and were trapped or delayed by defendants' tortious behavior: class members who attempted to travel to the airport by

rideshare; and class members who traveled to the airport to return rental cars rented at the airport. Time constraints and lack of third-party discovery prohibit as of April 23 expert calculations of class members dropped off by friends; who traveled by taxi; or who, like Manhart, traveled by their own automobile with an intent to park at the airport, but we know that these numbers are greater than zero.

Each of the two estimates by itself demonstrates numerosity. Together, they show thousands of class members—and this is a lower bound, because there are other class members who are not counted by either method.

> **1.** **At least 992 class members traveled to the airport by rideshare and were delayed by defendants' actions.**

Proposition #1: The City of Chicago publishes anonymized, trip-level data for all transportation network provider ("rideshare") trips, including pickup and drop-off census tracts and timestamps.[1]  These data include drop-off locations defined by Census tract area, and two areas include O'Hare Airport and surrounding facilities including the Multi-Modal Facility (which includes car rentals and a people-mover tram called the Airport Transit System that passengers can take to airport terminals).

Proposition #2: Using this dataset, one can identify, as Professors Litvak's and Black's expert report did, all rideshare trips with drop-offs at O'Hare during the morning of April 15, 2024, and compare those trips to trips occurring at the same times on comparable control days.  Similar comparisons may be made for control groups, which were (i) the immediately adjacent Mondays (April 8 and April 22, 2024) for aggregate comparisons and (ii) all Mondays in April (April 1, 8, 22, and 29, 2024) for ride-level matching analysis.

---

[1] City of Chicago, Transportation Network Providers – Trips (2023-2024), Chicago Data Portal, https://data.cityofchicago.org/Transportation/Transportation-Network-Providers-Trips-2023-2024-/n26f-ihde/about_data.

Proposition #3**:** Disrupted rideshare trips can be isolated by comparing the adjacent Mondays, which shows few trips on normal weeks span one hour between pickup and drop-off as rounded in the publicly-accessible data.  Counting all trips on April 15 with at least a one-hour gap yields 1,585 trips. This estimate would not include shorter trips that were nonetheless delays, but it also includes longer trips that would occur anyway. To produce a more conservative estimate, the average number of lengthy trips (those with longer than an hour gap) from the two adjacent weeks can be subtracted from the table, resulting in 1,401 trips delayed beyond the average of adjacent weeks. An even more accurate estimate can be made, as the experts did, by matching trips with identical pickup Census tract and drop-off time from the other four weeks in April 2024 (and for trips with fewer than three matching origin/drop-off time data, simply assuming the average length of trip for that time), and applying this as a filter to the initially-identified 1,585 trips.  Doing this, and requiring every trip to be delayed more than 15 minutes beyond the benchmark results in a more refined estimate of 1,528 rideshare vehicles delayed.

Proposition #4: Empirical airport studies show that rideshare and taxi vehicles typically carry between 1.2 and 1.8 passengers per vehicle, with a central estimate of approximately 1.5 passengers per vehicle.[2] Applying this occupancy range to the

---

[2] *See*, *e.g.*, Transportation Research Board, *Ground Access to Major Airports by Public Transportation*, ACRP Report 40, Washington, DC, National Academies Press (2010), https://crp.trb.org/acrp0715/wp-content/themes/acrp-child/documents/038/original/ACRP_40_Airport_Curbside_and_Terminal_Area_Roadway_Operations.pdf (averaging four prior studies and reaching 1.5 average); Karina Hermawan & Amelia C. Regan, *Impacts on Vehicle Occupancy and Airport Curb Congestion of Transportation Network Companies at Airports*, Transportation Research Record: Journal of the Transportation Research Board 2672, no. 23 (2018) (1.2–1.4); Broward County Aviation Department, Fort Lauderdale–Hollywood International Airport Master Plan Update: Appendix C—Ground Transportation Data, Fort Lauderdale, FL (2015) (1.7–1.8).

estimated number of delayed rideshare vehicles yields approximately 1,681 to 2,853 affected rideshare passengers, with a central estimate of 2,292 passengers.

Proposition #7: Passenger survey data indicate that a majority of passengers traveling to O'Hare are not Illinois residents. Specifically, approximately 21% of passengers are local and 49% are connecting, implying that only about 41% of originating passengers are local.[3] (21% divided by (100%-49%=57%) = 41%.)

Proposition #8: Some "non-local" passengers originating at O'Hare are Illinois citizens from elsewhere in the state who travel a long distance to O'Hare; some "local" passengers are from Indiana or Wisconsin regions in the Chicago Metropolitan Statistical Area, where the population is approximately 9% non-Illinois residents. We assume for the sake of simplicity that these offsetting numbers are immaterial when it comes to flights originating at O'Hare. If so, 59% (100% minus 41% from Proposition #7) of passengers originating at O'Hare are not Illinois citizens.

Proposition #9: Applying this estimate that 59% of rideshare passengers are non-Illinois citizens yields approximately 992 to 1,683 non-Illinois rideshare passengers adversely affected by the blockade, with a central estimate of 1,352 affected class members.

---

[3] Unison Consulting, *Concession Preference Survey, Chicago O'Hare – Terminals 1 and 3* (2023), https://www.flychicago.com/ORDerUp/assets/documents/ Enplanements%20Concessions%20Sales%20and%20Other%20Statistical%20Data/2023% 20Passenger%20Survey%20Results.pdf.

**2. At least 1,278 class members traveled to the airport to return rental cars during the relevant time frame, and would have been injured by the blockade.**

Proposition #1: 3,059,133 passengers departed O'Hare in April 2024, based on the Bureau of Transportation Statistics *TransStats* database.[4] We assume for the sake of simplicity that 1/30 of this number intended to leave O'Hare on April 15, which is reasonable because April 15 was actually slightly above the average for nationwide passenger screenings according to the Transportation Security Administration.[5] This implies 101,971 passengers per day.

Proposition #2: A total of 1,248 passenger flights departed Chicago based on the Flightera database, which shows the scheduled departure times of each flight.[6] Applying a simplifying assumption (that we have no reason to believe to be biased) that every flight contains the average number of passengers for the day, one can allocate the passengers departing the airport at each travel time.

Proposition #3: Assuming that rental car drivers will want to aim to return their vehicles 90 minutes before the scheduled flight time, and given that the disruption was fully evident at 8am and that the class definition requires one to have been hindered on the nearby highways by 10am, we find the relevant range of scheduled flight departure

---

[4] Queries may be run through Bureau of Transportation Statistics, *TransStats*, https://www.transtats.bts.gov/Data_Elements.aspx?Data=1. There appears to be no way to directly link to a particular query, but it is "Passengers" for "All U.S. and Foreign Carriers" with an origin of "Chicago, IL: Chicago O'Hare International." This figure includes only originating passengers, not connections.

[5] Transportation Security Administration, *2024 checkpoint travel numbers*, https://www.tsa.gov/travel/passenger-volumes/2024.

[6] Flightera, *Chicago O'Hare International Airport*, departure data for April 15, 2024, https://www.flightera.net/en/airport/Chicago/KORD/departure/2024-04-15%20%2008_00.

times to be 9:30-noon, and so estimate the number of passengers intended to depart from flights between these times as 14,950 based on the Flightera data.

Proposition #4: Empirical studies of airport ground transportation indicate that between 9% and 15% of departing passengers at large U.S. airports arrive by rental car.[7] Applying this range to the number of departing passengers implies 1,346 to 2,243 passengers returned via rental car, with a central estimate of 1,794.

Proposition #5: Car rentals at airports are subject to special fees and taxes above and beyond taxes on other car rentals, because politicians prefer to shift tax burdens onto non-locals; thus, locals, to the extent they rent cars, prefer to do so from locations that are not at the airport. For example, there is an $8/day Customer Facility Charge for car rentals at O'Hare. One can thus assume then that the vast majority of rental-car users at major airports are non-local travelers, and even considering the small number of flyers from downstate Illinois and locals who might have rented cars for other reasons we conservatively estimate 95% of passengers in airport rental car returns to be non-Illinois citizens, resulting in 1,278 to 2,131 class members, with a central estimate of 1,705.

> **3.** **Either estimate by itself satisfies numerosity. The combined lower bound of 2,270 also satisfies numerosity, while materially understating the size of the class.**

Each of these estimates is plausible. Either's lower bound—992 or 1278—satisfies numerosity. Combining these two types of class members, Professors Litvak and Black estimate 2,270 to 3,814 class members from rideshares and rental car returns with a central estimate of approximately 3,057 non-Illinois class members. Because of the press of time, the experts did not calculate other categories of class members adversely

---

[7] Transportation Research Board, *Accommodating Peer-to-Peer Carsharing at Airports: A Guide*, ACRP Research Rep. 274, at ch. 8 (Nat'l Acads. of Scis., Eng'g & Med. 2024), https://www.nationalacademies.org/read/27983/chapter/9.

affected by the illegal blockade. Thus these estimates are conservative because they do not include taxis, private vehicles, and buses, which also must have carried some additional number of non-Illinois citizens during the blockade. Several of these categories are likely material. For example, taxis and private drop-offs by friends and family together account for a meaningful share of airport ground access at large U.S. airports.[8] Additionally, out-of-state drivers in their own vehicles like the named plaintiff Manhart are not included within the experts' estimate whatsoever. Accordingly, the totals presented here should be understood as a lower bound on the number of affected non-Illinois citizens, which is still in the thousands of class members.

A class size of thousands of geographically dispersed class members satisfies both numerosity and § 1332(d)'s minimum number of class members. *Cf. Bennett v. Dart*, 53 F.4th 419 (7th Cir. 2022) (*per curiam*) (reversing decertification of class the district court found to consist of 200 prisoners in one facility because of possibility of Rule 23(c)(4) issue class without any mention of or apparent challenge to numerosity or class size).

## II. The amount in controversy is well over $5,000,000.

### A. Both the Seventh Circuit and Illinois permit sizable punitive damages for even nominal damages for intentional torts.

As discussed in page 37 of Manhart's opening brief, in *Mathias*, this Court affirmed an Illinois-state-law federal jury award of $5,000 in compensatory damages

---

[8] *See for example*, Metropolitan Washington Council of Governments, *Washington–Baltimore Regional Air Passenger Survey: General Findings Report* (2019) (showing 24% rideshare, 9% taxi, and 51% auto, which includes rentals, drop-offs, and long-term parking among the three D.C.-area airports), https://www.mwcog.org/newsroom/2020/04/07/how-did-people-get-to-the-airport-in-2019-and-how-much-were-they-willing-to-spend/.

and $186,000 in punitive damages per plaintiff for the minor injury of bedbug bites and inconvenience as consistent with Supreme Court limits on punitive damages in *State Farm*. *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003).

> [O]ne function of punitive-damages awards is to relieve the pressures on an overloaded system of criminal justice by providing a civil alternative to criminal prosecution of minor crimes. … [T]o limit the plaintiff to compensatory damages [for a minor dignitary injury] would enable the defendant to commit the offensive act with impunity provided that he was willing to pay, and again there would be a danger that his act would incite a breach of the peace by his victim…

> [I]f the total stakes in the case were capped at [five times compensatory damages], the plaintiffs might well have had difficulty financing this lawsuit…

*Id.* at 676-77. According to the Bureau of Labor Statistics CPI inflation calculator, $186,000 in October 2003 dollars is $319,388 in January 2025 dollars[9]—and *Mathias* was evaluated as a case of "gross negligence" or "recklessness" rather than the intentional wrongdoing alleged here. *Id.* at 674. *Mathias* is not an outlier decision. The Fifth Circuit upheld $125,000 in statutory-cap punitive damages for each of eight plaintiffs despite only nominal compensatory damages. *Abner v. Kansas City S. R. Co.*, 513 F.3d 154 (5th Cir. 2008); *accord Kirkpatrick v. Strosberg*, 894 N.E.2d 781, 787, 789 (Ill. App. 2008) (affirming $300,000 in total punitive damages for $100 nominal damages for four plaintiffs each, despite failure of three plaintiffs to prove actual damages); *id.* at 794-96 (citing cases). "[L]ow compensatory damages awards may support higher ratios where a particularly egregious act has resulted in a small amount of economic damage, or where an injury is hard to detect and the harm is difficult to determine." *International*

---

[9] The jurisdictional minimum is evaluated at the time of the filing of the operative complaint.

*Union v. Lowe Excavating Co.*, 870 N.E.2d 303, 322, 324 (Ill. 2006) (remittitur of punitives to 11:1 ratio where conduct was only "minimally reprehensible") (citing *Mathias* favorably).

**B.** **Because the complaint alleges willful and wanton conduct to maliciously injure class members, even nominal damages plus punitive damages satisfies the amount in controversy.**

Using the *Abner* number of $125,000 punitive damages per plaintiff plus nominal damages or the *Kirkpatrick* number of $75,000 punitive damages per plaintiff, the Class Action Fairness Act minimum of 100 members would readily reach the $5 million amount in controversy with only $50,000 in punitive damages/class member. If we take the lower bound of 2,270 class members calculated by Professors Litvak and Black, a Manhart class would need less than $2,203 in punitive damages per plaintiff to reach the jurisdictional minimum. Given the plausible allegations of intentional reprehensible wrongdoing that will subject a plaintiff to punitive damages, the $5,000,000 amount in controversy is plausible for any class where numerosity is satisfied.

**III.** **Manhart moves for a 28 U.S.C. § 1653 amendment to avoid any uncertainty.**

For these reasons, we believe that the operative complaint had already satisfied the Fed. R. Civ. Proc. 8 requirement of stating a plausible jurisdictional basis; normally, a party's pleading asserting jurisdiction "need not contain evidentiary submissions." *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 135 S. Ct. 547, 551 (2014) (removal under Class Action Fairness Act). While defendants cannot concede federal jurisdiction where it does not exist, it is certainly of some relevance that, though defendants felt it worthwhile to buck controlling precedent and make a frivolous First Amendment argument in the district court; a frivolous Article III argument in both the district court and appeals court; and a frivolous Rule 8 argument about the specificity of the complaint in both courts, there was never a hint of challenging § 1332(d) requirements in either the district court or this Court. And defendants' filing today will

be the fourth time this Court has invited the defendants to make a supplemental filing on jurisdiction. Yet with all these free bites at the apple, defendants never challenged either element of § 1332(d) at issue in this memorandum, even as they asserted (and the district court agreed) that the demand for punitive damages by itself demonstrated improper purpose meriting sanctions.

But because this will be Manhart's last chance to demonstrate jurisdiction to the satisfaction of the Court, Manhart accepts in an abundance of caution the Court's invitation to use 28 U.S.C. § 1653 to move to amend the operative complaint. *Cf. Hart v. Schering-Plough Corp.*, 253 F.3d 272 (7th Cir. 2001); *Chandler v. Miller*, 520 U.S. 305, 313 n.2 (1997). Manhart seeks an amendment to Paragraph 10 of the operative complaint to add subsections and incorporate the expert report and to Paragraph 80 to avoid ambiguity by more clearly conforming the class definition to Illinois law, to the granular rideshare data, and to specify "citizens" rather than "residents":

> 10. There are over a thousand Class Members and the aggregate amount in controversy exceeds Five Million Dollars ($5,000,000) exclusive of interest and costs.
>
> a. **Numerosity.** The Expert Report of Katherine Litvak and Bernard Black, attached as Exhibit B to this Complaint, calculates a conservative lower bound of the class size such that the class size is over 2,270 members, and probably over 3,057.
>
> i. For rideshare vehicles, the experts reviewed detailed trip-level data including all rideshare trips with dropoffs at O'Hare and its facilities over the relevant period. Based on disruption clearly seen in the data, they estimate approximately 1,401 to 1,585 rideshare vehicles delayed near O'Hare prior to 10:00, with a central estimate of 1,528. Applying empirically supported vehicle occupancy rates per vehicle, and assuming that only 59% of these originating passengers were non-Illinois citizens based on O'Hare

13

survey data, the experts estimate that the number of delayed rideshare vehicles translates to 992 to 1,683 non-Illinois rideshare passengers, with a central estimate of 1,352.

ii. For rental-car users, the experts estimate from surveys at similar large airports that 9% to 15% of departing passengers during the affected time window arrived via rental car. The experts estimate the number of passengers who attempted to reach the airport during relevant times by estimating the total number of O'Hare-departing passengers based on monthly figures of O'Hare originating passengers extrapolated onto the actual log of flights that departed April 15, 2024. This suggests approximately 14,950 departing passengers during the hours of actual disruption confirmed by the rideshare trip data. This yields 1,346 to 2,243 rental-car passengers and drivers, of whom the experts conservatively estimate 95% are non-Illinois citizens, resulting in 1,278 to 2,131 non-Illinois rental-car passengers with a central estimate of 1,705.

iii. Combining these two types of class members, the experts estimate 2,270 to 3,814 class members from rideshares and rental car returns with a central estimate of approximately 3,057 non-Illinois class members.

iv. These estimates are highly conservative because they do not include taxis, private vehicles, and buses, which also must have carried some additional number of non-Illinois residents during the blockade. Several of these categories are likely significant. For example, taxis and private drop-offs by friends and family together account for a meaningful share of airport ground access at large U.S. airports. Additionally, out-of-state drivers in their own vehicles like the named plaintiff Manhart are not included within the experts' estimate whatsoever. Accordingly, the totals presented here should be understood as a lower bound on the number of

affected non-Illinois citizens, which is still in the thousands of class members.

v. Manhart reasonably relies on the calculations and sources and estimates of the experts to assert in good faith that the class size is in the thousands.

b. **Amount in Controversy**. At the lower bound of 2,270, even if class members could prove only nominal damages, the $5,000,000 amount in controversy would be met with punitive damages of $2,202.65 per plaintiff. Even if the expert report erred by more than an order of magnitude, and the class size is only 200, the jurisdictional minimum would be met with punitive damages of only $25,000 per plaintiff, well below what Illinois and federal courts have permitted for reprehensible behavior intended to cause injury even when damages are merely nominal.

…

80. Manhart brings this action individually and on behalf of all persons as the Court may determine to be appropriate for class certification under Federal Rule of Civil Procedure 23. Manhart seeks to represent a Class of persons preliminarily defined as: all non-Illinois citizens who were either drivers or passengers of vehicles traveling on the morning of April 15, 2024, between the hours of 7:00 a.m. and 11:00 a.m. in Chicago, Illinois on Interstate 190 and nearby highways, who were confined in their vehicles or had their freedom of locomotion adversely affected because of the activists blockading traffic on Interstate 190 as it approaches the terminals at O'Hare International Airport.

These clarifications to the complaint should remove any doubt as to whether Manhart has adequately plausibly asserted jurisdiction.

**Conclusion**

There is federal jurisdiction over Manhart's complaint under the Class Action Fairness Act, which has plausibly alleged the numerosity of the class and that the amount in controversy exceeds $5,000,000.

Manhart's counsel will be happy to answer any follow-up questions the Court has in a supplemental oral argument or in another supplemental memorandum.

This Court should find jurisdiction, vacate and reverse the district court's order and opinion, and reinstate all counts of the complaint. Circuit Rule 36 should apply on remand.

Dated: April 23, 2026          /s/ *Theodore H. Frank*
                                    Theodore H. Frank (IL Bar. No. 6224948)
                                    HAMILTON LINCOLN LAW INSTITUTE
                                    1629 K Street, NW, Suite 300
                                    Washington, DC 20006
                                    Telephone: (703) 203-3848
                                    Email: ted.frank@hlli.org

                                    *Attorneys for Plaintiff-Appellant Manhart*

**Certificate of Service**

I certify that I electronically filed this Memorandum using the ECF system for the U.S. Court of Appeals for the Seventh Circuit, thus effecting service on all attorneys registered for electronic filing.

Dated: April 23, 2026

*/s/ Theodore H. Frank*